No.  14-35598 and 14-35816

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

JULIANNE PANAGACOS; et al,
Plaintiffs-Appellants
v.
CITY OF OLYMPIA, et al.,
Defendants-Appellees

On Appeal from the United States District Court
For the Western District of Washington
Case No.:  3:10-CV-05018-RBL

BRIEF OF APPELLEE CITY OF OLYMPIA, et al

John E. Justice
Law Lyman Daniel Kamerrer &
Bogdanovich, P.S.
P.O. Box 11880
Olympia, WA 98508
(360) 754-3480
jjustice@lldkb.com

Counsel for Defendants-Appellees
City of Olympia, Bjornstad, Lower,
Herbig, Nelson, Johnson, Costa,
Butler, Hall, Michel

November 20, 2015

**Table of Contents**

I.   STATEMENT OF ISSUES PRESENTED FOR REVIEW ...........................1

II.  STATEMENT OF THE CASE..................................................................1

    A.    Nature of the Case. ...................................................................1

    B.    Course of Proceedings and Disposition Below. ...................2

III. STATEMENT OF RELEVANT FACTS...................................................2

    A.    Factual History.........................................................................2

        1.    July 27, 2007 detention and arrest of Appellant Berryhill......2

        2.    *Terry* stop detention................................................................3

        3.    Arrest for disorderly conduct. ................................................4

    B.    November 2007 protests at the Port of Olympia..............................5

        1.    General description of events and challenges.........................5

        2.    Towery, Rudd and Colvin had no effect on Olympia Police tactics.........................................................................................6

        3.    November 8, 2007; pepper spraying of Appellant Dunn.........7

        4.    Alleged pepper "misting" over spray of Appellant Grande on November 7, 2007.................................................................9

        5.    November 10, 2007. ...............................................................10

            a.    Protester barricade at Port of Olympia Main Gate. ...10

            (1)    Pepper spraying of Appellant Robbins. ......................13

            (2)    Alleged pepper spraying of Appellant Garfield. ........14

            b.    Alleged pepper spraying of Appellant Garfield at 4th and Plum. ...................................................................15

            c.    "Sleeping Dragon" incident with Appellant Grande...16

            d.    Pepper spraying of Appellant Berryhill. ......................17

        6.    November 13, 2007................................................................18

        **a.**    **Women's sit down blockage of Stryker convoy.** ..........18

        **(1)**    **Sit down protest.** ...................................................18

        **(2)**    **Mass arrest of the women.** ...............................19

        **(3)**    **Arrest of Appellant Panagacos.** ....................20

        **(4)**    **Arrest and wrist hold on Appellant Robbins.**...........20

        **(5)**    **Appellant Panagacos' conditions during transport and holding complaints.** ...............................................22

        **b.**    **Stryker convoy's flanking movement; alleged pepper spraying of Appellant Grande.** .............................22

    **C.**    **Miscellaneous "harassment and/or surveillance" claims.**...........23

        **1.**    **Appellants Berryhill and Dunn.** ...........................24

        **2.**    **Appellant Robbins.** ..............................................25

    **D.**    **Other Olympia defendants.** ........................................25

        **1.**    **Detective Paul Lower.** ..........................................25

        **2.**    **Lieutenant James Costa.** ......................................26

        **3.**    **Commander Steve Nelson.** ....................................26

        **4.**    **City Manager Steve Hall.** ......................................27

**IV.**  **SUMMARY OF THE ARGUMENT** ..................................27

**V.**  **ARGUMENT** ...............................................................28

    **A.**    **Standard of Review.**.................................................28

    **B.**    **The Statute of limitations barred Mr. Berryhill's claims.** ..........29

    **C.**    **Qualified immunity.**.................................................31

    **D.**    **A claim for false arrest is defeated by probable cause.**...............34

        **1.**    **Berryhill.** ..............................................................36

            **a.**    *Terry* **stop.** .................................................36

            **b.**    **Arrest.** .........................................................37

        **2.**    **Panagacos and Robbins.**........................................37

    **E.**    **Use of force.** ...........................................................38

1. Appellant Dunn's pepper spraying on November 8, 2007. .41

2. Appellant Grande's alleged "misting" over spray..............41

3. Appellant Robbins' pepper spraying at the Main Gate......42

4. Appellant Garfield's alleged November 10 Main Gate incidental receipt of pepper spray.........................................43

5. Alleged pepper spraying of Appellant Garfield at 4th and Plum.........................................................................................44

6. Appellant Grande's "sleeping dragon" incident.................45

7. Appellant Berryhill's pepper spraying. ...............................48

8. Appellant's Robbins' wrist hold.............................................49

9. Appellant Panagacos' complaints re conditions and transport. .........................................................................................50

10. Grande's pepper spraying in the flanking movement.........50

F.   First Amendment. ...........................................................................52

G.   Other claims that were asserted in the complaint that were not challenged in response to the summary judgment motion are waived. .53

H.   Other Olympia defendants identified by Appellants for which no evidence or argument supports liability...................................................53

1. Detective Paul Lower.................................................................53

2. Lieutenant James Costa. ..........................................................54

3. Commander Steve Nelson. .......................................................54

4. City Manager Steve Hall. .........................................................54

5. Commander Tor Bjornstad. ......................................................55

I.   The District Court Correctly Awarded the Olympia Defendants their Costs..........................................................................................................55

1. Great Economic Disparity has not been Established. .........58

2. Issues in the Case Were Not Close and Difficult.................58

3. Appellants' case against Olympia Lacked Merit.................58

VI.  CONCLUSION ..................................................................................59

**Cases**

*Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034,
97 L.Ed.2d 523 (1987) …………………………………....31, 32, 33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986) .28, 29

*Boyles v. City of Kennewick,* 62 Wash.App. 174, 176, 813 P.2d 178, *review denied,*
118 Wn.2d 1006, 822 P.2d 288 (1991) …………………………30, 39-40

*Brinegar v. United States,* 338 U.S. 160, 176 (1949) …………………….……..35

*Dawson v. City of Seattle*, 435 F.3d 1054, 1070 (9th Cir. 2006) ……………….56

*Deleon v. City of Corpus Christi,* 488 F.3d 649, 655-56 (5th Cir. 2007) ……….38

*Doyle v. City of Medford*, 606 F.3d 667, 673 (9th Cir. 2010) …………….…..56

*First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-289,
88 S.Ct. 1575 (1968)…………………………………………………….28

*Ford v. Manufacturers Hanover Mortg. Corp.,* 831 F.2d 1520,
1523 (9th Cir. 1987)…….……………………………………………….31

*Gausvik v. Abbey,* 126 Wash.App. 868, 880, 107 P.3d 98, *review denied,*
155 Wn.2d 1006 (2005) ………………………………………….........30

*Graham v. Connor,* 490 U.S. 386 (1989) ………………………...….38, 39

*Haagen-Dazs Co., Inc. v. Double Rainbow Gourmet Ice Creams, Inc.*,
920 F.2d 587, 588 (9th Cir. 1990) …………………………….……57

*Hanson v. Snohomish,* 121 Wn.2d 522, 563-64, 852 P.2d 295 (1993) ……..34, 38

*Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) …………………….…..31

*Heckart v. City of Yakima,* 42 Wash.App. 38, 39, 708 P.2d 407 (1985) ……..29-30

*Illinois v. Gates,* 462 U.S. 213, 231 (1983) …………………………………35

*Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 678-679
    (9th Cir. 1963), *cert. denied*, 375 U.S. 922, 84 S. Ct. 267,
    11 L.Ed 2d 165 (1963) ……………………………………………56-57

*Jackson v. City of Bremerton,* 268 F.3d 646 (9th Cir. 2001) ……...……...39, 40

*Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1097-98, 89 L.Ed.2d 271
(1986) …………………………………………………………….……31

*Martinez-Serrano v. INS,* 94 F.3d 1256, 1259 (9th Cir.1996) ………………..29

*Mattos v. Agarano,* 661 F.3d 433, 442-43 (9th Cir. 2011) ………………………33

*McEuen v. Riverview Bancorp, Inc.*, 2104 U.S. Dist. LEXIS 72177
    (W.D. Wash. May 27, 2014) ……………………………………………57

*McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir. 1984) ……………….........35

*McKinney v. Tukwila,* 103 Wn. App. 391, 407 13 P.3d 631 (2000) ……..34, 36

*Nelson v. City of Davis,* 685 F.3d 867, 878 (9th Cir. 2012) ………………..39

*Pearson v. Callahan,* 555 U.S. 223, 236-43 (2009) ……………………………...32

*Pierson v. Ray,* 386 U.S. 547, 557 (1967) ……………………………………34

*Pinasco v. California*, 2012 U.S. Dist. LEXIS 178291, *3-4
    (E.D. Cal. December 15, 2012) ……………………………………………...57

*Rains v. State*, 100 Wn.2d 660, 665, 675 P.2d 165 (1983)………………………..38

*Rose v. Rinaldi,* 654 F.2d 546, 547 (9th Cir. 1981) ………………………………..29

*Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272
    (2001) …………………………………………………………………32, 33

*Skoog v. County of Clackamas*, 469 F.3d 1221 (9th Cir. 2006) …………..52, 53

*Smith v. City of Hemet,* 394 F.3d 689, 701 (9th Cir. 2005) ………………………39

*Southwick v. Seattle Police Officer John Does #s 1-5,* 145 Wash.App. 292, 297,
    186 P.3d 1089 (2008) …………………………………………………29, 30

*State v. Lund,* 70 Wn. App. 437, 444-45, 853 P.2d 1379 (1993) ………………..34

*State v. Terravona,* 105 Wn.2d 632, 643, 716 P.2d 295 (1986) ………………..34

*Terry v. Ohio,* 392 U.S. 1, 30 …………………………………………………..36

*U.S. v. Sokolow,* 490 U.S. 1, 8 (1989) …………………………………………36

*Western States Medical Center v. Shalala*, 238 F.3d 1090, 1093
    (9th Cir. 2001) …………………………………………………………28

*Young v. Akal,* 2013 WL 6326154 (W.D.La) ……………………………………40

*Young v. Cty. of Los Angeles,* 655 F.3d 1156, 1161 (9th Cir. 2011) …………40

**Statutes**

RCW 10.93.070 …………………………………………………………………..34

RCW 4.16.080(2) …………………………………………………………………29

RCW 4.16.100(1) …………………………………………………………………29

RCW 4.96.010(1) …………………………………………………………………30

RCW 4.96.020 …………………………………………………………………3, 29

RCW 4.96.020(1) ………………………………………………………………..30

RCW 4.96.020(2) …………………………………………………………………30

RCW 9.16.020 …………………………………………………………………..37

RCW 9A.16.020(1) …………………………………………………………………39

**Other Authorities**

28 U.S.C §1821   ……………………………………………………………2

28 U.S.C. §1920   …………………………………………………2, 56, 57

28 U.S.C. §1923   …………………………………………………………2

**Rules**

Fed R. Civ. P. 54(d)   …………………………………………1, 2, 55, 56

Fed. R. Civ. P. 56(c)   …………………………………………………28

Federal Rule of Civil Procedure 54(d)(1)   ……………………….........55

Local CR 54(d)   …………………………………………………2, 56

LCR 54(d)(3)   ……………………………………………………..56

## I.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Did the District Court properly grant the Olympia defendants' motion for summary judgment on appellants' claims under the Fourth Amendment? (Appellants' Issues D-E)

2.     Did the District Court properly award the Olympia defendants costs pursuant to Fed. R. Civ. P. 54(d)?  (Appellants' Issues P and Q).

## II.  STATEMENT OF THE CASE

### A.     Nature of the Case.

This is a civil rights case.   Appellants claim that alleged illegal spying on civilians, by appellees Towery and Rudd, secured confidential information and shared it with the Olympia Police Department, which in turn used it to develop tactics that violated appellants' civil and common law rights.  This response brief does not address the conduct of Towery or Rudd, who are represented by separate counsel.  It does establish that they had no effect whatsoever on Olympia Police Department tactics and that the Department's actions relative to the appellants were entirely reasonable and lawful.

A military ship off-loaded Strykers and associated equipment returning from the Iraq war at the Port of Olympia in November 2007.  A group of young people attempted to block the departure of this material from the Port and to impede its movement through Olympia city streets to I-5.  In most instances, pepper spray

was the only viable option for police to deal with their disruptive behavior. A common sequence attached: (1) the demonstrators were fully organized in advance; (2) they anticipated the use of pepper spray and dressed to nullify its effect by wearing protective clothing and covering their faces with bandanas and their eyes with goggles; (3) they were given lawful orders and repeatedly warned that not obeying would result in the deployment of pepper spray; and (4) they had full opportunity to obey.

## B.    Course of Proceedings and Disposition Below.

The Olympia defendants moved for summary judgment on all claims against all Olympia defendants. Dkt. No. 272. The Court granted the motion. Dkt. No. 399. The Olympia defendants then moved for an award of costs pursuant to Fed. R. Civ. P. 54(d), Local CR 54(d), and 28 U.S.C. §§ 1821, 1920 and 1923. Dkt. No. 377. The Court granted the motion for costs in the amount of $5,267.18. Dkt. No. 403. Plaintiffs appealed the summary judgment order and the award of costs to the Olympia defendants. Dkt. No. 390 & 413.

## III.  STATEMENT OF RELEVANT FACTS

## A.    Factual History.

### 1.    July 27, 2007 detention and arrest of Appellant Berryhill.

As part of this lawsuit, appellant Berryhill claims that on July 27, 2007 he was illegally detained in a *Terry* stop and then illegally arrested several hours later.

SER 320. Mr. Berryhill joined this case as a plaintiff via the Second Amended Complaint, Dkt, #31, filed with the Court on August 10, 2010, three years and fourteen days after the incidents of July 27, 2007. He filed no damages claim with the City of Olympia pursuant to RCW 4.96.020.

### 2. *Terry* stop detention.

At 1:53 am Mr. Steven McAllister reported what he believed to be a burglary in progress at 825 Columbia Street NE, Olympia, then under a reconstruction project. He described the suspect as, according to Officer Kimberly Seig's report:

> [W]hite, approximately 5'8" and 150 pounds. He has long dark curly hair and was wearing a dark hooded sweatshirt. The R/P stated at one point he thought the suspect took off the sweatshirt and was wearing a long sleeve shirt with possibly no pants on.

Officer Seig continued the investigation while Officer Kory Pearce left to cruise the area in search of the suspect. SER 733.

Officer Pearce prepared no report on the burglary incident. Presently he recalls being at the scene of the alleged burglary on Columbia Street, but he has no recollection of detaining a suspect. The Thurston County Central Dispatch CAD record of the incident, does show his departure from the Columbia scene at 2:24 am and his presence in front of Café Vita with a subject [Mr. Berryhill] wearing "underwear" a "green shirt" and "hoodie." SER 740; SER 736-737. Officer Seig's report states that "Officer Pearce did locate a male that was wearing a dark gray

hooded sweatshirt, shorts and he had curly black hair." Officer Pearce detained Berryhill while Officer Seig drove Mr. McAllister to that location. McAllister said Berryhill was not the suspect and so he was released. SER 734.

Café Vita is about 500 yards from 825 Columbia Street. *See* aerial photograph. SER 822 and 936.

### 3. Arrest for disorderly conduct.

On July 27, 2007 at about 3 am, Officer Charles Gassett was driving on patrol when he saw Officer Jacob Brown out of his car near 910 Fourth Avenue speaking with two males, later identified as Jeffrey Berryhill and Mitchell Inclan. He stopped to observe the situation as back-up for Officer Brown and recognized Mr. Berryhill as the person who had been stopped a short time earlier as a possible burglary suspect. Berryhill and Inclan were yelling at Officer Brown about that stop even though Brown had not been present when it occurred. When Berryhill took a step closer to Officer Brown, Gassett interceded. SER 783.

Since he had been there, Officer Gassett tried to explain to Inclan why Berryhill had been stopped over the burglary. Berryhill was clearly intoxicated and Gassett was hoping that Inclan would be able to quiet him down if he knew the circumstances of the stop. Berryhill and Inclan were standing next to several residences and Gassett was afraid that they would wake someone up. Instead, they continued to raise their voices. Both Officer Brown and Officer Gassett told them

several times to quit yelling and leave. Gassett told them they would be arrested if they continued. Berryhill said he couldn't arrest them for talking. Gassett said Berryhill was right, but he could arrest them for disorderly conduct if they continued to yell. SER 784.

Officer Gassett got closer to Inclan, who appeared to be more reasonable, in an attempt to keep Berryhill out of the conversation. Berryhill escalated and dared Gassett to take off his badge. When Berryhill took a step toward Gassett and reached out with his left hand toward Gassett's left arm, Officer Brown stepped in front of him and told him to back away. Berryhill didn't and Gassett informed them that they were under arrest. Gassett took Inclan into custody and Officer Brown did so for Berryhill. SER 784.

**B.    November 2007 protests at the Port of Olympia.**

### 1.    General description of events and challenges.

For orientation purposes, here is a brief outline of events in November of 2007. The USS Brittin arrived at the Port of Olympia on November 5. The next day there was a peaceful march to the Port Plaza Park. On November 7-8 the Olympia Police Department escorted convoys from about 8 pm on the 7th to 3:30 am on the 8th. Protests were peaceful to start but degenerated into grabbing batons, spitting, sitting in the street and throwing debris. The rest of November 8 was quiet and November 9 had no significant action. November 10 started with

the removal of the barricades on Marine Drive and at the Port Main Gate, followed by various convoy blocking attempts, including the "sleeping dragon" incident, all of which are described elsewhere. Convoys ran all day on November 11 with some protester resistance and November 12 was the Veterans day holiday with no activity. On the evening of November 13, a women's sit down protest at the Port Main Gate resulted in 39 arrests, again, described elsewhere. SER 818.

Consistent challenges to the Olympia Police Department during this period included: the sheer number of protesters engaging in unlawful behavior, often in different places at the same time; a lack of cooperation on scheduling from the Army and the longshore workers; the inability to get much assistance from other local law enforcement agencies, resulting in long operational periods with limited Officers; and inadequate jail resources. SER 818.

### 2. Towery, Rudd and Colvin had no effect on Olympia Police tactics.

In his position as Operations Commander, Tor Bjornstad confirmed that no tactic used by the Olympia Police Department against demonstrators alleged in this lawsuit was affected by information received from Thomas Rudd or Clinton Colvin. The fact that John Towery served as a source for Mr. Rudd only became known to Commander Bjornstad and others at the City of Olympia when *The Olympian* newspaper published an article about Mr. Towery's "outing" on July 28, 2009, long after the protests. SER 818.

### 3. November 8, 2007; pepper spraying of Appellant Dunn.

Like Berryhill, Brendan Dunn was added to this case via the Second Amended Complaint, filed on August 10, 2010. He had filed a claim for damages with the City of Olympia dated April 20, 2010, but only alleging "civil rights and civil liberties" violations. SER 849.

At about 2 am on November 8, 2007, a convoy of trucks transporting equipment from the Port of Olympia to I-5 passed the then City Hall moving southbound on Plum Street. Olympia Police Officers were serving as escorts for the convoy and were present along the side of the street in an effort to prevent interference by pedestrians. An individual, later identified as Shyam Prasad Khanna, ran from the City Hall block on the southeast side of the intersection across the northbound lanes and the island into the inside southbound lane being used by the convoy. With his hands up, Khanna stood directly in the path of a Stryker vehicle traveling at least 25 MPH. He was wearing all black clothing, including a hood over his head and a bandana over his face. The driver of the Stryker had to abruptly brake and swerve to the right, narrowly missing Khanna. SER 762.

Officer Chris Johnstone observed the event and promptly ran after Khanna, who was running toward a group of people gathered at the southeast corner of the intersection. Johnstone yelled several times for Khanna to stop. Instead, he ran

into the back of the group. Johnstone approached the group, quickly followed by Officer Bryan Houser, and told Khanna several times that he was under arrest and to come out. The group became belligerent and several people said, "He is not fucking under arrest." and similar comments. SER 763. *See* aerial photograph with approximate locations of the Stryker and Mr. Khanna and of the group into which he ran. SER 822 and SER 938.

Officer Johnstone went around to the back of the group. As he grabbed Khanna's left arm in an attempt to pull him out of the group, other members [including Mr. Dunn] locked arms together with Khanna. SER 763. Since Johnstone was not able to secure custody of Khanna by physical means, Officer Houser announced to the group that he was going to use pepper spray. When those directly around Khanna did not release him, Officer Houser deployed pepper spray at them. Johnstone was then able to take Mr. Khanna into custody. At the time, the Officers involved were too engaged with the convoy to deal with anyone in the group beyond Khanna. SER 765.

The Third Amended Complaint makes no reference to this incident and Defendant City of Olympia's 1st Interrogatories to Plaintiff Brendan Dunn and Plaintiff's Responses, answered on October 7, 2011, fails to mention it. SER 940. In his January 28, 2014 deposition, Brendan Dunn admitted to being one of the

individuals pepper sprayed, but only in the context of attempting to make it a new claim for damages in this lawsuit, more than six years after it occurred. SER 844. His attorney refused to allow a follow-up 15 minute deposition by telephone after defense counsel had the opportunity to investigate the new claim. SER 946.

### 4. Alleged pepper "misting" over spray of Appellant Grande on November 7, 2007.

Appellant Chris Grande testified in his deposition that at about 10 p.m. on what he believes to be November 9, 2007, he received some "overspray" "mist" of pepper spray directed at other people. This caused him to cough for about a minute. According to Grande, the circumstances were as follows: Stryker vehicles were coming southbound out the Main Gate of the Port and turning left, eastbound on Market Street. A male ran into the street on Market and sat down, blocking the next Stryker. That person was lifted up and walked off by police and then more people got into the street. They were pepper sprayed and Grande was behind them. SER 873.

As reported by Commander Bjornstad, *supra*, no Stryker or vehicle carrying military equipment successfully left the Port of Olympia on the night of November 9. SER 819. What does match Mr. Grande's description of a night time Stryker movement with a male running into the street, being lifted and walked off by the police and the crowd moving into the street, did indeed happen on the evening of

November 7. However, none of the three videos of the event depict pepper spraying and none on the various police reports mention pepper spray as a tactic. The only application of pepper spray that night was what occurred with the arrest of Mr. Khanna in the early hours of November 8. SER 818.

### 5. November 10, 2007.

#### a. Protester barricade at Port of Olympia Main Gate.

As discussed above, barricades had been constructed blocking both the Port of Olympia Marine Drive access road and the Main Gate during the night of November 9-10. By about 8:30 am the individuals behind the Marine Drive barricade had abandoned their position after a short burst of pepper spray and the debris itself had been scooped up and removed by Port of Olympia personnel. SER 772.

The demonstrators at the Main Gate had taken temporary sections of fence and linked them together in a line extending across Franklin in an east-west configuration about 100 feet south of the Main Gate. *See* marked aerial photograph showing the approximate location of the fence barricade relative to the Main Gate. SER 772 and SER 777.

About 20 individuals stood on plastic sheeting in front of the barricade, mostly with arms linked. They were dressed in protective clothing to guard against

pepper spray, with scarves or bandanas on their faces as well as protective goggles for their eyes.  SER 773 and 779.

A separate crowd milled around south of the barricade on the west side of Franklin, along a coffee shop named Batdorf & Bronson; on Franklin itself; and in the gravel parking lot to the east side of Franklin.  SER 773 and SER 777.

Officers approached the scene in two teams, one via the sidewalk on the north side of Market Street in front of Batdorf & Bronson and the other through the Batdorf back parking lot.  After the teams met, they formed a "police line" (with their backs secured against protesters) along the west side of Franklin, starting by the fence barricade and running south along the edge of the street.  Lieutenant Holmes then issued four separate warnings two minutes apart to the people at the barricade and in Franklin Street.  That had almost no effect.  SER 773.

After five more minutes Lieutenant Holmes gave the people at the barricade and the crowd in the street one more warning to leave, emphasizing that "chemical agents" would likely be used.  Only four people in the crowd left, none from the barricade.  Holmes paused a few minutes and then asked if any of them wanted to leave.  Getting no response, he stepped behind the police line and ordered the deployment of pepper spray. He did this for the following reasons.  For the people in the crowd on Franklin away from the barricade, he expected a fog of pepper spray would be enough to move them into the parking lot.  There really was no

other option under the circumstances.  On the other hand, the demonstrators at the barricade were clearly "hunkered down" as a unit to hold their position and to prevent the removal of the barricade.  Any attempt to remove them using "hands on" presented a substantial risk of injury to both the demonstrators and to the police.  SER 774.

First, the police had to remove the milling crowd from Franklin in front of the barricade.  Using a fog of pepper spray and some baton pushes, they were able to move the remaining individuals to the parking lot.  SER 774.

With Franklin secured to the south, the police were now prepared to deal with the demonstrators at the barricade.  Officer Cliff Maynard and Officer Mike O'Neill were charged with deploying the pepper spray.  But first, the protesters were warned yet again.  Among the Officers, it was understood that if the pepper spray failed, the "hands on" approach would be utilized with the expectation that resistance would ensue.  Unfortunately, only a few people at the barricade left as a result of the pepper spray, presumably because those who remained were so heavily protected by what they were wearing.  SER 774.

Reluctantly, officers then initiated the "hands on" approach.  As expected, most of the protesters struggled fiercely to avoid being dragged away.  That tactic generated an intensely hostile response from the crowd in the parking lot.  SER 774.

### (1)    Pepper spraying of Appellant Robbins.

Andrea Robbins was the only plaintiff below who lined up along the barricade fence.  She was located third from the right and she was wearing brown pants and a blue jacket.  To cover her face, she used a blue bandana and goggles.  SER 920.  *See* photograph.  SER 930.  She did not leave until after the pepper spraying of the people along the barricade had stopped.  In fact, Ms. Robbins sat down when the Officers initiated their "hands on" tactic with the people at the other end of the barricade and then she changed her mind and moved off into the parking lot with the two people at her end.  SER 932.

She claims she wanted to leave earlier, but the police were preventing people along the barricade from going to the gravel parking lot. SER 921.  The video on this period during the event shows exactly the opposite.  Police were trying to <u>keep</u> people from moving <u>out</u> of the gravel parking lot into Franklin.  SER 932.

Although her testimony is ambiguous between her bandana and her goggles, Ms. Robbins also claims that an Officer pulled off her goggles and then pepper sprayed her in the eyes.  SER 924.  At no point did any Officer remove goggles from the eyes of any demonstrator along the barricade fence.  SER 774.  This is confirmed by the available videos regarding this incident.  *Id.*

Of course, if that had indeed occurred to Ms. Robbins, she would have been severely affected by the pepper spray, just as she claims.  *Id.*  When the police gave

up using pepper spray and started to physically drag people off to the side, the crowd in the parking lot started chanting, "shame on you, shame on you." At that point Ms. Robbins can be clearly seen in a video, goggles still on and arm pumping, just a few moments after she left the barricade. SER 923 and SER 933.

### (2)   Alleged pepper spraying of Appellant Garfield.

Ms. Garfield claims to have been pepper sprayed on two occasions. The first one appears to be related to the November 10 clearing of the Main Gate barricade discussed in the last section. The second, also occurring on November 10, is covered in the next section.

Her reconstruction of the first incident is too vague for the Olympia Defendants to defend. Her "Allegation of Serious Employee Misconduct," filed with Olympia on November 11, 2007, states:

> I was standing on the sidewalk, non-violently, officers in riot gear lined the street in front of me. One officer near me was walking down the street. He appeared to drop a can of pepper spray. Within 10 seconds, my eyes and skin were burning. I had only been standing on the sidewalk. I suffered physical pain for at least an hour.

SER 859. Her Interrogatory answer dated November 25, 2011 recounts:

> ...I was standing on a sidewalk near the entrance to the Port of Olympia and the police pepper-sprayed the crowd. I was not doing anything at the time, I was simply standing on the sidewalk as part of the protest. There was so much spray, it became painful to breath.

SER 864.

In her deposition, she placed her location on the sidewalk west of Franklin and north of Market.  SER 852.  That would put her in the area where the "police line" formed as the initial tactical step during the Main Gate barricade incident.  As stated by Lieutenant Holmes, no protesters were allowed in that area.  SER 773.

The best that can be said about this claim is that Ms. Garfield makes no direct assertion that she was deliberately pepper sprayed.  If she were in that place and wished to stay during that event, she would most certainly have been removed.  Most likely, if indeed anything of this nature happened, she was in another place at another time and received some wind drifting pepper spray.

### b.  Alleged pepper spraying of Appellant Garfield at 4th and Plum.

On November 10, 2007 after the barricades on Marine Drive and at the Port Main Gate had been removed, the first convoy was blocked on Plum Street by individuals running out in front of the semi-tractor trailer trucks.  SER 817.

In one instance at the Plum Street/Fourth Avenue intersection, Sarah Warren, a friend of Ms. Garfield, was standing in front of a stopped truck carrying military equipment.  SER 853.  Then, in Ms. Garfield's words, "A police officer began running toward her.  She [Warren] had her back to the officer.  I ran into the street and tried to stand between her and the officer." SER 854.  The officer yelled, "Get out of the street."  SER 855.  She did not get out of the street and one of the officers in the area pepper sprayed her in the face.  SER 856.

### c. "Sleeping Dragon" incident with Appellant Grande.

Later in the afternoon of November 10 another group of demonstrators blocked the three southbound lanes of Plum Street just before they split to become the northbound ramp into I-5 and Henderson Boulevard which provides access to southbound I-5 and the southern part of Olympia. They formed what is referred to as a "sleeping dragon" by placing their arms in PVC pipe that has been covered with chicken wire and duct tape and by grabbing hand holds in the pipes. Connected together in this fashion, the group of demonstrators (or "sleeping dragon") is almost impossible to move without going through the cumbersome process of safely cutting each pipe section to separate the individuals. *See* the aerial photograph depicting this area with the approximate location of the "sleeping dragon" indicated. SER 742 and SER 745.

Just as the group in "sleeping dragon" mode moved into the street to block traffic, Officer Maynard arrived in a patrol car. While they were still standing, Officer Maynard immediately deployed pepper balls at the demonstrators in an attempt to disorient and move them off the roadway. This tactic had no apparent effect and the demonstrators sat down. SER 754.

Chris Grande is the only plaintiff who participated in the event. As depicted in the photograph he was wearing a green polyester jacket. Anticipating the use of

pepper spray, he wore a white handkerchief over his face and metal working goggles over his eyes.  SER 878 and 889.

Mr. Grande claims to have been struck by two pepper balls.  One was in the chest, causing a bruise "a little bit larger than a golf ball."  In spite of having his head in a protective down position, Mr. Grande claims the second pepper ball hit him "where the horizontal part of [his] chin becomes the vertical neck."  That one caused "light bruising" and what apparently amounted to an abrasion.  The pepper from the two balls caused him to cough for ten minutes.  He did not get any of it in his eyes. SER 879.

The pepper ball impact powder patterns on Mr. Grande's jacket indicate that the balls struck his chest and his left clavicle area.  SER 754.

Mr. Grande also complains that he got a sore shoulder while being held by a police officer as his PVC tubes were being cut off with an electric saw.  SER 880. This was a standard safety procedure used by police for the protection of "sleeping dragon" participants.  SER 743.

### d.    Pepper spraying of Appellant Berryhill.

Officer Maynard and Officer Bob Krasnican were in the same patrol car assigned to lead a convoy of trucks transporting military equipment from the Port of Olympia southbound on Plum Street to I-5.  As discussed, *supra*, Maynard responded to the "sleeping dragon" protesters blocking southbound Plum.  Several

protesters, not using the "sleeping dragon" devices, were partially blocking the northbound lanes. Officer Krasnican ordered them out of the roadway. Only one failed to comply, a white male, later identified as Mr. Berryhill. Officer Krasnican ordered him out of the roadway three more times. He never obeyed so Krasnican dispensed pepper spray in his direction from a distance of about six feet. This tactic was successful and now at least the outside northbound lane was clear to traffic. SER 761.

As with Mr. Dunn, Mr. Berryhill failed to identify this incident as an attempted additional claim to this lawsuit until the very end of his deposition on January 22, 2014. Even his attorney claimed not to know about it. SER 826 and 936.

**6.    November 13, 2007.**

      **a.    Women's sit down blockage of Stryker convoy.**

           **(1)    Sit down protest.**

On the evening of November 13, 2007, a convoy of Strykers was staged to leave the Port of Olympia via the main gate. On cue a carefully organized group of about forty women, including appellants Panagacos and Robbins, assembled and sat down in Franklin Street directly in front of the Port of Olympia main gate with the tactical purpose of blocking the convoy from getting out of the Port and going to Fort Lewis. SER 893.

### (2)    Mass arrest of the women.

As the Operations Supervisor, Lieutenant James Costa was in charge of four tactical teams of Officers, each headed by a Sergeant.  Commander Bjornstad was the Incident Commander.  SER 785.

Commander Bjornstad and Lieutenant Costa arrived at the main entrance to the Port at about 8:30 to 8:45 pm.  At that time a very large crowd of well over 150 people was gathered there, including a group of 30-40 women sitting in a group in the middle of the roadway.  Per Lieutenant Costa's direction all four tactical teams had come into the Port compound via the back or north gate.  SER 785.

Lieutenant Costa consulted with Commander Bjornstad on how to handle the women's sit-down demonstration.  They agreed that orders would be given for them to leave and that those remaining would be arrested.  This option was chosen mostly because the women involved displayed no apparent intent to actively resist being arrested.  The four teams were then brought out of the Port and situated in positions to best control the crowd, given the circumstances.  SER 785.

Using the very loud public address system in his police vehicle, Lieutenant Costa issued four orders and warnings in this time sequence: 9:05, 9:15, 9:25 and 9:31 pm.  He told the demonstrators, "Attention: this is the Olympia Police Department.  You are ordered to disperse immediately.  You must leave now. Your failure to do so will result in your arrest."  He also included an announcement

that they were illegally blocking the roadway and that the police would use force against them if they did not leave. These statements through the public address system were made at a very loud level at a time when the crowd was fairly quiet. SER 786.

After the last warning, the arrests began. Teams of two Officers would lift the suspects under the arms or simply hold the arms while the subjects stood up. They were then escorted away under physical control for field booking photographs, application of zip-ties, and placement in a jail transport van. SER 786.

### (3) Arrest of Appellant Panagacos.

Appellant Panagacos was arrested without difficulty. She stood up on her own and cooperatively walked to the transport vehicle. SER 900.

On October 30, 2009 Ms. Panagacos stipulated to facts sufficient to find her guilty of attempted disorderly conduct. On February 18, 2010, the charge was dismissed with prejudice. SER 902.

### (4) Arrest and wrist hold on Appellant Robbins.

Appellant Robbins claims that her arm was bent back and pressure applied to her wrist in a manner that hurt. This was done when her arm was behind her back and before the Officers started to escort her to the transport vehicle.

SER 928. Ms. Robbins can't recall whether she was in a dead-weight situation or she assisted the Officers in getting her to a standing position. She also can't remember if she walked or was dragged over to the transport bus. SER 928. In any event, she was captured on a Q13Fox video being dragged to the vehicle. SER 934.

Officer Renschler and Watkins formed the team that arrested Ms. Robbins. Renschler cannot recall her specific arrest. He does confirm this entry in his report:

> The resistance level varied between passive resistance, where they would not move and act as dead weight, and active resistance, where they attempted to pull away from us. I utilized Level 1 Control Tactics in removing the subjects to include two pain compliance wrist lock techniques commonly referred to as a "gooseneck" and a "straight wrist twist."

SER 738.

Officer Renchler is the lead Defensive Tactics Instructor for the Olympia Police Department and he is certified as a Master Defensive Tactics Instructor by the Washington State Criminal Justice Training Commission. SER 738.

A "Level 1 Control Tactic" allows an Officer to secure a non-resisting subject with no pain but to maintain control if the subject should passively or actively resist. This is done by applying pressure against the joint structures, such as a wrist, which results in pain but no injury. SER 739.

From reading Ms. Robbins deposition testimony (162/7 to 164/12), Officer Renschler believes he was using a "gooseneck" hold, but only so as to cause pain for a brief moment as she was brought to a standing position. SER 739.

### (5) Appellant Panagacos' conditions during transport and holding complaints.

Ms. Panagacos complains that she did not have "enough room to comfortably sit" in the transport van." SER 897. Regarding her six to ten hour stay in the Jail holding cell, she complains that there was not enough room for her and for the eight other sit down protest women confined there. They did, however, sing at intervals. SER 899.

These claims, if indeed they are really being pursued, are completely lacking in substance.

### b. Stryker convoy's flanking movement; alleged pepper spraying of Appellant Grande.

While the last of the women's sit down demonstrators were being arrested, Lieutenant Costa contacted Sergeant Partin who had been standing by to begin moving the Strykers off the Port. After getting confirmation that Strykers could negotiate the sharp turn out the north gate of the Port compound, Costa instructed Partin to have his team of Officers escort the convoy out that gate and down Marine Drive while the large crowd at the main gate was still distracted by the arrest process. Unfortunately, as the first Stryker vehicles passed by Market Street

on Marine Drive, they were spotted and much of the crowd ran over to Marine Drive where a chaotic encounter ensued between Strykers, police and demonstrators, fortunately involving no injuries. SER 786.

During this melee Appellant Grande claims to have been pepper sprayed. According to Mr. Grande, 15 to 20 people were walking in front of a Stryker and he was taking photographs of the police using pepper spray to disburse them. Grande claims he was out of the street on a sidewalk in the southwest corner of the Marine Drive/Market Street intersection when he looked to his left and was pepper sprayed by an Officer. He cannot identify the Officer and he has no witnesses to the alleged event. SER 882.

A Q13 Fox video (VKCPQ14 01) taken at that time shows Strykers moving south on Marine Drive. The videographer is in the parking lot northwest of the intersection. Franklin Street comes into the video from the right. Mr. Grande can be seen standing <u>in the roadway</u> in the southwest area of the intersection taking photographs of the Strykers. SER 887.

## C.  Miscellaneous "harassment and/or surveillance" claims.

Three of the appellants made various claims unsubstantiated by facts that they suffered harassment and/or surveillance by the Olympia Police Department.

### 1. Appellants Berryhill and Dunn.

Appellants Berryhill and Dunn identify three patterns of police surveillance harassment behavior relating to the house where they were tenants at 910 Fourth Avenue East: (1) Olympia Officers frequently cruised through the alley behind the house; (2) Officers parked in front of the A-1 Rental store across Fourth Avenue; and (3) Officers interfered with their relationship with the landlord such that they were forced to move out in December, 2008. SER 842 and SER 940.

The house at 910 Fourth Avenue East is located in a residential area on the edge of the Olympia downtown. Frequently cruising alleys in an area of that nature is an essential function of law enforcement. Fourth Avenue is the primary arterial roadway going eastbound in Olympia. When a business like A-1 Rentals is closed, commonly Officers will park there to observe traffic. SER 781.

Harold Mullbock and his wife have owned the property at 910 East 4th Avenue since 2005. During the period that Jeff Berryhill and Brendan Dunn were tenants, there was a problem with vagrants on the premises. This included sleeping on the porch and harassing people walking by on the sidewalk. When the lease was up for renewal at the end of December, 2008, Mr. Mullbock's wife secured a form from the City of Olympia, the bottom of which is entitled, "Authorization to Enter/Remove Trespassers." Through their agent, the Mullbocks made signing this form a requirement of renewing the lease. On December 10, 2008 they received a

letter through their agent from Mr. Berryhill, declaration Exhibit 2, stating that, "We the residents at 910 4th Ave. E have decided to end our stay at the house. We will vacate the premises by January 1st, 2009." SER 747 and SER 750.

During the Mullbocks' landlord/tenant relationship with Dunn and Berryhill, they knew very little about them except that they were Evergreen State College students. They knew nothing about their politics or protest activity. Other than the problem with vagrants, they were satisfactory tenants and as indicated, they would have otherwise renewed their lease. SER 748.

### 2. Appellant Robbins.

Appellant Robbins testified that shortly after November 10, 2007, she saw someone in a dark colored sedan parked across the street from her house during the day. She could only describe the person as a "white male," but she did not recognize him as any one of her neighbors. He was still there two hours later. SER 926.

### D. Other Olympia defendants.[1]

### 1. Detective Paul Lower.

Detective Lower was never involved in "illegal spying on, surveillance of Plaintiffs" or "illegal gathering of protected information, and illegal harassment of

---

[1] Appellants also made allegations against Olympia employees Cathie Butler, Sgt. Paul Johnson, Officer Jeff Herbig and former Olympia Police Chief Gary Michel. There is no reference to these individuals in appellants' brief, however, and therefore appellants apparently concede their dismissal was proper.

Plaintiffs" as alleged in paragraph 1.20 of their Complaint. Regarding the allegations in paragraph 2.52 of the Complaint, on May 30, 2006 he did take video of interaction between Olympia Officers and the crowd of protesters. The video turned out to be of very bad quality. There were a few images, but nothing of value. Pursuant to direction from his supervisors and what was then the practice of the Department, he destroyed the tape. SER 758.

## 2. Lieutenant James Costa.

Lieutenant Costa's only direct or indirect interaction with the appellants occurred on the night of November 13, 2007 when he supervised the arrests of the sit-down protesting women at the Port of Olympia Main Gate. *See* Section B.6., *supra*. Lieutenant Costa has read the allegations of the Complaint relating to him and other than getting his County residence and job title right, he believes the allegations are completely false. SER 787.

## 3. Commander Steve Nelson.

Commander Steve Nelson has read the allegations of the Complaint relating to him and other than getting his County residence and job title right, he believes the allegations are completely false. SER 746.

### 4. City Manager Steve Hall.

City Manager Steve Hall works directly for the City Council in what is known as a "council manager" form of government. Ten people report directly to him, six of whom are department heads, including the Police Chief. SER 767.

Mr. Hall was on a hiking vacation to the Grand Canyon with several other men during November of 2007. He flew to Las Vegas on November 6, entered the Canyon on November 7, came out on November 11, and flew home on November 12. His only firsthand knowledge was viewing part of the women's sit-down demonstration at the Port Main Gate the night of November 13. He had no involvement with the tactics used during that or any other demonstration that month. SER 767.

Mr. Hall has also read the allegations in the Complaint relating to him and other than getting his County residence and job title right, he believes the allegations are completely false. SER 768.

## IV. SUMMARY OF THE ARGUMENT

The addition to the complaint of appellant Berryhill's claim was more than three years after the event in question and was barred by the applicable statute of limitations and thus the District Court's summary judgment on that claim should be affirmed. The District Court's determination that the Olympia defendants were

entitled to qualified immunity for the remaining claims and its award of costs to the Olympia defendants should also be affirmed.

## V. ARGUMENT

### A.    Standard of Review.

This Court reviews the trial court's grant of summary judgment de novo. *Western States Medical Center v. Shalala*, 238 F.3d 1090, 1093 (9th Cir. 2001). Under Fed. R. Civ. P. 56(c), summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . .Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 247-248.

Moreover, the "party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a *genuine* issue for trial."  477 U.S. at 248, *quoting, First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288-289, 88 S.Ct. 1575 (1968) (emphasis added.)  The "mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.

## B.     The Statute of limitations barred Mr. Berryhill's claims.

The Second Amended Complaint, Dkt. #31, adding Mr. Berryhill and Mr. Dunn as plaintiffs, was filed on August 10, 2010, more than three years after Berryhill's *Terry* stop and arrest on July 27, 2007.  Berryhill filed no damages claim pursuant to RCW 4.96.020.  Dunn filed a claim dated April 20, 2010, but only alleging "civil rights and civil liberties" violations against the City, as well as various other entities including the Army.[2]

Section 1983 claims are subject to Washington's three year statute of limitations for personal injury actions under RCW 4.16.080(2).  *Rose v. Rinaldi,* 654 F.2d 546, 547 (9th Cir. 1981); *Southwick v. Seattle Police Officer John Does #s 1-5,* 145 Wash.App. 292, 297, 186 P.3d 1089 (2008).  Accordingly, all of Berryhill's claims arising on July 27, 2007 were time barred and were properly dismissed by the District Court.  Dkt. No. 399, pg. 6.

State law claims for false arrest and false imprisonment are subject to the two year statute of limitations under RCW 4.16.100(1).  *Heckart v. City of Yakima,*

---

[2]  Appellants make no arguments concerning Mr. Dunn's claims against the Olympia defendants and thus they are waived. *See Martinez-Serrano v. INS,* 94 F.3d 1256, 1259 (9th Cir.1996) (issues raised in a brief which are not supported by argument are deemed abandoned)

42 Wash.App. 38, 39, 708 P.2d 407 (1985); *Gausvik v. Abbey,* 126 Wash.App. 868, 880, 107 P.3d 98, *review denied,* 155 Wn.2d 1006 (2005). State claims of excessive force are considered claims for assault and battery, also subject to the two year statute of limitations. *Boyles v. City of Kennewick,* 62 Wash.App. 174, 176, 813 P.2d 178, *review denied,* 118 Wn.2d 1006, 822 P.2d 288 (1991). For that reason, the state claims of Berryhill and Dunn for false arrest, false imprisonment, assault and battery and excessive force were also time barred.

RCW 4.96.010(1) makes local governmental entities liable for damages arising from their tortious conduct or the tortious conduct of their past or present employees to the same extent as if they were a private person or corporation, and then provides that "[f]iling of a claim for damages within the time allowed by law shall be a condition precedent to the commencement of any action claiming damages." RCW 4.96.020(1) makes the claim filing provisions applicable to claims for damages against all local governmental entities and their employees, while RCW 4.96.020(2) requires that such claims " . . . shall be presented to the agent within the applicable period of limitations within which an action must be commenced." State claim filing and tolling provisions do not apply to federal civil rights claims. *Southwick v. Seattle Police Officer John Doe #s 1-5*, 145 Wn. App. 292, 298-301, 186 P.3d 1089 (2008). Berryhill failed to file any claim for damages with the City of Olympia prior to joining this lawsuit with the filing of the Second

Amended Complaint.  Consequently, for this additional reason, all state law claims advanced by Berryhill were properly dismissed.[3]

Mr. Dunn filed a claim with the City, failed to make any allegations against the City or its employees upon which his state law claims could be based. Accordingly, all of Dunn's state law claims were subject to dismissal.  *See, supra,* note 2.

## C.    Qualified immunity.

Government officials performing discretionary functions are shielded from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Qualified immunity is available to law enforcement officers defending against unlawful seizure (false arrest) claims.   *See, Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also, Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1097-98, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

---

[3]    *Ford v. Manufacturers Hanover Mortg. Corp.,* 831 F.2d 1520, 1523 (9th Cir. 1987) (The appellate court can uphold the entry of summary judgment on any basis supported by the record.)

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) the Court set forth the process which courts must follow in ruling on a qualified immunity defense as follows:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. . . . [I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. <u>This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition</u>; . . . <u>The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.</u> . . . If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.[4]

*Saucier,* 121 S.Ct. at 2156-57 (internal citation omitted, emphasis added). *See also, Anderson v. Creighton*, 483 U.S. at 640 (the contours of the right allegedly violated "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right").

If a reasonable law enforcement officer "could" have believed their actions were lawful under the specific circumstances, they are protected from suit by

---

[4] In *Pearson v. Callahan,* 555 U.S. 223, 236-43 (2009), the Supreme Court modified *Saucier* by holding that the order in which the two prongs of the *Saucier* qualified immunity test are considered is to be decided within the discretion of the reviewing court based upon the circumstances of the particular case at hand. The substance of the *Saucier* two prong test and standards, however, remain controlling.

qualified immunity and are entitled to dismissal. *Anderson,* 483 U.S. at 646, n. 6. In addition, although citation to existing precedent must not include a case directly on point, " . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Mattos v. Agarano,* 661 F.3d 433, 442-43 (9th Cir. 2011).

Qualified immunity also applies to claims of excessive force. The Court in *Saucier* gave the following example of the difference between ruling on a qualified immunity motion and determining excessive force on the merits:

> If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.
>
> The qualified immunity inquiry, on the other hand, has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the <u>legal</u> constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. <u>An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.</u> <u>If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.</u>

*Saucier,* 121 S.Ct. at 2158 (emphasis added).

State law false arrest claims are also subject to a defense of state law qualified immunity:

> State law qualified immunity rests on a different analysis than does qualified immunity under § 1983. . . . An officer has state law

qualified immunity from suit for false arrest where the officer "(1) carries out a statutory duty, (2) according to procedures dictated to him by statute and superiors, and (3) acts reasonably." . . .

*McKinney v. Tukwila,* 103 Wn. App. 391, 407, 13 P.3d 631(2000).

These three requirements for state law qualified immunity are met in the present case. First, police officers in general act under statutory authority to enforce the state criminal laws. *See,* RCW 10.93.070. Second, Appellants argue under their section 1983 claim against the City that the officers acted in accordance with department procedures. Finally, the officers acted reasonably under the circumstances. *McKinney,* 103 Wn. App. at 407 (internal citations omitted).

**D.    A claim for false arrest is defeated by probable cause.**

Where probable cause is present, an arresting officer cannot be liable for an unlawful seizure under § 1983. *Pierson v. Ray,* 386 U.S. 547, 557 (1967). An arrest challenged under state law must also be based upon probable cause to believe that a crime has been or is being committed. *State v. Lund,* 70 Wn. App. 437, 444-45, 853 P.2d 1379 (1993). The probable cause standard in Washington is functionally equivalent to the standard applied to claims under federal law. *See, State v. Terravona,* 105 Wn.2d 632, 643, 716 P.2d 295 (1986). Probable cause is a complete defense to a false arrest claim under Washington law. *Hanson v. Snohomish,* 121 Wn.2d 522, 563-64, 852 P.2d 295 (1993).

"Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy

information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested."

*McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir. 1984) (internal citation omitted).

Probable cause is a "practical, non-technical conception." *Brinegar v. United States,* 338 U.S. 160, 176 (1949). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.,* at 175.

*Illinois v. Gates,* 462 U.S. 213, 231 (1983). The court in *Gates* further explained the probable cause standard as follows:

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact finders are permitted to do the same - and so are law enforcement officers.

*Gates,* 462 U.S. at 231-232. Although probable cause generally presents a fact question for a jury, it may be determined as a matter of law on summary judgment if a reasonable juror could reach only one conclusion as to its existence. *McKenzie,* 738 F.2d at 1008.

### 1. Berryhill.

Notwithstanding the statute of limitations issue, discussed *supra*, summary judgment on Berryhill's claims was also appropriate because the officers were entitled to qualified immunity.

### (a) *Terry* stop.

A police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *U.S. v. Sokolow,* 490 U.S. 1, 8 (1989) citing *Terry v. Ohio,* 392 U.S. 1, 30. Here, given the similarity of Berryhill's appearance to the description of the reported burglar and his proximity to the scene of the burglary when contacted, the initial, brief detention of Berryhill in the early morning hours of July 27, 2007 constitutes a permissible *Terry* stop as a matter of law. State law immunity also applies, since the officers were acting under the same statutory authority to enforce the state criminal laws as that cited in *McKinney*, appellants allege and the defendants do not dispute that the officers were acting within the scope of their employment and with the knowledge and consent of the City and Police Department, and the officers acted reasonably in effecting the investigatory detention. Even if this conclusion were considered debatable (which it is not), dismissal of Berryhill's federal unlawful detention claim would still be warranted on grounds of qualified

immunity since a reasonable officer acting as Officer Pearce did *could* have believed his actions were lawful.

###### b. Arrest.

As for Berryhill's arrest a short while later, Officer Gassett clearly had probable cause to arrest Berryhill for the crime of disorderly conduct pursuant to RCW 9.16.020. These facts and circumstances were more than sufficient to warrant an officer of reasonable caution in the belief that Berryhill had committed the crime of disorderly conduct. Since this is the only reasonable conclusion which can be reached, summary judgment on the unlawful seizure claim is warranted on the merits of the probable cause determination. State law immunity also applies. Even if this conclusion were considered debatable (which it is not), dismissal of Berryhill's federal false arrest claim would still be warranted since a reasonable officer acting as Officer Gassett did *could* have believed his actions were lawful.

#### 2. Panagacos and Robbins.

Similarly Lieutenant Holmes had probable cause to believe that as a minimum, Ms. Panagacos and Ms. Robbins had committed the crime of attempted disorderly conduct.[5]

---

[5] Appellants make no arguments in support of this claim. *See, supra*, Note. 2.

In addition, Ms. Panagacos, as part of an apparent deferred prosecution agreement, "stipulated to facts sufficient to enter a finding of guilty" regarding one of the two charges for which she was arrested. SER 904. By stipulating as she did, Ms. Panagacos is estopped from challenging probable cause for her arrest. *Hanson v. Snohomish Cty*., *supra,* 121 Wn.2d at 561. Collateral estoppel bars a second litigation of the issues between a party even where a different cause of action or claim is asserted. *Rains v. State*, 100 Wn.2d 660, 665, 675 P.2d 165 (1983). Collateral estoppel may be applied in a civil action or civil rights action in which a party seeks to retry issues resolved against a defendant in a previous criminal case. *Hanson*, 121 Wn.2d at 561. *See also, Deleon v. City of Corpus Christi,* 488 F.3d 649, 655-56 (5th Cir. 2007) (no cognizable § 1983 claim for false arrest, false imprisonment and malicious prosecution because deferred adjudication after pleading guilty functional equivalent of conviction).

**E.     Use of force.**

In *Graham v. Connor,* 490 U.S. 386 (1989), the court held that excessive force claims are governed by the Fourth Amendment, and  ruled that each such claim must be reviewed "with careful attention to the facts and circumstances . . . including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight . . . ." *Graham,* 490 U.S. at

396. Other relevant factors include the amount of time and any changing circumstances during which the officer had to determine the type and amount of force that appeared to be necessary, and the availability of alternative methods to subdue the plaintiff. *Smith v. City of Hemet,* 394 F.3d 689, 701 (9th Cir. 2005). The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision in hindsight. *Graham,* 490 U.S. at 396. In determining whether a particular use of force is reasonable, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Nelson v. City of Davis,* 685 F.3d 867, 878 (9th Cir. 2012) citing *Graham,* 490 U.S. at 396.

Moreover, although the issue of reasonableness is usually one for a jury, it may be decided as a matter of law if, in resolving all factual disputes in favor of the plaintiff, a finding of reasonableness under the circumstances is the only conclusion which can be drawn. *Jackson,* 268 F.3d at 651, n. 1, and cases cited therein.

The related state law assault or battery claim similarly turns on the reasonableness of the force used under the circumstances, as RCW 9A.16.020(1) makes the use of force upon the person of another lawful "[w]henever necessarily used by a public officer in the performance of a legal duty . . . ." *See also, Boyles*

*v. City of Kennewick,* 62 Wash.App. 174, 176, 813 P.2d 178, *review denied*, 118 Wn.2d 1006, 822 P.2d 288 (1991) ("[g]enerally, a police officer making an arrest is justified in using sufficient force to subdue a prisoner, however he becomes a tortfeasor and is liable as such for assault and battery if unnecessary violence or excessive force is used in accomplishing the arrest." [emphasis and internal citation omitted]).

The use of pepper spray has been generally held to be regarded as an "intermediate" level of force which presents a significant intrusion upon an individual's liberty interest. *Young v. Cty. of Los Angeles,* 655 F.3d 1156, 1161 (9th Cir. 2011). However, the specific application method at issue must be considered in balancing the competing interests in each case. For example, use of an aerosol tear gas deployed in short bursts to disperse an uncooperative festival crowd blocking a roadway was found objectively reasonable as a matter of law in *Young v. Akal,* 2013 WL 6326154 (W.D.La), the court noting that the undisputed evidence showed that the circumstances facing the officers were "tense and uncertain," and that the crowd had ignored repeated verbal instructions to disperse. Similarly, the court in *Jackson v. City of Bremerton,* 268 F.3d 646 (9th Cir. 2001) held that the use of pepper spray did not constitute excessive force when it was used to subdue and arrest a non-compliant citizen attempting to directly interfere with an officer's attempt to maintain order over a large group which ignored

commands to disperse and warnings that chemical irritants would be used if they did not.

### 1. Appellant Dunn's pepper spraying on November 8, 2007.

Officer Houser was confronted by a group of individuals attempting to prevent the arrest of Mr. Khanna. They were warned but continued their wonton unlawful conduct. His choice was to either abandon the arrest or to deploy a moderate amount of pepper spray. He chose the latter course and quickly secured custody of Mr.Khanna. The appellants' failed to establish this use of force was unreasonable or that a reasonable officer in Officer Houser's position would have known it was clearly unlawful to use pepper spray in this manner. The District Court properly concluded that Officer Houser was entitled to qualified immunity. Dkt. No. 399, pg. 6.

### 2. Appellant Grande's alleged "misting" over spray.

Mr. Grande's version of events is impossible to support by available evidence. Nevertheless, his version of this encounter amounts to nothing more than his getting a wisp of pepper spray directed at a crowd of people out in the street blocking a convoy of Strykers. The appellants' failed to establish this use of force was unreasonable or that a reasonable officer would have known it was clearly unlawful. The District Court properly concluded that Officers were entitled to qualified immunity. Dkt. No. 399, pg. 7.

### 3. Appellant Robbins' pepper spraying at the Main Gate.

Ms. Robbins came to the Main Gate barricade demonstration fully protected from the pepper spray she expected to receive. She ignored multiple warnings and a full opportunity to leave. Unaffected by the spray, she still refused to leave and sat down when the "hands on" removal process began.

The following points were not disputed in the District Court:

a. Robbins can't remember whether her goggles or a handkerchief were removed by the police. In answer to Defendant Rudd's First Set of Interrogatories SER 702, Robbins said at ¶ 2, "I was aggressively pepper sprayed while my handkerchief was forcibly removed by police." and at ¶ 3, "At one point an officer came walking down the line of protestors, removing our handkerchiefs and goggles to pepper spray directly into our eyes..." *See* her testimony on this subject. SER 924-925.

b. No video ever depicts an Officer removing handkerchiefs, bandanas, or goggles from anyone, let alone Ms. Robbins, and no other person testifies to that effect.

c. Robbins' behavior immediately after is completely inconsistent with having been pepper sprayed directly in her face with goggles (or handkerchief) removed. Video shows that she sat down when the Officers initiate their "hands on" removal of protesters and then she changed her mind, got up and left, all

without any sign of pepper spray distress. SER 931-934. The same is true when she is shown shortly thereafter pumping her arm to the "shame on you" chant while still wearing the goggles. *Id.*

The appellants' failed to establish this use of force was unreasonable or that a reasonable officer would have known it was clearly unlawful. The District Court properly concluded that Officers were entitled to qualified immunity. Dkt. No. 399, pg. 7.

### 4.   Appellant Garfield's alleged November 10 Main Gate incidental receipt of pepper spray.

Ms. Garfield claims to have been pepper sprayed on two occasions. The first one appears to be related to the November 10 clearing of the Main Gate barricade discussed in the last section. The second, also occurring on November 10, is covered in the next section.

Her reconstruction of the first incident was "hopelessly vague and there is no direct assertion that she was deliberately pepper sprayed." Dkt. No. 399, pg. 7. Her "Allegation of Serious Employee Misconduct," filed with Olympia on November 11, 2007, states:

> I was standing on the sidewalk, non-violently, officers in riot gear lined the street in front of me. One officer near me was walking down the street. He appeared to drop a can of pepper spray. Within 10 seconds, my eyes and skin were burning. I had only been standing on the sidewalk. I suffered physical pain for at least an hour.

SER 859. Her Interrogatory answer dated November 25, 2011 recounts:

43

...I was standing on a sidewalk near the entrance to the Port of Olympia and the police pepper-sprayed the crowd. I was not doing anything at the time, I was simply standing on the sidewalk as part of the protest. There was so much spray, it became painful to breath.

SER 864.

In her deposition, she placed her location on the sidewalk west of Franklin and north of Market. SER 852. That would put her in the area where the "police line" formed as the initial tactical step during the Main Gate barricade incident. As stated by Lieutenant Holmes, no protesters were allowed in that area. SER 773.

The appellants' failed to establish a constitutional violation. The District Court properly granted summary judgment. Dkt. No. 399, pg. 7.

### 5. Alleged pepper spraying of Appellant Garfield at 4th and Plum.

On November 10, 2007 after the barricades on Marine Drive and at the Port Main Gate had been removed, the first convoy was blocked on Plum Street by individuals running out in front of the semi-tractor trailer trucks. SER 819.

In one instance at the Plum Street/Fourth Avenue intersection, Sarah Warren, a friend of Ms. Garfield, was standing in front of a stopped truck carrying military equipment. SER 853-854. Then, in Ms. Garfield's words, "A police officer began running toward her. She [Warren] had her back to the officer. I ran into the street and tried to stand between her and the officer." *Id.* The officer yelled, "Get out of the street." SER 855. She did not get out of the street and one of the officers in the area pepper sprayed her in the face. SER 856.

The appellants' failed to establish this use of force was unreasonable or that a reasonable officer would have known it was clearly unlawful. The District Court properly concluded that Officers were entitled to qualified immunity. Dkt. No. 399, pg. 8.

Appellants' Brief also states, Officers "hit, kicked, and pepper sprayed" Ms. Garfield. Brief, pg. 24. With respect to the "hit, kicked," she did not testify to both a "hit" and "kick." She said, "I felt a blow to my body, I believed that the officer kicked me." SER 865. Nevertheless, regarding the location and nature of the "blow," she could not remember or she could only speculate. SER 709. She did not see any officer kick her and suffered no injury. SER 710.

The appellants' failed to establish this vague description of a use of force by an unidentified officer was unreasonable or that a reasonable officer would have known it was clearly unlawful under the circumstances in this manner. The District Court properly concluded that the Officer was entitled to qualified immunity. Dkt. No. 399, pg. 7.

**6.     Appellant Grande's "sleeping dragon" incident.**

Later in the afternoon of November 10 another group of demonstrators blocked the three southbound lanes of Plum Street just before they split to become the northbound ramp onto I-5 and Henderson Boulevard which provides access to southbound I-5 and the southern part of Olympia. They formed what is referred to

as a "sleeping dragon" by placing their arms in PVC pipe that has been covered with chicken wire and duct tape and by grabbing hand holds in the pipes. Connected together in this fashion, the group of demonstrators (or "sleeping dragon") is almost impossible to move without going through the cumbersome process of safely cutting each pipe section to separate the individuals. *See* the aerial photograph depicting this area with the approximate location of the "sleeping dragon" indicated. SER 742-745.

Just as the group in "sleeping dragon" mode moved into the street to block traffic, Officer Maynard arrived in a patrol car. While they were still standing, Officer Maynard immediately deployed pepper balls at the demonstrators in an attempt to disorient and move them off the roadway. This tactic had no apparent effect and the demonstrators sat down. SER 754.

Chris Grande is the only appellant who participated in the event. As depicted in the photograph, deposition Exhibit 2, he was wearing a green polyester jacket. Anticipating the use of pepper spray, he wore a white handkerchief over his face and metal working goggles over his eyes. SER 877-878 and SER 889.

Mr. Grande claims to have been struck by two pepper balls. One was in the chest, causing a bruise "a little bit larger than a golf ball." In spite of having his head in a protective down position, Mr. Grande claims the second pepper ball hit him "where the horizontal part of [his] chin becomes the vertical neck." That one

caused "light bruising" and what apparently amounted to an abrasion. The pepper from the two balls caused him to cough for ten minutes. He did not get any of it in his eyes. SER 879.

The pepper ball impact powder patterns on Mr. Grande's jacket indicate that the balls struck his chest and his left clavicle area. SER 754.

Mr. Grande also complains that he got a sore shoulder while being held by a police officer as his PVC tubes were being cut off with an electric saw. SER 880. This was a standard safety procedure used by police for the protection of "sleeping dragon" participants. SER 743.

Much like Ms. Robbins at the Main Gate barricade, Mr. Grande came prepared both to protect himself from pepper spray and to make it inordinately hard for the police to remove him and his cohorts from the street. He received two pepper balls in Officer Maynard's attempt to disrupt the "sleeping dragon" formation as it first moved into the street.

The appellants' failed to establish this use of force was unreasonable or that a reasonable officer would have known it was clearly unlawful. The District Court properly concluded that Officers were entitled to qualified immunity. Dkt. No. 399, pg. 8.

### 7.     Appellant Berryhill's pepper spraying.

Officer Maynard and Officer Bob Krasnican were in the same patrol car assigned to lead a convoy of trucks transporting military equipment from the Port of Olympia southbound on Plum Street to I-5.  As discussed, *supra*, Maynard dealt with the "sleeping dragon" protesters blocking southbound Plum.   Several protesters, not using the "sleeping dragon" devices, were partially blocking the northbound lanes.  Officer Krasnican ordered them out of the roadway.  Only one failed to comply, a white male, later identified as Mr. Berryhill.  Officer Krasnican ordered him out of the roadway three more times.  He never obeyed so Krasnican dispensed pepper spray in his direction from a distance of about six feet. This tactic was successful and now at least the outside northbound lane was clear to traffic. SER 760-761.

As with Mr. Dunn, Mr. Berryhill failed to identify this incident as an attempted additional claim to this lawsuit until the very end of his deposition on January 22, 2014.  Even his attorney claimed not to know about it.  SER 827 and SER 830-833.

As with Garfield at 4th and Plum, Mr. Berryhill stood in Plum Street after being ordered to get out, in his case, several times. When he was pepper sprayed, Mr. Berryhill claims he "had one foot on the sidewalk and one foot in the street on Plum out in front of where there's like a car rental spot and a Shell gas station over

on Plum." SER 827. The sidewalk at that location is separated from the street by approximately 20 feet of grass. SER 745.

The appellants' failed to establish this use of force was unreasonable or that a reasonable officer would have known it was clearly unlawful. The District Court properly concluded that Officers were entitled to qualified immunity. Dkt. No. 399, pg. 8.

### 8. Appellant's Robbins' wrist hold.

Appellant Robbins claims that her arm was bent back and pressure applied to her wrist in a manner that hurt. *Appellants' Brief*, pg. 25. This was done when her arm was behind her back and before the Officers started to escort her to the transport vehicle. SER 928. Ms. Robbins can't recall whether she was in a dead-weight situation or she assisted the Officers in getting her to a standing position. She also can't remember if she walked or was dragged over to the transport bus. *Id.*

Officer Renschler and Watkins formed the team that arrested Ms. Robbins. Renschler cannot recall her specific arrest. He does confirm this entry in his report:

> The resistence level varied between passive resistence, where they would not move and act as dead weight, and active resistance, where they attempted to pull away from us. I utilized Level 1 Control Tactics in removing the subjects to include two pain compliance wrist lock techniques commonly referred to as a "gooseneck" and a "straight wrist twist."

SER 738-739.

Appellant Robbins suffered momentary slight pain through a common police Control Tactic as she was being brought to her feet while resisting. The appellants' failed to establish this use of force was unreasonable or that a reasonable officer would have known it was clearly unlawful. The District Court properly concluded that Officers were entitled to qualified immunity. Dkt. No. 399, pg. 9.

### 9. Appellant Panagacos' complaints re conditions and transport.

Ms. Panagacos complains that she did not have "enough room to comfortably sit" in the transport van." SER 897. Regarding her six to ten hour stay in the Jail holding cell, she complains that there was not enough room for her and for the eight other sit down protest women confined there. They did sing at intervals. SER 899. The appellants have failed to establish this constituted a constitutional violation. The District Court correctly granted summary judgment on this claim. Dkt. No. 399, pg. 9.

### 10. Grande's pepper spraying in the flanking movement.

While the last of the women's sit down demonstrators were being arrested, Lieutenant Costa contacted Sergeant Partin who had been standing by to begin moving the Strykers off the Port. After getting confirmation that Strykers could negotiate the sharp turn out the north gate of the Port compound, Costa instructed

Partin to have his team of Officers escort the convoy out that gate and down Marine Drive while the large crowd at the main gate was still distracted by the arrest process.  Unfortunately, as the first Stryker vehicles passed by Market Street on Marine Drive, they were spotted and much of the crowd ran over to Marine Drive where a chaotic encounter ensued between Strykers, police and demonstrators, fortunately involving no injuries.  SER 785-787.

During this melee Mr. Grande claims to have been pepper sprayed. According to Mr. Grande, 15 to 20 people were walking in front of a Stryker  and he was taking photographs of the police using pepper spray to disburse them. Grande claims he was out of the street on a sidewalk in the southwest corner of the Marine Drive/Market Street intersection when he looked to his left and was pepper sprayed by an Officer.  He cannot identify the Officer and he has no witnesses to the alleged event.  SER 882-886.

A Q13Fox video (VKCPQ14 01) taken at that time shows Strykers moving south on Marine Drive.  The videographer is in the parking lot northwest of the intersection.  Franklin Street comes into the video from the right.  Mr. Grande can be seen standing <u>in the roadway</u> in the southwest area of the intersection taking photographs of the Strykers.  SER 887.  [Filed with Clerk in Physical Format - VKCPQ14 01, 1:01 to 1:10]

Like his own "misting" and Ms. Garfield's first touch of pepper spray, Mr. Grande is vague in his pepper spray claim, except for his certainty about being on the sidewalk. As it turns out, the video caught him square in the street.

The appellants' failed to establish this use of force was unreasonable or that a reasonable officer would have known it was clearly unlawful. The District Court properly concluded that Officers were entitled to qualified immunity. Dkt. No. 399, pg. 9.

## F.    First Amendment.

In *Skoog v. County of Clackamas*, 469 F.3d 1221 (9th Cir. 2006), the Court examined a claim for First Amendment retaliation in the context of a custodial arrest. The Court noted that, as of 2006, there was no clearly established right to be free from a probable cause arrest even if the arrest was in retaliation for the exercise of First Amendment rights. The Court held that, at the time of the plaintiff's arrest, no such clearly established right existed. *Id.* At 1235. However, the Court went on to state that, henceforth, "a right exists to be free of police action for which retaliation is a but-for cause even if probable cause exists for that action."

Thus, following *Skoog* a plaintiff is not required to prove lack of probable cause to sustain her claims. However, a plaintiff must establish that the officers'

"desire to cause the chilling effect [on the exercise of First Amendment rights] was a but-for cause"of the officers alleged actions. *Id.*

In this case, there is no evidence that the but-for cause of the officers' actions was a desire to chill plaintiff's first amendment activities, if any. Instead, each officer was acting simply to enforce applicable laws. The appellants have cited no evidence to the contrary.

**G.    Other claims that were asserted in the complaint that were not challenged in response to the summary judgment motion are waived.**

In their complaint, appellants also asserted claims against the Olympia defendants for substantive due process, outrage, harassment, violation of the state constitution, and a municipal claim against the City of Olympia. The City moved for summary judgment on all of those claims. Dkt. No. 272. They were not opposed below and appellants have not made any arguments supporting those claims on appeal and they are waived. *See*, *supra*, note 2.

**H.    Other Olympia defendants identified by Appellants for which no evidence or argument supports liability.**

**1.    Detective Paul Lower.**

Appellants submit one sentence in the Response which incorrectly asserts Detective Lower "was assigned to collect and collate all intelligence on the demonstrations and activists." Lower denies he has never been assigned to collect and collate material on demonstrators, nor has he done that during his tenure as an

Olympia Police Officer. SER 690. No evidence or arguments are identified supporting liability against Detective Lower.

### 2. Lieutenant James Costa.

Lieutenant Costa's only direct or indirect interaction with the appellants occurred on the night of November 13, 2007 when he supervised the arrests of the sit-down protesting women at the Port of Olympia Main Gate. SER 785-787. Lieutenant Costa has read the allegations of the Complaint relating to him and other than getting his County residence and job title right, he believes the allegations are completely false. *Id.* No evidence or arguments are identified supporting liability against Lt. Costa.

### 3. Commander Steve Nelson.

Appellants mention Commander Nelson and his job duties, but make no argument supporting liability for Commander Nelson. *Appellants' Brief*, pg. 8.

### 4. City Manager Steve Hall.

Appellants mention Steve and his job duties. *Appellants' Brief*, pg. 8. They claim he "participated in meetings with the Army regarding military shipments. *Id.* He is alleged to have been "involved in meetings with the Army regarding the Stryker shipments." *Id.* The full context of his deposition testimony reveals that these meetings were <u>after</u> the November, 2007 events and involved "debriefing of what had happened" and "conditions under which the City might be

able to support their mission in the future." SER 714-715. Appellants make no argument supporting liability for Mr. Hall.

### 5. Commander Tor Bjornstad.

Tor Bjornstad was the Olympia Police Department Operations Commander during the relevant period of this lawsuit. As already discussed, in several instances he personally determined the tactics to be used, such as with the attempted removal of the protesters at the Port Main Gate on November 10 by deploying pepper spray and with the arrest of the women participating in the sit-down protest on November 13. In other instances Officers acted on their own initiative. No information received from Rudd by Bjornstad had any effect on the use of force or arrest tactics employed by Officers of the Olympia Police Department. SER 818. Further, Commander Bjornstad was not aware that Towery was the source of the information to Rudd until long after the events complained of by appellants. *Id.* Appellants cite no evidence and make no arguments supporting liability against Commander Bjornstad.

### I. The District Court Correctly Awarded the Olympia Defendants their Costs.

Federal Rule of Civil Procedure 54(d)(1) provides, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party." FRCP 54(d) creates a *presumption* that the prevailing party is entitled to costs and the losing party bears

the burden to show why costs should not be awarded. *Dawson v. City of Seattle*, 435 F.3d 1054, 1070 (9th Cir. 2006).

Under LCR 54(d), all motions for costs are to be decided by the Clerk. The rule states that "[t]he clerk shall allow such items specified in the motion which are properly chargeable as costs." LCR 54(d)(3). Thus, under the express language of the rule, the Clerk's ruling on a motion to tax costs is non-discretionary and the Clerk must award those costs which are authorized by the court rule and applicable statutes. *See Doyle v. City of Medford*, 606 F.3d 667, 673 (9th Cir. 2010) ("The statute's use of the word 'shall,' then, constitutes 'mandatory language that restricts the discretion of the decision maker.'").

In the instant case, the Olympia defendants prevailed on all claims brought against them. Dkt. No. 399. Therefore, they were entitled to taxable costs as allowed by FRCP 54(d), LCR 54(d) and the relevant federal statutes.

28 U.S.C. §1920 expressly allows for the taxation of costs for deposition transcripts that were "necessarily obtained for use in the case." In construing this statute, the Ninth Circuit has expressly held that the cost of an original and one copy of any deposition is an allowable and taxable cost to the prevailing party, *even if the deposition was not introduced into evidence or used at trial*, so long as *at the time it was taken* it could reasonably be expected that the deposition would be used for trial preparation, rather than mere discovery. *See Independent Iron*

56

*Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 678-679 (9th Cir. 1963), *cert. denied*, 375 U.S. 922, 84 S. Ct. 267, 11 L.Ed 2d 165 (1963). *See also McEuen v. Riverview Bancorp, Inc.*, 2104 U.S. Dist. LEXIS 72177 (W.D. Wash. May 27, 2014)(cost of depositions, i.e. appearance fees and video recording, are properly considered a cost of litigation).

28 U.S.C. §1920 also expressly allows as taxable costs witness fees and disbursements, as well as fees for exemplification and costs for obtaining necessary copies. *Pinasco v. California*, 2012 U.S. Dist. LEXIS 178291, *3-4 (E.D. Cal. December 15, 2012)(*quoting Haagen-Dazs Co., Inc. v. Double Rainbow Gourmet Ice Creams, Inc.*, 920 F.2d 587, 588 (9th Cir. 1990)(allowing as taxable costs 160,000 papers copied by Haagen-Dazs, even though the papers were not introduced into evidence in summary judgment motion)). Thus, depositions for persons who *might* be called at trial are "necessarily obtained for used in the case," even though the deponents are never called at trial, and the costs for such depositions are allowed to the prevailing party. *Independent Iron Works*, 322 F.2d at 678-79.

The appellants' case against the City of Olympia defendants should not be conflated with the case against the Army defendants. Appellants cast the case as one involving domestic spying. That was not the case the appellants developed against Olympia and its employees. In the end, appellants' claims against the

Olympia defendants amounted to little more than a series of fairly minor claims of alleged excess force that were not supported. The case against the City of Olympia defendants was an "ordinary" civil rights case by any definition.

### 1. Great Economic Disparity has not been Established.

There is no evidence in the record as to who would actually be responsible to pay any costs awarded by the Court. There may be an agreement absolving individual appellants in this case of being responsible for costs, in which case appellants' counsel may be responsible. The appellants have not established that they would be the ones footing the bill and the Court should not presume as much without evidence in support.

### 2. Issues in the Case Were Not Close and Difficult.

The Court summarily dismissed the claims against the City of Olympia and its employees. Qualified immunity, statute of limitations and lack of evidence doomed the appellants' causes of action and the Court had no apparent difficulty in reaching that conclusion.

### 3. Appellants' case against Olympia Lacked Merit.

As noted above, the appellants' claims against Olympia and its employees should not be conflated with the case against other defendants. They did not even present argument against many of the named Olympia defendants. The appellants made serious allegations, but failed to back them up with any evidence.

Appellants do not challenge the specific amount of the costs awarded. The costs set forth herein are accurate and were necessarily incurred in this case. SER 453. Therefore, the District Court's order awarding the Olympia Defendants $5,267.18 should be affirmed.

## VI. CONCLUSION

The District Court's grant of summary judgment and award of costs should be affirmed.

Respectfully submitted this 20th day of November, 2015.

> LAW, LYMAN, DANIEL,
> KAMERRER & BOGDANOVICH, P.S.
>
> /s/ *John E. Justice*
> _____
> John E. Justice, WSBA #23042
> Attorney for Defendants-Appellees
> Law Lyman Daniel Kamerrer &
> Bogdanovich, P.S.
> P.O. Box 11880
> Olympia, WA 98508
> Tel: (360) 754-3480/ Fax: 360-357-3511
> jjustice@lldkb.com

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2, Respondents hereby certify that no other cases pending in this Court are deemed related.

LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.

/s/ *John E. Justice*

_____

John E. Justice, WSBA #23042
Attorney for Defendants-Appellees
Law Lyman Daniel Kamerrer &
Bogdanovich, P.S.
P.O. Box 11880
Olympia, WA 98508
Tel: (360) 754-3480/ Fax: 360-357-3511
jjustice@lldkb.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,892 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013, font Times New Roman, and font size 14.

LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.

/s/ *John E. Justice*
_____
John E. Justice, WSBA #23042
Attorney for Defendants-Appellees
Law Lyman Daniel Kamerrer &
Bogdanovich, P.S.
P.O. Box 11880
Olympia, WA 98508
Tel: (360) 754-3480/ Fax: 360-357-3511
jjustice@lldkb.com

61

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Signature:           /s/ John E. Justice
                          Law, Lyman, Daniel, Kamerrer & Bogdanovich, P.S.
                          2674 RW Johnson Blvd S
                          Tumwater, WA 98512
                          (360) 754-3480