**Appeal No. 14-35598, 14-35816**

---

**United States Court of Appeals
for the Ninth Circuit**

---

**JULIANNE PANAGACOS, ET AL.,**

Plaintiffs - Appellants,

v.

**JOHN J. TOWERY, ET AL.,**

Defendants - Appellees.

---

Appeal of Court Orders Dismissing Complaint and Awarding Costs
in United States District Court for the Western District of Washington at Seattle
Case No. 3:10-CV-05018-RBL - Honorable Ronald B. Leighton

---

**Appellee Towery's Response Brief to Appellants' Brief**

---

**McKay Chadwell, PLLC**
Thomas M. Brennan
Michael D. McKay
600 University Street, Suite 1601
Seattle, WA 98101-4124
(206) 233-2800

Attorneys for Appellee John J. Towery

# TABLE OF CONTENTS

I. STATEMENT OF JURISDICTION .................................................................... 1

II. STATEMENT OF ISSUES PRESENTED FOR REVIEW AND
STANDARD OF REVIEW .......................................................................... 1

III. STATEMENT OF THE CASE ...................................................................... 3

IV. STATEMENT OF FACTS ............................................................................ 5

      *a.*     *Fact Summary and Early Litigation Developments* ............................ 5

      *b.*     *Material Background Facts* ................................................................ 7

      *c.*     *Evidence Refutes Protesters' Oft-Repeated Factual
          Misrepresentations* .......................................................................... 12

V. SUMMARY OF ARGUMENTS .................................................................. 15

VI. ARGUMENT ............................................................................................ 18

      *a.*     *Appellate Courts Review de Novo a District Court's Fed. R.
          Civ. P. 56 Summary Judgment Ruling* ............................................ 18

      *b.*     *Protesters Lack Any Evidence either (i) that Towery Intended
          to Chill Speech, or (ii) that Towery Actually Impinged
          Protesters' First Amendment Rights* ................................................ 20

           *i.*     *The Protesters lack evidence necessary to establish
                Towery's intent to suppress speech* ......................................... 24

           *ii.*    *Facts reveal Towery had no deterrent impact on First
                Amendment speech activities* ................................................... 27

      *c.*     *Causal Connection between Towery and Protesters too
          Attenuated to Find Towery Liable for Actions Taken by Local
          Agencies* ........................................................................................... 30

      *d.*     *Protesters Unable to Prove Disparate Treatment of Speech
          based on Viewpoint* .......................................................................... 34

      *e.*     *Protesters Lack Any Evidence Towery Violated the Fourth
          Amendment when he Engaged the Activists within the Scope
          of his Invitation* ................................................................................ 35

           *i.*     *In light of the Fourth Amendment, Towery acted in
                good faith when he investigated the Protesters in order
                to prevent unlawful disruption to Army operations* ................. 37

i

ii. *Towery viewed open, public listservs and did not violate the Fourth Amendment by illegally accessing or viewing a "privileged" listserv* ...........................................39

    A. *Protestors lacked reasonable expectation of privacy when posting information on a public listserv* ..................................................................................42

    B. *Public, electronic internet communications are not privileged, and the Protesters waived any attorney-client or work-product privilege by posting information on the Oly22 listserv* ......................45

f. *Towery did not Infringe Freedom to Associate or Assemble* .............48

g. *Posse Comitatus Act does not give Rise to Fourth Amendment Violations in this Case* ......................................................49

h. *Protesters Fail to Present Evidence Necessary to Persuade this Court to Re-Tax Fed. R. Civ. P. 54(d) Costs* ...............................51

VII. CONCLUSION ....................................................................................55

VIII. STATEMENT OF RELATED CASES ...........................................56

# TABLE OF CASES, STATUTES & OTHER AUTHORITIES

## CASES

*Adcock v. Chrysler Corp.,* 166 F.3d 1290 (9th Cir.1999) .......................................18

*Alcantara v. City of New York*, 646 F.Supp.2d 449 (S.D.N.Y. 2009) .....................36

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).................................... 16, 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................16

*Ass'n of Mexican-Am. Educators v. State of California*, 231 F.3d 572 (9th Cir. 2000) ...................................................................................... 52, 53, 54

*Bates v. Arata*, 2008 WL 820578 (N.D. Cal. 2008) ......................................... 21, 22

*Bissonette v. Haig*, 776 F.2d 1384 (8th Cir. 1985) .......................................... 50, 51

*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) ............ passim

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)..................................................... 23, 24

*California v. Ciraolo*, 476 U.S. 207 (1986)............................................................43

*California v. Greenwood*, 486 U.S. 35 (1988) .......................................................41

*Catlin v. United States*, 324 U.S. 229 (1945) ...........................................................1

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................19

*Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090 (9th Cir. 2005) ......................24

*Corder v. Lucent Techs. Inc.*, 162 F.3d 924 (7th Cir. 1998) ..................................54

*Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir. 2003).......................................23

*Curtis v. Buckley*, 2011 WL 2551369 (E.D. Cal. 2011) .........................................20

*Ellins v. City of Sierra Madre*, 710 F.3d 1049 (9th Cir. 2013)...............................22

*Gelboim v. Bank of Am. Corp.,* 135 S. Ct. 897, 190 L. Ed. 2d 789 (2015) ..............1

*Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979).................................27

*Golden Gate Hotel Ass'n v. City & County of S.F.,* 18 F.3d 1482 (9th Cir. 1994) ...........................................................................................................52

*Handschu v. Special Services Div.*, 349 F.Supp. 766 (S.D.N.Y. 1972) .................38

*Hanson v. Wells Fargo Home Mortg., Inc.*, 2013 WL 5674997 (W.D. Wash. 2013) ....................................................................................................47

*Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997) ...................................................31

*Hartman v. Moore*, 547 U.S. 250 (2006)....................................................................31

*Hoffa v. United States*, 385 U.S. 293 (1966) ............................................. 35, 37, 43

*Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011) ..........................................35

*Janoe v. Stone*, 2012 WL 70424 (S.D. Cal. 2012)...................................................53

*Katz  v. United States*, 389 U.S. 347 (1967) ....................................................... 42, 43

*Laird v. Tatum*, 408 U.S. 1 (1972)...................................................................... 27, 36

*Lamont v. Haig*, 539 F.Supp. 553 (D. S.D. 1982) ...................................................50

*Long Haul, Inc. v. Regents of Univ. of California*, 2009 WL 4546684
    (N.D. Cal. 2009) ....................................................................................................20

*Maryland v. Macon*, 472 U.S. 463 (1985) ..............................................................35

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) .................................18

*Mendocino Envtl. Ctr. v. Mendocino County*, 14 F.3d 457 (9th Cir. 1994).....20, 22

*Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283 (9th Cir.
    1999) ................................................................................................................ 16, 20

*Metoyer v. Chassman*, 504 F.3d 919 (9th Cir. 2007) ..............................................18

*MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118 (9th Cir.
    2013) ......................................................................................................................52

*Moss v. U.S. Secret Serv.*, 572 F.3d 962 (9th Cir. 2009) ........................................31

*Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274 (1977) ....................................23

*Munoz v. Small Bus. Admin.*, 644 F.2d 1364 (9th Cir. 1981). ................................50

*Nat'l Info. Servs. v. TRW, Inc.*, 51 F.3d 1470 (9th Cir. 1999)......................... 52, 53

*Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010)............................................44

*Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856 (9th Cir. 2011) ...................... 2, 3, 18

*Panagacos v. Towery*, 501 Fed. Appx. 620 (9th Cir. 2012) ......................................5

*Panagacos v. Towery*, 782 F.Supp.2d 1183 (W.D. Wash. 2012)............................37

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ........................................................48

*Save Our Valley v. Sound Transit,* 335 F.3d 932 (9th Cir. 2003)............................53

*Skoog v. County of Clackamas*, 469 F.3d 1221 (9th Cir. 2006) ..............................21

iv

*Smith v. Se. Penn. Transp. Auth.*, 47 F.3d 97 (3rd Cir. 1995) .................................53

*Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1316 (9th Cir. 1989)......... 20, 23

*Sorrells v. United States*, 287 U.S. 435 (1932)....................................................6

*Stanley v. Univ. of S. California*, 178 F.3d 1069 (9th Cir. 1999) ...........................54

*State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc*., 425 F.3d 708 (9th Cir. 2005). .....................................................................................3

*State v. Aquino-Cervantes*, 88 Wash. App. 699 (1997)..........................................47

*Stevenson v. Koskey*, 877 F.2d 1435 (9th Cir. 1989)..............................................32

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.,* 330 F.3d 1110 (9th Cir. 2003) ................................................................................................................18

*T.W. Elec. Serv. Inc*. *v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626 (9th Cir. 1987) ................................................................................................................19

*Taylor v. Donley*, 2010 WL 958067 (E.D. Cal. 2010)..................................... 16, 31

*Terry v. Allstate Ins. Co.,* 2007 WL 3231716 (E.D. Cal. 2007) .............................54

*Thomas v. Collins*, 323 U.S. 516 (1945)....................................................... 48, 49

*Trulock v. Freeh*, 275 F.3d 391 (4th Cir. 2001).....................................................44

*United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) ................................................................................................ 27, 28, 36

*United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989)........................ 35, 36, 39, 45

*United States v. Barth*, 26 F.Supp.2d 929 (W.D. Tex. 1998) ................................44

*United States v. Bode*, 2013 WL 4501303 (D. Md. 2013)......................................44

*United States v. Charbonneau*, 979 F.Supp. 1177 (S.D. Ohio 1997).....................45

*United States v. Gonzalez*, 539 F.2d 1238 (1976) ................................................37

*United States v. Jacobsen*, 466 U.S. 109 (1984)....................................................16

*United States v. King*, 509 F.3d 1338 (11th Cir. 2007) .........................................44

*United States v. King*, 55 F.3d 1193 (6th Cir. 1995) .............................................41

*United States v. Maxwell,* 45 M.J. 406 (U.S. Armed Forces 1996)........................45

*United States v. Mayer*, 503 F.3d 740 (9th Cir. 2007)........................ 16, 36, 37, 39

*United States v. Pope*, 686 F.3d 1078 (9th Cir. 2012)...........................................37

v

*United States v. Scherer*, 673 F.2d 176 (7th Cir. 1982)...........................................37

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982) ......................................................27

*Van Deelen v. Johnson*, 535 F.Supp.2d 1227 (D. Kan. 2008).................................48

*Warth v. Seldin*, 422 U.S. 490 (1975)............................................... 27, 28

*Washburn v. Fagan*, 2008 WL 361048 (N.D. Cal. 2008) ........................................54

**STATUTES**

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 1331 .....................................................................................1

**RULES**

9th Cir. R. 28-2.7 ....................................................................................3

9th Cir. R. 30-1.7 ....................................................................................4

Fed. R. Civ. P. 12(b)(6)......................................................................4, 38

Fed. R. Civ. P. 54(a).................................................................................1

Fed. R. Civ. P. 54(d) ............................................................. 1, 3, 52, 54

Fed. R. Civ. P. 56 ............................................................. 1, 17, 18, 19

Local CR 54(d)(3) ................................................................. 52, 54

## I.    STATEMENT OF JURISDICTION

The District Court for the Western District of Washington had jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1331. On June 18, 2014, the District Court granted Appellee - defendant John Towery's Fed. R. Civ. P. 56 summary judgment motion and dismissed the entire action (ER 61), which is an appealable final decision within the meaning of 28 U.S.C. § 1291. A final decision is "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Gelboim v. Bank of Am. Corp.,* 135 S. Ct. 897, 902, 190 L. Ed. 2d 789 (2015) *quoting Catlin v. United States*, 324 U.S. 229, 233 (1945). The Ninth Circuit has subject matter jurisdiction pursuant to 28 U.S.C. § 1291.

On August 14, 2014, the District Court imposed Fed. R. Civ. P. 54(d) costs against the Appellant - plaintiffs (Protesters). ER 3320. Towery was a prevailing party. The Ninth Circuit has jurisdiction to review an order imposing Fed. R. Civ. P. 54(d) costs under 28 U.S.C. § 1291, because costs are only awarded when the judgment is final and appealable. Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies").

## II.    STATEMENT OF ISSUES PRESENTED FOR REVIEW AND STANDARD OF REVIEW

a.    Whether the District Court erred when it reviewed the dispositive briefs and all supporting papers, heard oral argument, and concluded that Towery

(a former civilian Army employee) did not intentionally chill the Protesters' First Amendment free speech rights. The relevant District Court language can be found at pp. 13-14 of the District Court Order Granting Defendants' Motion for Summary Judgment (Order). ER 73 - 74. A district court's grant of summary judgment is reviewed de novo. *See Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011).

b.      Whether the District Court erred when it reviewed the dispositive briefs and all supporting papers, heard oral argument, and concluded that Towery did not breach a reasonable expectation of privacy and therefore did not violate the Protesters' Fourth Amendment rights to be free of an unreasonable search or seizure. The relevant District Court language can be found at pp. 12-13 of the Order. ER 72 - 73. A district court's grant of summary judgment is reviewed de novo. *See Oswalt*, 642 F.3d at 859.

c.      Whether the District Court erred when it reviewed the dispositive briefs and all supporting papers, heard oral argument, and concluded that Towery did not participate in any arrest or seizure conducted by any local law enforcement agency and therefore did not violate the Protesters' Fourth Amendment right to be free from an unlawful seizure. The relevant District Court language can be found at pp. 12-14 of the Order. ER 72 - 74. A district court's grant of summary judgment is reviewed de novo. *See Oswalt*, 642 F.3d at 859.

2

d.    Whether the District Court erred when it reviewed the dispositive briefs and all supporting papers, heard oral argument, and concluded that Towery did not breach the Protesters' reasonable expectation of privacy under the Fourth Amendment when he accessed a public computer listserv (in the normal course of business) that the Protesters placed on the internet.  The relevant District Court language can be found at p. 10 of the Order.  ER 70.  A district court's grant of summary judgment is reviewed de novo.  *See Oswalt*, 642 F.3d at 859.

e.    Whether the District Court erred when it reviewed the briefs in support of, and opposition to, the cost bill submitted by prevailing party Towery under Fed. R. Civ. P. 54(d) and taxed costs, jointly and severally, against all Protesters in the amount of $12,834.34.  The relevant District Court language can be found on pp. 1-2 of the Taxation of Costs.  ER 3320 - ER 3321.  A district court's decision to award costs to a prevailing party pursuant to Fed. R. Civ. P. 54(d) is reviewed for abuse of discretion.  *See State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc*., 425 F.3d 708, 723 (9th Cir. 2005).

An addendum of pertinent constitutional provisions, statutes, and rules follow this brief.  9th Cir. R. 28-2.7.

## III.   STATEMENT OF THE CASE

After 5 years, 13 months of discovery, 19 depositions, and the production of more than 16,000 pages of documents, the Protesters are unable to substantiate

their theory that Towery was a government "spy" coordinating efforts with local police to illegally arrest war protesters and suppress speech activity. The Protesters originally accused roughly 27 government agencies of spying and infiltration, including disparate entities like the Los Angeles Police Department and Air Force Intelligence located at McGwire Air Force Base in New Jersey. ER 153. The Protesters' obfuscate the case by focusing on broad conspiracy themes rather than specific facts that might support their causes of action -- First Amendment speech suppression and Fourth Amendment illegal search and seizure.

Although elegantly phrased, the Protesters have no evidence that Towery was the "personification of the unity of targeting anti-war activists." ER 154. There is no evidence that Towery worked with local police to suppress speech and conduct false arrests. These allegations, lacking evidentiary support, cannot survive either summary judgment, or a de novo review of the facts.

On May 24, 2011, the District Court dismissed all claims against Towery but for the Protesters' First Amendment and Fourth Amendment causes of action. SER 1863.[1] At that time, the District Court rejected Towery's Fed. R. Civ. P. 12(b)(6) qualified immunity argument and Towery appealed that ruling. *Id.* The Ninth Circuit affirmed the District Court on December 17, 2012. *See Panagacos v.*

---

[1] For efficiency, the appellees jointly prepared a Supplemental Excerpts of Record (SER). The SER has been prepared consistent with 9th Cir. R. 30-1.7.

*Towery*, 501 Fed. Appx. 620 (9th Cir. 2012).

The parties thereafter proceeded to discovery. Initially, the Protesters levied several false allegations regarding Towery's actions and intent; however, discovery dispelled those false allegations. Undeterred by fact, the Protesters continue to make the same unsubstantiated and often disproved assertions. For instance, the Protesters insist Towery directed local law enforcement arrests (Opening Brief at p. 10) and used unique computer skills to "hack" into the Protesters "private" listservs (*Id*. at p. 42). The evidence in this case belies these allegations.

After full discovery, all claims against Towery were found to be meritless.[2] The District Court dismissed the Protestors' entire case on summary judgment and entered judgment on June 18, 2014. SER 499.

## IV.   STATEMENT OF FACTS

### a. *Fact Summary and Early Litigation Developments*

Between 2006 and 2008, the Protesters, via an anti-war group known as Port Militarization Resistance (PMR), challenged the Iraq War and the War in Afghanistan. Towery worked for the Army Directorate of Emergency Services (DES) at Joint Base Lewis-McChord (JBLM) near Tacoma. Among other duties, DES worked to protect JBLM property. The District Court correctly noted that the Protesters engaged in hazardous activities when attempting to blockade the

---

[2] Towery rebuts the Protesters' most common false allegations in Section IV. c.

movement of military equipment from JBLM to the Tacoma and Olympia seaports. ER 62, 73.

The Protesters described their activism as "direct action," which included strategies designed to block the flow of vehicular traffic on city streets and freeways, and to lock activists to gates and/or vehicles. SER 1304 - 1305, 1322 - 1324, 1346 - 1348, 1358, 1372 - 1374, 1376 - 1377. PMR primarily focused on preventing the military's use of local marine ports. SER 1341 - 1343, 1384, 1405. The protest activity occurred in public areas without municipal permit. SER 1302 - 1303, 1410 - 1411, 1413 - 1414. The Protesters were arrested in Olympia and/or Tacoma on multiple occasions.

The District Court denied Fed. R. Civ. P. 12(b)(6) motions and allowed this lawsuit to proceed to discovery for the following reasons:

> Plaintiffs allege Rudd and Towery disrupted PMR's activities because they did not like the content of their speech. The next section of this Order addresses the conclusory language used by Plaintiffs. For now, it is enough to say the [Third Amended Complaint], taken as a whole and in the light most favorable to Plaintiffs, alleges Defendants intentionally deterred Plaintiffs' speech because Defendants disagreed with the content of PMR's message.

> Plaintiffs also manage to allege Defendants knowingly violated their Fourth Amendment rights. The alleged violations refer to deceptive infiltration of the PMR and the breaking of the listserv security. The deceptive infiltration probably did not violate the Fourth Amendment because the government may use undercover agents when investigating suspected illegal activity. *See Sorrells v. United States*, 287 U.S. 435, 441-42 (1932).

6

SER 1871.

Through discovery, the aforementioned allegations were dispelled by

testimony, including the following revelations:

- Towery did not break into the publically-accessible Oly22 listserv
  SER 1493 - 1494, 1515;

- Towery did not disrupt PMR activities
  SER 1298, 1389, 1390, 1548 - 1549;

- Towery did not meet with Olympia or Tacoma police, did not
  identify persons for arrest, and did not strategize with local police to
  suppress speech
  SER 1459 - 1460, 1463, 1474 - 1475; and

- Towery did not target Protesters for harassment or encourage them
  to engage in tactics designed to undermine protest activities
  SER 1325 - 1327, 1447 - 1449.

### b. Material Background Facts

During relevant dates, the Protesters were young adults living in group

homes or in residential housing at Evergreen State College. The Protesters claim

to have been subject to false arrest and/or excessive force in both Olympia and

Tacoma during a series of direct action protests. Tacoma police clashed with

protesters engaged in criminal activity near the Port of Tacoma in March 2007.

SER 1464, 1480 - 1481. The Tacoma protests lasted 12 days and cost the city $1

million. *Id.* The November 2007 Olympia protests also lasted several days and

cost the City of Olympia more than $112,000.00, including nearly $4,000.00 in

damage to police vehicles. SER 1563, 1571. Olympia City Manager Steven Hall

described the events as mayhem and witnessed protesters throwing rocks at military equipment and jumping in front of moving military vehicles. SER 1563 - 1564.

Certain groups, including PMR, publicized the desire for direct action to blockade cargo and prevent the shipment of equipment to Iraq. SER 1405. PMR made a distinction between direct action that physically stops military movements (protests that "get ugly") and demonstrations that do not actually disrupt the movement of equipment. *Id*.

To prevent direct action confrontation, local police agencies collected information about potential criminal activity in order to plan for demonstrations and prevent criminal activity and disruptions to local residents and businesses. SER 1465 - 1473. Police knew the internet was a good source for relevant information. SER 1454 - 1458.

At the same time, DES also was concerned about activities that adversely affected the safety and security of Army personnel, families, and equipment. DES employees would gather information from public sources, such as the internet. SER 1576 - 1577. DES personnel would attend meetings with local agencies to plan the movement of military personnel and equipment between JBLM and the local marine ports. SER 1583 - 1584. The agencies would discuss a variety of hazards, including risks posed by protesters. *Id*. DES would share information

8

with local law enforcement agencies. SER 1577.

During relevant dates, defendant Thomas Rudd was the I Corps and Fort Lewis Protection Chief under DES. SER 1583 - 1584. Rudd testified that the Army's goal was to avoid confrontations and focus on safety. ER 819. Towery worked as a Computer Systems Administrator and Criminal Intelligence Specialist for DES. SER 1278. His job, in part, was to help ensure the safety and welfare of those living and working on JBLM. *Id*. Towery also assisted the Army with the planning and implementation of the movement of equipment to/from the ports, and he would collect information that might affect those operations. SER 1279. As did DES in general, Towery viewed the Protesters' publically-accessible computer listservs. Contrary to the Protestors' allegations, he did not hack into any listserv.

Towery notably did not disagree with the Protesters' opposition to the Iraq War. SER 1280. He was not concerned with the nature of the Protesters' speech and was able to distinguish that speech activity from his duty to protect JBLM personnel and property. *Id*.

While working on military equipment convoys, Towery interacted with activists to learn about strategies and tactics designed to block the convoys. *Id*. Towery shared information about potential hazards with the Army personnel tasked with planning and conducting the movement of military equipment. *Id*. Towery took no steps to impede or chill protest activities. *Id*.

9

In the spring of 2007, Towery volunteered as a confidential source on his personal time for the Pierce County Sheriff's Office (PCSO). SER 1280, *see also* SER 1623 - 1625. The confidential source work was separate from his Army work. SER 1280. Towery shared criminal information with PCSO which included, for instance, plans to pour concrete on railroad tracks leading to the Port of Olympia; plans to throw rocks and bricks off Interstate 5 overpasses; plans to commit arson to Stryker vehicle tires; plans to set up street blockades; and plans to stretch aircraft wire across roadways to disrupt the Stryker commanders. SER 1281. Neither the Army nor PCSO paid Towery for his time volunteering as a confidential source. SER 1280.

Towery attended numerous PMR meetings and social events during the course of his Army and PCSO work. He was always welcome. SER 1387, 1391, 1446. Nobody asked Towery to leave any of these meetings or events. SER 1446. Indeed, Towery did not disrupt PMR activities; rather, he facilitated PMR activities. For instance, he helped plaintiff Dunn make a presentation at a Tacoma book fair. SER 1298. He provided car rides to activist events. SER 1391. He drove plaintiff Crespo to coffee shops and a gun exposition when Crespo was interested in purchasing a gun. SER 1415 - 1419. And, he drove Crespo to an anarchist book fair in Portland and to a Northwest Anti-Imperialist Direct Action Coalition meeting in Olympia. SER 1548 - 1550. Towery was a friend. SER

1289, 1298, 1391, 1445.

Towery shared information about criminal activity concerning PCSO with PCSO but not DES. SER 1281. Towery only informed DES about potential harm to Army operations and JBLM. *Id.* And, he only relayed information to DES and PCSO that the Protestors willingly shared with him. He never accessed information that was meant to remain private. SER 1280.

Some information that Towery shared with DES would periodically be entered in daily Threat Assessment reports prepared by Rudd's office. The broad, comprehensive reports discussed events that might impact JBLM safety and security. The reports were distributed to government agencies throughout the Puget Sound region. SER 1282. When planning for protest events, local agencies relied on a variety of sources, not just DES reports. SER 1474 - 1475. As it turned out, the Army information was not particularly useful to local decision makers. SER 1452 - 1453.

Neither the Olympia Police Department (OPD) nor the Tacoma Police Department (TPD) relied on any information provided by DES, Rudd or Towery when detaining or arresting activists. SER 1452, 1459 - 1460, 1463, 1474. Neither DES, Rudd nor Towery instructed OPD or TPD to take any specific steps in relation to protest activities. SER 1459 - 1460, 1462, 1475. Local officers Bjornstad (OPD) and Feddersen (TPD) did not even know Towery. ER 742, SER

11

1459 - 1460.  Similarly, Towery never advised PCSO to arrest any Protester or other activist.  SER 1626.

The Protesters discovered Towery's role as a PCSO confidential source on or about July 2009.  SER 1314, 1420 - 1421.

### c. Evidence Refutes Protesters' Oft-Repeated Factual Misrepresentations

The Protesters repeat many false allegations in an attempt to create an issue of fact.  For the most part, the allegations are immaterial to an analysis of whether Towery violated either the First or Fourth Amendment.  Nonetheless, to ensure accuracy, Towery corrects some of the most egregious claims and notes that the Excerpts of Record do not substantiate the Protesters' claims.  For instance, the Protestors claim Towery was an undercover agent for a Regional Intelligence Group (RIG) (Opening Brief at p. 9); he was not (in fact, Towery volunteered as a confidential source for PCSO.  SER 1281).  The Protestors claim that Towery provided tactical direction and instruction to local police (Opening Brief at p. 10); he did not (in fact, Towery did not coordinate with local police to suppress speech or assist in making arrests (SER 1459 - 1460, 1463, 1474 - 1475), and local police plans did not even rely on Army Threat Assessment reports (ER 655, 661)).  The Protestors claim that Towery infiltrated or "hacked" into an internet listserv (Opening Brief at pp. 15, 42); he did not (in fact, the relevant listserv administrator and the Protestors' own e-mails confirmed the listserv was open to the public, and

anyone was allowed to subscribe. SER 1491 - 1492, 1515 - 1517, 1522 - 1523). The Protestors claim that "Towery could not identify a single act of violence or potential violence that he witnessed" (Opening Brief at p. 59); he could and did (Towery, indeed, was aware of specific acts of violence caused by war protest groups. SER 1280 - 1281). Notably, the Protesters cite the excerpts, but none affirm these allegations.

The Protesters also claim an Army Certificate of Achievement (which Towery received related to the safe transport of Army equipment) evidences Towery's influence over OPD. Opening Brief at p. 14. That is not the case. Towery was commended for gathering information and sharing it with Rudd. Rudd would then share useful information with local agencies. Towery had no idea whether or how the information was used, and more importantly, there is no suggestion in the excerpts that Towery instructed OPD how to treat anti-war protesters. Again, Bjornstad testified that OPD did not use Army information to make tactical plans. ER 655, 661.

The Protesters further claim Colonel Lois Beard's 2008 e-mail evidences a government desire to suppress speech. ER 1489 - 1490. But, Beard explained during her deposition that she was pleased local agencies were able to prevent criminal behavior, not free speech. Her reference to frustrating protesters and their mission was a reference to frustrating their plans to commit crimes. ER 625 - 631.

13

The Beard e-mail does not discuss how the Army, Rudd or Towery formulated or directed local law enforcement planning (because they did not). The Protesters cannot hold Towery accountable for alleged constitutional violations simply because the Army shared relevant information with local agencies. The Protesters need evidence exhibiting Towery's intent to suppress speech, or his desire to share data that foreseeably would be used illegally by local police. Such evidence does not exist.

Towery also had no role in the creation of a domestic terrorist index that identified certain Protesters and was distributed at a terrorism conference in Spokane. Opening Brief at p. 19. The Protesters speculate (*Id*. at p. 56) that they were harassed by local police because of the domestic terrorist list and, without evidence, claim Towery provided information that led to the creation of that list. In fact, RIG employee Michael Kortjohn testified that such information was pulled from arrest reports. SER 726 - 728. Even so, there is no credible evidence that Protesters were harassed because of that list, which was created by a state agency, not Towery.

The Protesters also claim Towery "tried to entrap Crespo and his housemates into using guns, including taking them to a shooting range, attempting to convince Crespo to purchase an assault rifle, and demonstrating how to clear a building with a firearm." Opening Brief at p. 22. Towery showed some Protesters his personal

firearm and attended a gun show with them. ER 953, 3166, 3210. None of this activity, however, was illegal or remotely resembles "attempted entrapment." These allegations are immaterial to the issues before this Court and do not create a genuine issue of material fact.[3]

## V.    SUMMARY OF ARGUMENTS

The heart of this appeal focuses on whether Towery violated the Protesters' First Amendment speech activity and Fourth Amendment protection against unreasonable searches and seizures. Per *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), the Protesters wish to impose a private right of action against Towery (a federal employee) for alleged violations of these constitutional rights. As a civilian employee for DES, Towery was concerned about the safety of military equipment and personnel. As a confidential source for PCSO, Towery was concerned about criminal activity within the anti-war activist movement. Accordingly, Towery interacted with the Protesters in order to gain information relevant to both his Army job and Pierce County's public safety interests.

The legal questions are: (1) whether Towery acted in a way that deterred speech; and (2) whether Towery infringed a reasonable expectation of privacy

---

[3] Other uncorroborated allegations: (1) Towery caused arrests at a special women-only protest in Olympia. This allegation is based merely on declarant Patricia Imani's "belief Towery passed on intelligence." Opening Brief at p. 68. (2) Berryhill, without evidence, claims Towery was compiling license plate data for police use. *Id.* at p. 67.

when he interacted with the Protesters.

To prevail on a First Amendment speech claim, the Protesters must prove that Towery deterred the Protesters' speech activity and that Towery was motivated by that deterrence. *See Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999). To prevail on a Fourth Amendment search or seizure claim, the Protesters must exhibit an expectation of privacy that society is willing to consider reasonable. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984). It is well established law that when a government official is an invited informer, undercover activities are not an unreasonable search under the Fourth Amendment. *See United States v. Mayer*, 503 F.3d 740, 750 (9th Cir. 2007). The governmental agent, or invited informer, can enter private meetings so long as the agent does not exceed the scope of the invitation. *Id*.

A *Bivens* plaintiff must also demonstrate that a defendant "participated directly" in the acts that allegedly violated the plaintiff's rights. *Taylor v. Donley*, 2010 WL 958067 *5 (E.D. Cal. 2010). Vicarious liability does not apply in the *Bivens* context, and a plaintiff must establish that a defendant is accountable for his or her own actions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

At summary judgment, the non-moving party must present genuine factual issues upon which "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In this

instance, the Protesters have generated no evidence that Towery was motivated by a desire to deter their speech. Rather, Towery worked for the Army and helped the Army understand protest activity by reviewing online publications and webpages and by attending protest planning meetings. Towery was tasked with ensuring the safety of military convoys. And, Towery volunteered as a source for PSCO and relayed information about possible criminal behavior to the county. Further, Towery had no interaction with local law enforcement agencies when the agencies detained and arrested the Protesters, and Towery had no role in directing those detentions and arrests.

Towery became friends with the Protesters and was welcome to attend their meetings and social events. The Protesters' own testimony also confirms the fact that their internet communications were open to the public and not hacked by Towery. The Protesters simply have presented no issue of fact upon which a reasonable juror could conclude that Towery acted with a desire to suppress speech or exceeded the scope of his invitation.

Hence, this Court should affirm the District Court's Fed. R. Civ. P. 56 dismissal.

# VI.  ARGUMENT

### a. *Appellate Courts Review de Novo a District Court's Fed. R. Civ. P. 56 Summary Judgment Ruling*

A District Court's grant of summary judgment is reviewed by the appellate court de novo. *See Oswalt*, 642 F.3d at 859. The appellate court views the evidence in the light most favorable to the non-moving party, determines the existence of any genuine issues of material fact and "…whether the district court correctly applied the relevant substantive law." *Oswal*t, 642 F.3d at 859 (citations omitted). "On summary judgment, we 'must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence.'" *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.,* 330 F.3d 1110, 1132 (9th Cir. 2003) *quoting Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991). The appellate court's review is "governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c)." *Adcock v. Chrysler Corp.,* 166 F.3d 1290, 1292 (9th Cir.1999) (citations omitted).[4]

---

[4] The Protesters argue for a "heightened" summary judgment standard (Opening Brief at p. 38) and cite a race discrimination case that discusses how the factfinder should consider the evidence no matter how little. *See Metoyer v. Chassman*, 504 F.3d 919 (9th Cir. 2007). But, *Metoyer* does not require litigants to satisfy a "heightened" test for establishing that the non-moving party has put forth no genuine issue of material fact. Constitutional torts do not have a unique summary judgment standard.

Under Fed. R. Civ. P. 56, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Liberty Lobby, Inc*. 477 U.S. at 257. If accomplished, the burden shifts to the non-moving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Genuine factual issues are those for which the evidence is such that "a reasonable jury could return a verdict for the non-moving party." *Liberty Lobby, Inc*. 477 U.S. at 248. Material facts are those which might affect the outcome of the lawsuit under governing law. *Id*.

A non-moving party cannot rely on the pleadings, but instead must produce evidence that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324. The non-moving party cannot merely state that s/he will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *See T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).

Under the applicable summary judgment standard, the District Court ruled, "Plaintiffs have failed to adduce sufficient evidence to establish a necessary connection between Defendants' conduct and any constitutional violations." ER 61. "Plaintiffs have offered numerous legal theories to causally link Rudd and Towery's actions to later arrests. Yet, the quantity of arguments does not

compensate for a lack of quality or coherence. Plaintiffs have not come forward with evidence to lend any credence to their theories." ER 74.

     *b. Protesters Lack Any Evidence either (i) that Towery Intended to Chill Speech, or (ii) that Towery Actually Impinged Protesters' First Amendment Rights*

A successful First Amendment plaintiff must provide evidence that a defendant deterred or chilled speech and such deterrence was a substantial or motivating factor in defendant's conduct. *See Mendocino Envtl. Ctr.* 192 F.3d at 1300. Intent is a necessary element of the claim. *See Mendocino Envtl. Ctr. v. Mendocino County*, 14 F.3d 457, 464 (9th Cir. 1994).

A plaintiff must "put forth evidence of retaliatory motive, that taken in the light most favorable to him presents a genuine issue of material fact as to intent… To determine motivation, the Court looks to Defendants' knowledge of the protected activity, Defendants' conduct and statements, proximity in time between the protected activity and the adverse action, and the nature of the action." *Curtis v. Buckley*, 2011 WL 2551369 at *4 (E.D. Cal. 2011) *citing Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1316 (9th Cir. 1989). A plaintiff need not prove that his or her speech was suppressed but must establish that the defendant "took action that would chill or silence a person of ordinary firmness from future First Amendment activities." *Long Haul, Inc. v. Regents of Univ. of California*, 2009 WL 4546684 at *7 (N.D. Cal. 2009) *quoting Skoog v. County of Clackamas*, 469

F.3d 1221, 1231-32 (9th Cir. 2006).

A federal district court dismissed First Amendment speech claims against San Francisco police officers after protesters were arrested for interfering with traffic on San Francisco streets without a permit. *See Bates v. Arata*, 2008 WL 820578 (N.D. Cal. 2008). The *Bates* plaintiffs brought claims against the arresting officers and detention supervisory officers. One of the arresting officers, Captain Dennis Martel, declared, "At no time was anything I said or did with respect to the plaintiffs... motivated by a desire or purpose on my part to interfere with or to retaliate against any plaintiff for anything that he/she said or expressed." *Bates*, 2008 WL 820578 at *24.

In particular, the *Bates* Court concluded:

[P]laintiffs argue that a reasonable juror could infer intent to chill political speech simply because the SFPD knew of the reason for plaintiffs' protest and arrested them. The Court finds, however, that such conclusory evidence is insufficient to defeat summary judgment. Further, plaintiffs have stipulated that they were standing in the roadway blocking vehicular traffic at the time of their arrest; thus, there was a basis for arresting plaintiffs. Without any specific evidence that Martel took plaintiffs' political expression into consideration, no reasonable juror could find that he had intent to chill their protected speech. Consequently, the Court GRANTS defendants' motion for summary judgment on plaintiffs' First Amendment claims against Captain Martel.

*Id*.

Here, the Protesters knew they were violating municipal codes by blocking streets and either ignored police warnings or expected to be arrested. SER 1359 -

21

1360, 1375, 1600.  Similar to the police in San Francisco, the local police here had a lawful reason for arresting the Protesters aside from and distinct from any interaction Towery had with the Protesters.  And, the Protesters here were not deterred or chilled from engaging in civil disobedience as evidenced by their propensity for arrests.

Like in *Bates*, the Protesters produced no evidence that Towery was spurred or motivated by a *Mendocino* intent to chill speech.  Rather, Towery testified that his actions were intended solely to protect Army equipment and to assist PCSO's criminal prevention efforts.  SER 1280.  As discussed, Towery took no steps to prevent or disrupt protest activities and sometimes even aided the Protesters' ability to attend free speech activities.  He never instructed or encouraged the Protesters to take any action that would undermine their speech activities.  SER 1280.  Towery simply had no desire to retaliate against any Protester for anything that s/he said or expressed.  *Id*.  Towery did not fundamentally disagree with the Protesters' message.  *Id*.

The Protesters discuss several First Amendment employment retaliation cases.  Opening Brief at p. 58.  These cases use a five-step inquiry when determining whether a public employer violates a public employee's right to make private-citizen comments about issues of public concern.  *See Ellins v. City of Sierra Madre*, 710 F.3d 1049 (9th Cir. 2013); *Coszalter v. City of Salem*, 320 F.3d

968 (9th Cir. 2003); *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274 (1977); and

*Soranno's Gasco, Inc.*, 874 F.2d 1310 (a government contract retaliation case).

These cases are not analogous to the facts at issue here, and they do not support the

contention that Towery was motivated by a desire to chill anti-war speech.

The Protesters also rely on *Brandenburg v. Ohio*, 395 U.S. 444 (1969) to

suggest that their civil disobedience was protected by the First Amendment.  The

State of Ohio passed a law that proscribed the advocacy of the use of force or

illegal behavior regardless of whether the advocacy was likely to cause imminent

lawless activity.  *Brandenburg* explained that the threat of revolt is protected

speech so long as it does not incite imminent lawlessness.

Here, local law enforcement and DES were aware of acts of violence,

including the use of rocks as projectiles, vandalism to police cruisers, efforts to

blockade public roads, and plans to commit arson.  SER 1281, 1563, 1571.  Plans

to incite lawlessness and actual harm were imminent each time the Protesters

engaged local law enforcement.

Unlike the Ku Klux Klan members in *Brandenburg*, the Protesters did not

confine their activities to mere abstract discussions about how violence might

affect political reform.  *See Brandenburg*, 395 U.S. at 448.  Protestors chose to put

their words to action and incited violence.  For instance, when dismantling a Port

of Olympia gate, plaintiff Dunn implored the activists to "tear it down!" SER 1307

- 1313, 1332. Also, unlike *Brandenburg*, this is not a case where any particular government entity enacted a proscriptive measure that curtailed the Protesters' ability to peacefully foment revolutionary ideas.

> ### i. *The Protesters lack evidence necessary to establish Towery's intent to suppress speech*

The Protesters cite the employment retaliation cases discussed above for the proposition that they can survive summary judgment scrutiny with circumstantial evidence. Opening Brief at pp. 57 - 58. However, the Protestors lack even circumstantial evidence. Under the non-analogous employment retaliation line of cases relied on by the Protestors, "when the plaintiff relies on circumstantial evidence, that evidence must be 'specific and substantial' to defeat the employer's motion for summary judgment." *Coghlan v. Am. Seafoods Co. LLC*., 413 F.3d 1090, 1095 (9th Cir. 2005) (citations omitted).

The Protesters specifically attempt to establish Towery's "intent" to suppress speech with the following:

- Army Col. Beard was purportedly pleased that Protesters were experiencing "frustration"
  Opening Brief at p. 60;

- Towery referred to Protesters as "anarchists"
  *Id.*;

- Towery attended a law enforcement regional domestic terrorist conference
  *Id.* at p. 61;

- Towery attempted to organize a working group regarding anarchist activities
  Opening Brief at p. 61*;*

- Towery attended social events with Protesters
  *Id.;*

- Towery attempted to "disrupt" plaintiff Crespo's news publications by encouraging Crespo to publish an inflammatory 9/11 article
  *Id.* at p. 63;

- Towery attempted to entrap Protesters by encouraging them to purchase assault rifles
  *Id.* at p. 40; and

- Towery singularly focused on Protesters and was unconcerned about other groups like biker gangs or right-wing activists
  *Id.* at p. 62.

The Protesters believe they can make these separate, singular allegations seem sinister by lumping them together into a larger conspiracy and deeming them "circumstantial evidence." However, these assertions are either irrelevant or inaccurate. Even if true, the assertions do not tend to establish Towery's intent to suppress speech. For example, there exists no evidence that Towery was attempting to "entrap" the Protestors either through gun purchases or an article about the 9/11 terrorist attacks. First, Towery attended a gun show with some of the Protesters, but only after they expressed an interest in doing so. ER 3210. Second, Towery and Crespo had several conversations about politics and had exchanged literature on multiple occasions. ER 3212 - 3219. Crespo asked Towery to draft an article for Crespo's fledgling news publication. ER 3216.

Towery wrote an article about 9/11 that mimicked an essay "written from the point of view of the captain of the U-boat that sunk the LUSITANIA." ER 3214. Crespo had given Towery the original Lusitania essay, which prompted Towery to believe Crespo "would enjoy" his revised article. ER 3216. Crespo now claims Towery "browbeat" Crespo to publish a fictional article about 9/11 that would ultimately serve to discredit Crespo's publication and lead to "intensified law enforcement scrutiny[.]" Opening brief at p. 41. Towery never pressured Crespo to publish the article. ER 3217 - 3218. The theory that Towery was attempting to entrap Crespo is fanciful.

Further, certain assertions are actually false, as established by direct evidence.[5] For example, Col. Beard's direct testimony was that she was pleased that local agencies were able to prevent criminal behavior, not free speech. Her reference to frustrating protesters and their mission was a reference to their plans to commit crimes. ER 625 - 631. Regardless, Beard's viewpoint cannot be vicariously attributed to Towery. *See Taylor*, 2010 WL 958067 at *5.

---

[5] Notably, direct evidence is found to be more probative than circumstantial. *See Coghlan*, 413 F.3d at 1095 ("The distinction between direct and circumstantial evidence is crucial, because it controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment. Because direct evidence is so probative, the plaintiff need offer 'very little' direct evidence to raise a genuine issue of material fact").

In addition, both DES and local law enforcement confirmed the fact that their offices monitored all types of activist groups -- both liberal and conservative. ER 610, 2972, SER 730. As a whole, the above-referenced innocuous facts are not "specific and substantial" (*Coghlan*, 413 F.3d at 1095) and do not create a genuine issue of material fact as to whether Towery was motivated by the desire to suppress speech.

### ii. Facts reveal Towery had no deterrent impact on First Amendment speech activities

The Protesters claim Towery is responsible for PMR's eventual "disintegration," even though PMR's purpose naturally expired when the Iraq War and port shipments concluded. Opening Brief at p. 70. Nonetheless, "[a]llegations of a subjective 'chill' [on First Amendment rights] are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]" *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). A plaintiff must show that he or she "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) *quoting Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) *quoting Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979). Injury must be "distinct and palpable." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). The *Laird* Court dismissed a suit targeting a U.S. Army intelligence-

27

gathering program, because a subjective chill was not an adequate substitute for specific present, objective harm. Similarly, the *United Presbyterian Church* Court dismissed a complaint where the plaintiffs, without concrete harm, alleged only a generalized fear and concern regarding intelligence-gathering activities.

The "subjective chill" cases are important here, because some Protesters concede they cannot recall a time when they were prevented from being able to attend a protest event. SER 1392 - 1393. And, the Protesters were, in fact, not chilled as evidenced by the fact that they continue to engage in political speech. SER 1363, 1371, 1380 - 1381, 1446. Plaintiff Dunn was brazen enough to subsequently shout down a United States President. SER 1294, 1328 - 1329.

This case lacks any evidence of a "distinct and palpable" injury as required by *Warth*. Without evidence of an objective chill, Towery's conduct did not injure the Protesters' First Amendment interests.

In fact, the Protesters were undeterred from continuing their activism. Plaintiff Berryhill was arrested in both Olympia and Tacoma in 2007. In Tacoma, he was arrested for entering the road after being instructed not to do so. He has no knowledge or evidence that Towery played any role in the arrests made by local law enforcement. Berryhill still engages in protest activity, and he does not recall a time when he has been prevented from protesting. SER 1380 - 1383, 1390, 1393 - 1394.

Plaintiff Crespo pled guilty in 2007 to resisting arrest during a 2007 Tacoma protest. He has no knowledge or evidence that Towery had any role in the Tacoma arrest. Crespo still engages in protest activity and participated in an anti-police violence rally in Tacoma in 2010. SER 1410, 1424, 1442.

Plaintiff Dunn was arrested in Olympia and Tacoma in 2006 and 2007 respectively. He admits to walking in front of a military Stryker convoy. Dunn has no knowledge or evidence that Towery had any role in the arrests made by local police. Dunn still engages in First Amendment protest activities. Indeed, in 2010, Dunn was arrested for causing a disturbance by verbally accosting President Clinton at a public speech in Utica, New York. He called President Clinton a war criminal. SER 1294 - 1296, 1301, 1332.

Plaintiff Garfield participated in protest activities in Olympia in 2007. She was neither arrested nor detained. Garfield has neither met nor communicated with Towery. She does not recall seeing Towery at activist meetings. She has no knowledge of any specific information Towery might have shared with any agency. And, she has no knowledge of Towery ever exceeding the scope of his invitation when meeting with the Protesters or other activists. SER 1590 - 1597.

Plaintiff Grande was arrested in Olympia in 2007 for participating in a human road blockade. He was also arrested in Tacoma in 2009 for attempting to block interstate exit ramps. Grande has no knowledge about Towery's activities

aside from Towery attending a protest planning meeting and possibly gathering information at that meeting. SER 1338 - 1340, 1344 - 1345, 1349 - 1350.

Plaintiff Panagacos was arrested in Olympia in 2007 when sitting in a roadway. She remained in the road despite being warned by police four times to move or risk arrest. Panagacos has never met Towery or attended any meetings with Towery. And, she has no first-hand knowledge of his interactions with PMR. Panagacos has continued to engage in protest activity, including a 2013 march in Olympia. SER 1359 - 1362, 1364 - 1368.

Plaintiff Robbins was arrested in both Olympia and Tacoma in 2007. In Olympia, she recalls police warning her to exit a street, but she refused to move. In Tacoma, Robbins was arrested for climbing a barricade and moving beyond a designated speech zone. Robbins breached the barricade, because she disagreed with the enforcement of a speech zone. Robbins recalls other protesters cheering and celebrating their freedom of expression rights during her arrest. Robbins has no first-hand knowledge or evidence that Towery in any way affected her arrests in Olympia and Tacoma. SER 1600 - 1603, 1610, 1616.

Put simply, no Protester abandoned his or her anti-war speech activities in response to Towery's investigative work.

### c. Causal Connection between Towery and Protesters too Attenuated to Find Towery Liable for Actions Taken by Local Agencies

A *Bivens* plaintiff must demonstrate how a defendant "participated directly"

30

in the unconstitutional acts. *Taylor*, 2010 WL 958067 at *5. The Ninth Circuit dismissed a *Bivens* action against federal agents when the plaintiff neither alleged nor implied that the agents had anything to do with local police efforts to move political protesters. "Without any allegation tying the Agents to the actions of the local police, we may not assume that either did anything beyond ordering Plaintiffs moved to the east side of Fourth Street." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 971 (9th Cir. 2009). The *Moss* plaintiffs were ordered by local police to move across the street when protesting a presidential motorcade, but at a location farther away than the location for Bush supporters. Secret Service agents were relieved from liability, because there was no evidence "tying" them to a decision to move different types of protesters to different locations. *Id.* at 971.

 *Bivens* causation can be established when a defendant sets in motion a series of acts by others the defendant knows or reasonably should know would cause others to inflict constitutional injury. *See Harris v. Roderick*, 126 F.3d 1189, 1196 (9th Cir. 1997) (agent should have known that lying about plaintiff's role in Ruby Ridge incident would lead to constitutional harm). A plaintiff must show a causal connection between a retaliatory intent and the subsequent injury. *See Hartman v. Moore*, 547 U.S. 250, 260 (2006). "If there is a finding that retaliation was not the but-for cause of the [retaliatory harm], the claim fails for lack of causal connection between unconstitutional motive and resulting harm…." *Id*.

31

In the civil rights context, the Ninth Circuit also has drawn on tort law to analogize "[i]f the defendant can foresee neither any danger of direct injury, nor any risk from an intervening cause, the defendant is simply not negligent." *Stevenson v. Koskey*, 877 F.2d 1435, 1439 (9th Cir. 1989) (citation omitted). "In tort law, the function of the doctrine of proximate cause is to establish the outer limits to which the negligent actors would result in liability to those injured…proximate cause has served the same purpose in civil rights law." *Id.* at 1439. In *Stevenson*, the defendant probation officer could not be liable when she could not have reasonably foreseen that another officer would illegally open plaintiff's jail mail when the she gave the mail to the offending officer.

The Protesters concede that Towery did not directly arrest any of the Protesters. Opening Brief at p. 67. But, the Protesters claim Towery both identified individuals for arrest because he did not like the content of their speech and met with police to design strategies to silence the PMR. The evidence, however, establishes that Towery had no interaction with local law enforcement officers in Olympia and Tacoma, and he had no impact on the decisions made by local law enforcement. SER 1459 - 1460, 1462, 1474 - 1475. Towery did not arrest or detain Protesters, and the Protesters themselves acknowledge that they have no information proving that Towery played any role in the Olympia and Tacoma arrests. SER 1289 - 1293, 1350 - 1355, 1362, 1389 - 1390, 1423 - 1442,

1593 - 1595, 1604 - 1617. While DES shared Threat Assessments with local police, that fact alone is not enough to pin liability on Towery, especially when local officers have testified that Towery never directed any of their actions. Sharing information is different than providing specific instruction, and neither Towery nor DES provided any instruction on how to handle the Protesters.

The Protesters attempt to pin causation on Towery by claiming he set in motion a chain of events he knew, or should have known, would lead to First Amendment violations. Hence, they claim he is responsible for false arrests, detentions and animus-motivated use of force that was intended to chill protest demonstrations. Opening Brief at p. 70. However, they have provided no direct or circumstantial evidence to support this claim. It is unreasonable to argue that but-for Towery's surveillance, the Protesters would not have been arrested by OPD and TPD. This is especially true since the activists often expected to be arrested because of their direct action techniques, not because Towery set in motion the chain of events that led to these arrests. SER 1359 - 1360, 1600.[6] Like the *Stevenson* defendant, Towery could not have reasonably foreseen that the Protesters would be arrested "illegally" as opposed to legally simply by sharing

---

[6] The Protesters have characterized 24 arrests in May/June 2006 as "notable early success" when the arrestees "laid down at [the Port of Olympia's] open gate and refused to move until arrested." ER 153. The Protesters anticipated arrests even if they claim otherwise today.

information about potential criminal behavior with his PCSO contact.[7]  The

claimed causation becomes even more attenuated when considering the fact that

neither OPD nor TPD relied on the Army's information when deciding how to

handle the protests.  SER 1452, 1459 - 1460, 1463, 1474.  Towery was neither the

cause in fact nor the proximate cause of any harm alleged by the Protesters.

> d. *Protesters Unable to Prove Disparate Treatment of Speech based on
> Viewpoint*

Finally, the Protesters claim they were targeted based on the content of their

speech or their viewpoint.  They claim Towery and others were not concerned

about other potentially troublesome groups, like biker gangs or neo-Nazi groups.

Opening Brief at p. 62.  But, the Protesters have presented no instance when pro-

war activists (or other "right wing" groups) were treated differently, or favorably,

in comparison to the Protesters.  In fact, there is no evidence that pro-war activists

were ever an issue in this case.  Hence, no comparison can be made here.

Regardless, RIG employee Michael Kortjohn testified that his office did study and

monitor "the right-wing, the white-power extremists, the militia…."  ER 2972.

The RIG was concerned about all kinds of criminal activity.  ER 610 - 611.

Adamson also confirmed that his office studied various groups, including the white

power movement, environmentalists, anarchists, and outlaw bikers.  *Id*.  And,

---

[7] Towery has no reason to believe OPD or TPD acted unlawfully.

Towery himself collected information on any organization that made public statements of intent to harm or disrupt the military. SER 730. Towery was not singularly focused on the Protesters.

As has been explained, the Protesters' interaction with law enforcement was because of their decisions to illegally blockade roads and prevent vehicular traffic, for instance, not because of the content of their message. No doubt, government agencies cannot favor one side of a public debate. *See Hoye v. City of Oakland*, 653 F.3d 835, 849 (9th Cir. 2011). However, Towery attested to the fact that he did not disagree with the Protesters' message and did not harbor disdain for that speech. SER 1280.

### e. Protesters Lack Any Evidence Towery Violated the Fourth Amendment when he Engaged the Activists within the Scope of his Invitation

A Fourth Amendment violation for unreasonable search or surveillance turns on whether a plaintiff has a reasonable expectation of privacy. *See Maryland v. Macon*, 472 U.S. 463, 469 (1985). There is no reasonable expectation of privacy when a plaintiff willingly shares information with third parties, even if the third party is a government informant. *See United States v. Aguilar*, 883 F.2d 662, 697-99 (9th Cir. 1989), superseded by statute on other grounds. And, there is no expectation of privacy even if that information is shared in a private setting. *See Hoffa v. United States*, 385 U.S. 293, 302 (1966). The invited informer doctrine

applies to political associations when undercover agents operate without a search warrant. *Aguilar*, 883 F.2d at 705. The agents, however, must be careful not to exceed the scope of invitation in the sense that they cannot seize information a plaintiff did not willingly share. *Id.*

The Protesters welcomed Towery to attend their meetings and activities. SER 1297, 1387, 1446. Nobody asked Towery to leave these meetings. SER 1391, 1446. Towery only relayed the information that the Protesters willingly shared with him. SER 1280.

It is not a violation of constitutional law when a government agent infiltrates a group to investigate possible criminal acts. *See Mayer*, 503 F.3d 740 (undercover F.B.I. agent allowed to investigate association by joining association using an alias); *United Presbyterian Church*, 870 F.2d 518 (INS agents afforded qualified immunity after surreptitiously recording church services); *Aguilar*, 883 F.2d 662 (undercover agents allowed to investigate the smuggling of illegal aliens); *Alcantara v. City of New York*, 646 F.Supp.2d 449 (S.D.N.Y. 2009) (undercover police officers and DEA agents allowed to investigate members of drug money laundering organizations); and *Laird*, 408 U.S. 1 (a surveillance system that gathers information about protest activities from intelligence officers who attend public meetings and write reports about meetings is constitutional unless people under surveillance allege a specific future harm). It also is

36

appropriate for an agent to earn a plaintiff's trust or gain his or her confidence

while acting undercover or with an alias.  *See United States v. Gonzalez*, 539 F.2d

1238, 1239 (1976), *see also Hoffa*, 385 U.S. at 414.

> The District Court noted:

> A 'search' for the purposes of the Fourth Amendment 'occurs when the government infringes on a subjective expectation of privacy that society is prepared to recognize as reasonable.' *United States v. Pope*, 686 F.3d 1078, 1081 (9th Cir. 2012).  An undercover operation where the agent is an 'invited informer' are not searches under the Fourth Amendment.  *Panagacos v. Towery*, 782 F.Supp.2d 1183, 1191 (W.D. Wash. 2012) (citing *United States v. Mayer*, 503 F.3d 740, 750 (9th Cir. 2007).  'A government agent may obtain an invitation onto property by misrepresenting his identity, and if invited, does not need probable cause nor a warrant to enter so long as he does not exceed the scope of his invitation.' *United States v. Scherer*, 673 F.2d 176, 182 (7th Cir. 1982).

ER 72 - 73.

> i. *In light of the Fourth Amendment, Towery acted in good faith when he investigated the Protesters in order to prevent unlawful disruption to Army operations*

The Protesters contend Towery violated the established Fourth Amendment

invited informer doctrine, because he did not act in good faith or for a purpose

other than to abridge their constitutional rights.  Opening Brief at p. 39.  No doubt,

good faith is a requirement for investigations under the Fourth Amendment.  *See*

*Mayer*, 503 F.3d at 751.  Good faith means the investigation must not be for the

purpose of abridging First Amendment freedoms.  *Id*.  It must be "justified by a

legitimate law enforcement purpose that outweighs any harm to First Amendment

interests." *Mayer*, 503 F.3d at 753.

Towery and DES were concerned about JBLM safety issues and the safety of equipment during equipment convoys. This concern was borne out of prior confrontations with war protesters. The Protesters suggest Towery's infiltration was impure. They claim Towery nefariously showed the Protesters how to use guns and encouraged the Protesters to purchase assault rifles. Opening Brief at pp. 40 - 41. They claim Towery encouraged Crespo to publish an incendiary article in order to draw police scrutiny. *Id*. They claim these examples are evidence that Towery engaged in illegitimate government infiltration. First, there is no evidence Towery was attempting to disrupt PMR or induce criminal activity as discussed in *Handschu v. Special Services Div.*, 349 F.Supp. 766 (S.D.N.Y. 1972) (District Court denied Fed. R. Civ. P. 12(b)(6) motion when plaintiff alleged that anti-war group disbanded due to an undercover agent's attempt to compel a group to participate in unlawful conduct at demonstrations).

The Protesters continually attempt to reframe the facts by referring to their activities as "non-violent civil disobedience." Opening Brief at p. 43. They refuse to acknowledge instances, for example, when they implored the public to "tear down" a fence on public property. SER 1307 - 1313, 1332. The fact remains that both Army DES and local law enforcement were concerned about criminal activity, such as property damage. War protesters had caused damage and clashed

with law enforcement agents on multiple occasions. SER 1464, 1480 - 1481.

Towery was motivated by a desire to protect Army property and prevent criminal

activity. SER 1280. Consistent with *Aguilar* and *Mayer*, Towery was engaged in a

legitimate law enforcement purpose by collecting information about potential

criminal activity. Hence, it was legal for Towery to interact with activists and

discuss his observations with others, and given the case law in this regard, the

Protesters cannot establish an illegitimate, deceptive (or bad faith) infiltration that

exceeded the scope of invitation.

### ii. Towery viewed open, public listservs and did not violate the Fourth Amendment by illegally accessing or viewing a "privileged" listserv

The District Court correctly concluded the Protesters had no expectation of

privacy as to internet listservs, because listservs are accessible to the public. ER

70. Plaintiffs Berryhill and Dunn allege Towery covertly broke the security of a

confidential "attorney-client" listserv known as Oly22. Opening Brief at p. 42.[8]

No other listserv is at issue here. SER 1388 -1389. The Oly22 listserv was created

in 2006 in response to the arrest of 22 individuals at the Port of Olympia. Berryhill

and Dunn claim the Oly22 listserv was intended to facilitate confidential, attorney-

client communications related to the criminal prosecution. They allege Towery

"hacked" the listserv, inappropriately accessed a jury questionnaire spreadsheet,

---

[8] No other Protester claims damages related to the Oly22 listserv.

and damaged their defense by disclosing the spreadsheet to law enforcement. Opening Brief at pp. 42, 81.

It was common for activist groups (like PMR) to set up community forums, or listservs, on internet servers like riseup.net. SER 1279. Anyone could learn about protest activities by searching publicly-accessible listservs, blogs and websites. *Id.* DES was aware of these types of online tools and searched riseup.net for news about upcoming protests and meetings. SER 1279. Dunn testified that forums like the riseup.net listserv were a vehicle to share news and build support. SER 1299. The listservs admittedly were open to the public in order to disseminate information. *Id.* These types of listservs were not meant to be secret. Hence, there is no credible evidence that the listserv was meant to be private.

Phan Nguyen was one of the Oly22 listserv administrators in late March 2007, and he investigated the listserv security settings at the time the jury spreadsheet became public. SER 1491 - 1492, 1515 - 1517, 1522 - 1523. As confirmed by Protester e-mails and Nguyen's testimony, the Oly22 listserv was an "open discussion list…and the default settings were to allow anyone to subscribe." *Id.* "[T]here was no need to do any hacking, because the list was open to new subscribers." SER 1493 - 1494.

Any person would be granted access to the Oly22 listserv by simply entering

his or her e-mail address.  It had "minimum security."  SER 1495, 1516.  Also,

individuals were added to listservs by providing e-mail addresses at public

planning meetings.  SER 1385 - 1386.  The administrator would collect the e-mail

addresses and add them to the listserv.  SER 1369 - 1370.

The Oly22 listserv could be found by conducting a keyword search.  SER

1494 - 1495.  Towery automatically joined the Oly22 list on or about February 16

or 17, 2007 -- about one month before the jury spreadsheet became an issue.  SER

1282, 1493 - 1495, 1515.

On the one hand, the Protesters admit the "listservs were open to members

of the public to facilitate participation in the anti-war movement."  Opening Brief

at p. 75.  On the other hand, the Protesters claim the Oly22 listserv was meant to be

like "sending a private e-mail to one recipient."  *Id.*  But, this latter position

fundamentally misstates the function of a listserv.  A listserv is like a public,

electronic bulletin board.  Comments are broadcast to the entire distribution list.

No reasonable person would consider the listserv "no different from sending a

private email to one recipient."  *Id.*  And, it is unreasonable for the Protesters to

compare the use of a listserv to the delivery of a letter through the U.S. Postal

Service.  *See e.g., California v. Greenwood*, 486 U.S. 35 (1988) and *United States

v. King*, 55 F.3d 1193 (6th Cir. 1995).  The facts here are more analogous to

posting an announcement on a cork bulletin board at a local community center.

The Protesters also falsely claim the Oly22 listserv was protected by a privacy setting (Opening Brief at p. 79), but they have no evidence of that claim. Frankly, that claim is inconsistent with the Protesters' desire to publicize their anti-war activism. In fact, the Oly22 listserv did not employ passwords or a mechanism to screen new subscribers. SER 1300.

The Protesters' 2007 communications also confirm that "[s]ubscription was open to the public, although the list admin would receive an e-mail whenever anyone subscribed or unsubscribed." SER 1496, 1516. In fact, three people (Christian Hill, Mike Hirte and Ryan Tompkins) tested the listserv security and were able to subscribe to the list freely. SER 1502. An Olympian newspaper reporter, Christian Hill, also wrote an article about his newspaper's ability to access the Oly22 listserv without interference. SER 1619 - 1620.

### A. Protestors lacked reasonable expectation of privacy when posting information on a public listserv

"What a person knowingly exposes to the public…is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). Both Berryhill and Dunn claim Towery accessed the Oly22 listserv in violation of their Fourth Amendment expectation of privacy. Towery, like the Olympian reporter, was able to access the Oly22 listserv by self-subscribing and did nothing to breach any security protocols or covertly access the listserv. The list was in plain view and knowingly exposed to the public.

42

Federal courts employ the following two-part test to determine Fourth Amendment protection: (1) a person must exhibit an actual (subjective) expectation of privacy, and (2) the expectation must be one that society is prepared to recognize as reasonable. *Katz*, 389 U.S. at 361 (Harlan, J., concurring). In addition, warrantless searches are reasonable when a government agent, for instance, obtains evidence in plain view when he or she has a legal right to be in that location (*See California v. Ciraolo*, 476 U.S. 207 (1986)) or when a person mistakenly places his or her trust in someone who turns out to be a government agent (*See Hoffa*, 385 U.S. 293).

The question here is whether plaintiffs Berryhill and Dunn exhibited an actual (subjective) expectation of privacy when they shared information about the Oly22 arrests on a public listserv, and whether the public at large is willing to deem a public listserv (or chatroom) communication a private communication that reasonably should be afforded Fourth Amendment protection. The Oly22 listserv administrator admitted under oath that the Oly22 listserv was "open to the public," and the default setting was to "allow anyone to subscribe," because it was an "open discussion list." SER 1509, 1523. Towery accessed the listserv consistent with the protocols set forth by the Protestors. SER 1282.

Federal courts have distinguished privacy expectations between (a) personal, one-on-one e-mail, and (b) internet chat rooms, or listservs. "To begin with, the

cases finding a reasonable expectation of privacy in email or similar electronic communication have been premised on the private, person-to-person nature of the communication, akin to a letter. In contrast, one's 'reasonable expectation of privacy' cannot encompass anything exposed to the public[.]" *United States v. Bode*, 2013 WL 4501303 *16 (D. Md. 2013) *citing Ostergren v. Cuccinelli*, 615 F.3d 263, 282 (4th Cir. 2010). The *Bode* Court rejected the notion that a person is afforded privacy when posting messages in public chatrooms since messages sent to the public-at-large in chatrooms lose any semblance of privacy. *Bode*, 2013 WL 4501303 *16.

Monitoring content on internet bulletin boards on widely accessible computer networks does not amount to a search because there can be no reasonable expectation of privacy. *See United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (no Fourth Amendment search where claimant connected to work network in which everyone had access to all files and could view bulletin boards, just as the government investigator did).

Some courts distinguish situations where a claimant may suffer an illegal search when internet passwords are compromised or when searches exceed the scope of access granted by a computer owner. *See e.g., Trulock v. Freeh*, 275 F.3d 391 (4th Cir. 2001) and *United States v. Barth*, 26 F.Supp.2d 929 (W.D. Tex. 1998). Those types of privacy expectations do not exist here, because the Oly22

44

listserv was meant to be, and was, open to the public.

Furthermore, a party loses a reasonable expectation of privacy in chatrooms, because he or she runs the risk of speaking to an undercover agent. *See United States v. Charbonneau*, 979 F.Supp. 1177 (S.D. Ohio 1997), *see also United States v. Maxwell,* 45 M.J. 406, 417 (U.S. Armed Forces 1996) (noting that "the more open the method of transmission, such as the 'chat room,' the less privacy one can reasonably expect").

The Protesters deliberately established a self-subscription listserv rather than a listserv that required security settings, which undermines any actual (subjective) expectation of privacy.

> **B.** *Public, electronic internet communications are not privileged, and the Protesters waived any attorney-client or work-product privilege by posting information on the Oly22 listserv*

The Protesters contend the listserv incorporated an "attorney-client privilege notice," and therefore, nobody was permitted to access the listserv unless he or she was a member of the Oly22 legal team or an Oly22 defendant. Opening Brief at p. 75. But, the Protesters have presented no evidence of such notification, and Towery did not see that type of notice. SER 1282. This argument, however, distracts from the real question: whether Towery infringed the Protesters' reasonable expectation of privacy (*Aguilar*, 883 F.2d 662) when he accessed information that was posted on the internet listserv, regardless whether it was

45

marked "attorney-client privileged." Whether the Oly22 listserv was designated privileged is immaterial and does not affect the outcome of the case, or the question of whether Towery infringed the Fourth Amendment by accessing the listserv.

"[E]ven if there was such a notice, the attorney-client privilege does not apply to communications shared with third persons. Public communications are not privileged as a matter of law, and it is not a cause of action to see privileged information." ER 70.

It is disingenuous to claim "…only Oly22 defendants, attorneys, and legal workers used the listserv for case strategy and trial work…." Opening Brief at p. 78. Both Berryhill and Dunn have confirmed that people were admitted to the listserv who were neither defendants nor parties to the prosecution, and hence, were not clients afforded an attorney-client privilege. SER 1315, 1320, 1402.

Nguyen identified 11 persons that were neither Oly22 defendants nor part of the legal team. SER 1500 - 1501, 1516.[9] Most of the 11 were not arrested on May

---

[9] Nguyen's March 30, 2007 e-mail (SER 1515) notes that the following persons "were not supposed to receive the [jury] spreadsheet:" Magi Belknap (original Oly22 defendant), Michael Yates (original Oly22 defendant), Mat Slobodkin (original Oly22 defendant, riot), Daniel Keesler (original Oly22 defendant, riot), Tanya Kinigstein (May 24 blockade arrestee), Sandy Mayes (May 24 blockade arrestee), Patty Imani (May 24 blockade arrestee), Drew Hendricks (May 23 blockade arrestee), jaamt004@gmail.com, Doug Brinkerhoff (May 23 blockade arrestee) and Dave Lynn (May 23 blockade arrestee).

30, 2006, which would make them ineligible to be considered an Oly22 arrestee or defendant. Nguyen's 2007 e-mail was plainly correct. These people were not part of an attorney-client relationship and should not have received "privileged" communications. These individuals were not necessary to facilitate a privileged communication, such as an interpreter, as suggested by the Protesters. Opening Brief at p. 78, citing Washington State appellate court case *State v. Aquino-Cervantes*, 88 Wash. App. 699 (1997).

"Generally, voluntary disclosure to a third party in a state or federal proceeding of a document protected by attorney-client privilege or the work-product doctrine waives both protections." *Hanson v. Wells Fargo Home Mortg., Inc*., 2013 WL 5674997 *5 (W.D. Wash. 2013). The Protesters knowingly allowed unfettered access and subscription to the Oly22 listserv (including at least 11 non-parties). Any legal communications shared with these third parties cannot be glossed over as an inadvertent disclosure or part of a legal strategy.

In addition, the Protesters claim a spreadsheet about potential jurors in the Oly22 case was privileged work-product (Opening Brief at p. 80) that should not have been viewed by Towery, despite the fact they acknowledge the listserv was published on the Oly22 listserv. It is unclear whether the spreadsheet was attorney work-product, but it is indisputable that any such privilege was waived, such as in *Hanson*, when the Protesters shared the document with as many as 11 individuals

not associated with the state court prosecutions.

Ultimately, the Oly22 listserv administrator, Nguyen, confirmed the fact that Towery subscribed to the listserv per the protocol and took no steps to hack the listserv. SER 1500 - 1501, 1516. Towery simply did not exceed a reasonable expectation of privacy in regards to the listserv.

### f. Towery did not Infringe Freedom to Associate or Assemble

The freedom to speak includes an implicit right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. *See Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984). Government actions that may unconstitutionally infringe upon this freedom of association can take a number of forms: imposition of penalties or withholding benefits from individuals because of their membership in a disfavored group; requiring disclosure of the fact of membership in a group seeking anonymity; and interfering with the internal organization or affairs of the group. *Id*. at 622.

"The right of assembly is the right to physically hold and attend meetings, marches, pickets, demonstrations, parades, and the like." *Van Deelen v. Johnson*, 535 F.Supp.2d 1227, 1233 (D. Kan. 2008) *citing Hague v. Comm. for Indus. Org.,* 307 U.S. 496, 512 (1939). "[T]he rights to free speech, peaceable assembly and expressive association have been called 'inseparable.'" *Id*. at 1234 *citing Thomas v. Collins*, 323 U.S. 516, 530 (1945). Any attempt to limit assemblies must be

48

justified by clear public interest and threatened by clear and present danger -- only the gravest abuses against paramount interests justify such limitations. *See Thomas*, 323 U.S. at 530.

The Protesters make an oblique reference to the "forced disclosure of an organization's members…" and suggest Towery monitored list memberships. Opening Brief at p. 76. They also claim Towery undermined assembly and association rights by assisting pre-emptive arrests (*Id*. at p. 72), and interfering with a women's protest in Olympia.

But, the Protesters have identified no instance wherein they were denied the right to assemble or associate with other anti-war activists. Towery personally did not disrupt PMR activities; rather, he facilitated its activities. For instance, he helped Dunn make a presentation at a Tacoma book fair. SER 1298. He provided car rides to activist events. SER 1391, ER 322. He drove Crespo to coffee shops and a gun exposition when Crespo was interested in purchasing a gun. SER 1415 - 1419. And, he drove Crespo to an anarchist book fair in Portland and to a Northwest Anti-Imperialist Direct Action Coalition meeting in Olympia. SER 1548 - 1550. The evidence is inconsistent with a claim that Towery interfered with any right to freely assemble or associate.

### g. *Posse Comitatus Act does not give Rise to Fourth Amendment Violations in this Case*

The District Court dismissed the Protesters' Posse Comitatus Act (PCA)

49

claim on May 24, 2011 (SER 1863) noting that the Protesters conceded the PCA does not give rise to a private right of action. It is a criminal statute. *See Lamont v. Haig*, 539 F.Supp. 553, 558 (D. S.D. 1982). The Protesters now incorrectly claim the "trial court did not rule directly on Plaintiffs' claims that Defendants Rudd and Towery, as Army civilian employees, violated the [PCA]." Opening Brief at p. 44. In fact, the District Court addressed the PCA claim directly four years ago when it dismissed that claim. SER 1863. Towery concedes, however, that this Court could review the 2011 PCA order had the Protesters properly identified that final order in their notice of appeal (they did not do so). *See Munoz v. Small Bus. Admin.*, 644 F.2d 1361, 1364 (9th Cir. 1981).

To briefly respond, some districts have answered the question "whether a search or seizure, otherwise permissible, can be rendered unreasonable under the Fourth Amendment because military personnel or equipment were used to accomplish those actions." *Bissonette v. Haig*, 776 F.2d 1384, 1386 (8th Cir. 1985). The *Bissonette* Court held, "We believe that the Constitution, certain acts of Congress, and the decisions of the Supreme Court embody certain limitations on the use of military personnel in enforcing the civil law, and that searches and seizures in circumstances which exceed those limits are unreasonable under the Fourth Amendment." *Id.* at 1386-87.

The *Bissonette* question here would be whether the Protesters were subjected

to some military power which was regulatory, proscriptive or compulsory.

*Bissonette*, 776 F.2d at 1390.  The answer is no.

> [M]ilitary involvement, even when not expressly authorized by the Constitution or a statute, does not violate the Posse Comitatus Act unless it actually regulates, forbids, or compels some conduct on the part of those claiming relief.  A mere threat of some future injury would be insufficient…the mere furnishing of materials and supplies cannot violate the statute.  The same thing is true, as we have previously noted, of the use of military personnel, planes, and cameras to fly surveillance and the advice of military officers in dealing with the disorder, advice, that is, as distinguished from active participation or direction.

*Id*.

The Army had no role in the arrests and detentions that took place locally in Tacoma and Olympia.  The Army's decision to share information through Threat Assessments throughout the Puget Sound region did not give rise to a claim that the Army "actively participated in or directed" OPD and TPD law enforcement decisions.  Moreover, the Protesters cite no authority for their position that PCA violations may give rise to a *Bivens* claim.  Opening Brief at p. 50.

> ### h.  *Protesters Fail to Present Evidence Necessary to Persuade this Court to Re-Tax Fed. R. Civ. P. 54(d) Costs*

On August 11, 2014, the District Court awarded Towery costs as the prevailing party.  ER 3320.  Pursuant to Local CR 54(d)(3), "[t]he clerk shall allow such items specified in the motion which are properly chargeable as costs."  As the prevailing party, Towery sought reimbursement for the following charges which were itemized in supporting documentation: deposition fees, deposition transcript

and exhibit fees, photocopy costs and statutory fees. SER 391. Towery did not seek reimbursement for electronic legal research, travel expenses, messenger services, postage, or PACER charges. Appellate courts review a Fed. R. Civ. P. 54(d) determination for abuse of discretion. *See Ass'n of Mexican-Am. Educators v. State of California*, 231 F.3d 572, 592 (9th Cir. 2000). "Discretion is abused when the judicial action is 'arbitrary, fanciful or unreasonable' or 'where no reasonable man [or woman] would take the view adopted by the trial court.'" *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1126 (9th Cir. 2013) *quoting Golden Gate Hotel Ass'n v. City & County of S.F.,* 18 F.3d 1482, 1485 (9th Cir. 1994) (alteration in original).

The Protesters argue each side should bear its own costs, but that approach is inconsistent with Local CR 54(d)(3) and contrary to the presumption in favor of awarding certain costs to the prevailing party. *See Ass'n of Mexican-Am. Educators,* 231 F.3d at 591. "This presumption is supported by the explicit language of Rule 54(d)(1), which makes the award of costs to a prevailing party automatic in the absence of an express direction to the contrary by the district court." *Nat'l Info. Servs. v. TRW, Inc*., 51 F.3d 1470, 1472 (9th Cir. 1999) (overruled in part on other grounds, 231 F.3d 572 (9th Cir.2000)) *citing* Fed. R. Civ. P. 54(d)(1) (costs "shall be allowed as of course ... unless the court otherwise directs").

An unsuccessful litigant may persuade a district court to use its discretion to refuse to award costs. *See Ass'n of Mexican-Am. Educators*, 231 F.3d at 591. The district court must specify its reasons so as to allow a reviewing court an opportunity to understand the reasoning. *Id.* A court may consider economic disparity, misconduct on the part of the prevailing party, whether the case is of public import, and whether the award of costs might chill future civil rights litigants. *Id.* "The loser bears this burden because the denial of costs is by nature a penalty." *Nat'l Info. Servs.*, 51 F.3d at 1472 *citing Smith v. Se. Penn. Transp. Auth.*, 47 F.3d 97 (3rd Cir. 1995). In this case, the Protesters have made no argument and presented no evidence of fault, misconduct, or default worthy of punishment.

The Protesters attempt to distinguish this case as a novel civil rights lawsuit that carries "significant public interest." Opening Brief at p. 94. Respectfully, Towery disagrees. The Protesters might believe they had a groundbreaking lawsuit, but the District Court dismissed this case at the pre-trial stage and after considerable discovery. This is not a case where the "issues in the case are close and difficult." *Janoe v. Stone*, 2012 WL 70424 *2 (S.D. Cal. 2012) *citing Ass'n of Mexican-Am. Educators*, 231 F.3d at 592. Even so, a losing party must show why costs should not be awarded "even in a civil rights case." *Stone*, 2012 WL 70424 *2 *citing Save Our Valley v. Sound Transit,* 335 F.3d 932, 944-45 (9th Cir. 2003).

When applying CR 54(d) and Local CR 54(d), civil rights cases are treated no differently than any other case. *Ass'n of Mexican-Am. Educators*, 231 F.3d at 593.

In addition, the Protesters claim indigency relieves them of CR 54(d) costs. It is appropriate for courts to consider a party's indigency when determining whether to tax costs. *See Stanley v. Univ. of S. California*, 178 F.3d 1069, 1079-80 (9th Cir. 1999). "However, the burden is on the losing party to substantiate a claim of indigency." *Washburn v. Fagan*, 2008 WL 361048 *2 fn. 4 (N.D. Cal. 2008) *citing Terry v. Allstate Ins. Co.,* 2007 WL 3231716 at *5 (E.D. Cal. 2007) and *Corder v. Lucent Techs. Inc*., 162 F.3d 924, 929 (7th Cir. 1998).

As it turns out, six of the seven Protesters were employed during the discovery stage of this case. ER 3332. The seventh, Dunn, was studying for a master's degree. *Id*. In contrast, the plaintiff in *Washburn* made only $600.00 a month and had but $1,300.00 in the bank. *Washburn*, 2008 WL 361048 *2 fn. 5. In addition, the Protesters have consistently solicited media attention and public support for this case. In fact, they have created a sophisticated website, www.peoplevtowery.org, which explains how supporters can make payments electronically via PayPal, by mail to an Olympia address, or by tax-deductible donation to the National Lawyers Guild. SER 352, 355. In addition, Dunn also has created a fundraising website (www.gofundme.com) specifically designed to help pay for this lawsuit. SER 358. According to his web page, Dunn had raised

$1,390.00 as of the date of the District Court filing. The Protesters are savvy and have employed enterprising means to generate notoriety and assistance throughout this case. They provided no information to convince the Clerk of the Court that they were indigent and incapable of satisfying the presumptive costs. They provided no information about their financial wherewithal (or lack thereof), other than to report that each Protester is employed or earning a master's degree. None of the Protesters fit the profile of an indigent litigant.

Towery, in the normal course of business, itemized his costs. SER 391. The information was furnished to the District Court. After reviewing the material, the Clerk of the Court denied costs sought for video depositions and deposition transcripts. This amounted to $2,753.55. The Clerk also denied $1,520.88 in copying costs associated with the production of discovery. The Clerk ultimately awarded Towery $12,171.94. ER 3320. The Clerk properly applied Local CR 54(d), and it is difficult to conclude that the Clerk's findings were illogical or implausible.

## VII.  CONCLUSION

For the preceding reasons, Towery respectfully submits that the District Court Order should be affirmed. Upon de novo review, the Protesters have provided no evidence upon which a reasonable juror could rule in their favor. The Protesters' claims fail in three significant ways: (1) they have no evidence that

Towery was motivated by a desire to suppress speech, (2) they have no evidence that Towery exceeded the scope of a reasonable expectation of privacy, and (3) they have no evidence that Towery participated directly in any arrest or detention. These shortcomings inhibit the Protesters' ability to present a genuine issue of material fact, and this case was properly dismissed at summary judgment.[10]

## VIII.  STATEMENT OF RELATED CASES

Towery knows of no other related appeal.

Respectfully submitted November 20, 2015.


**McKay Chadwell, PLLC**

By: _s/ Thomas M. Brennan_
Michael D. McKay, WSBA #7040
Thomas M. Brennan, WSBA #30662

---

[10] Towery does not respond to the Protesters' request to unseal U.S. Army records. Opening Brief at p. 81.  Towery did not seal any records.  He defers to prior arguments and submissions made by Appellee Rudd and the U.S. Army.

# ADDENDUM

# ADDENDUM OF RELEVANT CONSTITUTIONAL PROVISIONS, STATUTES AND RULES

## TABLE OF CONTENTS

| Relevant Authority | Page No. |
|---|---|
| U.S. Const. amend. I | i |
| U.S. Const. amend. IV | i |
| 28 U.S.C. § 1291 | i |
| 28 U.S.C. § 1331 | i |
| Federal Rule of Civil Procedure 54 (relevant portions) | i |
| Federal Rule of Civil Procedure 56 (relevant portions) | ii, iii |
| Ninth Circuit Rule 30-1.7 | iii |
| Western District of Washington's Local Rule of Civil Procedure 54 (relevant portions) | iv |

## ADDENDUM OF RELEVANT CONSTITUTIONAL PROVISIONS, STATUTES AND RULES

U.S. Const. amend. I:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. IV:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

28 U.S.C. § 1291 (Final decisions of district courts):

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

28 U.S.C. § 1331 (Federal question):

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

Relevant Portions of Federal Rule of Civil Procedure 54(Costs):

(a) Definition; Form. "Judgment" as used in these rules includes a decree and any order from which an appeal lies….

(d) Costs; Attorney's Fees.

i

(1) Costs Other Than Attorney's Fees.  Unless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party.  But costs against the United States, its officers, and its agencies may be imposed only to the extent allowed by law.  The clerk may tax costs on 14 days' notice.  On motion served within the next 7 days, the court may review the clerk's action.

(2) Attorney's Fees.

(A) Claim to Be by Motion.  A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.

(B) Timing and Contents of the Motion.  Unless a statute or a court order provides otherwise, the motion must: (i) be filed no later than 14 days after the entry of judgment; (ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award; (iii) state the amount sought or provide a fair estimate of it; and (iv) disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

Relevant Portions of Federal Rule of Civil Procedure 56(Summary Judgment):

(a) Motion for Summary Judgment or Partial Summary Judgment.  A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

(c) Procedures.

(1) Supporting Factual Positions.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) Objection That a Fact Is Not Supported by Admissible Evidence.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

Ninth Circuit Rule 30-1.7:(Appellee's Supplemental Excerpts of Record):

If the appellee believes that the excerpts of record filed by the appellant exclude items which are required under this rule, or if argument in the answering brief requires review of portions of the reporter's transcript or documents not included by appellant in the excerpts, the appellee shall, unless exempt pursuant to Circuit Rule 30-1.2, at the time of the appellee's brief is submitted, submit supplemental excerpts of record, prepared pursuant to this rule, comprised of the omitted items. Appellee shall submit 4 copies of the supplemental excerpts. The appellee shall serve one copy of the supplemental excerpts of record on each of the other parties. If the brief is submitted electronically, the excerpts shall be mailed to the other parties and the Court on the same day that the brief is submitted electronically. If the brief is not submitted electronically, the excerpts shall accompany the original and copies of the brief.

If appellant did not file excerpts of record under subsection 30-1.3 of this rule, the contents of appellee's supplemental excerpts are limited to the district court docket sheet, the notice of appeal, the judgment or order appealed from, and any specific portions of the record cited in appellee's brief.

Relevant Portions of Western District of Washington's Local Rule of Civil Procedure 54(d)(Costs):

(3) Taxation by Clerk.  Motions for costs shall be considered by the clerk.  All motions for costs will be decided by the clerk on the written filings and without oral argument unless the clerk specifically directs the parties to appear for a hearing.  The clerk shall allow such items specified in the motion which are properly chargeable as costs.

In taxing costs, the following rules shall be observed:

(A) The attendance, travel, and subsistence fees of witnesses, for actual and proper attendance, shall be allowed in accordance with 28 U.S.C. § 1821, whether such attendance was procured by subpoena or was voluntary;

(B) Reasonable premiums paid on undertakings or bonds or security stipulations shall be allowed where the same have been furnished by reason of express requirement of law, rule, or court order;

(C) Expenditures incident to the litigation which were ordered by the court as essential to a proper consideration of the case shall be allowed;

(D) All other costs shall be taxed in accordance with 28 U.S.C. §§ 1920, 1921, 1923, 1927, and 2412.

The clerk typically will not tax costs beyond those set forth in the statutes listed above.  A party seeking additional costs may file a motion, directed to the court, seeking an award of the excess costs.

(4) Appeal.  The taxation of costs by the clerk shall be final, unless modified on appeal to the district court judge or magistrate judge to whom the case was assigned.  An appeal may be taken by filing a motion to retax which shall be filed and served within seven days after costs have been taxed and which shall specify the ruling(s) of the clerk to which the party objects.  The motion to retax shall be noted for consideration pursuant to LCR 7(d)(3).

iv

## CERTIFICATE OF COMPLIANCE PURSUANT
## TO FED. R. APP. P. 32(a)(7)(C)
## FOR CASE NUMBERS 14-35598, 14-35816

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

I certify that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[X] Pursuant to Fed. R. App. P. 32(a)(7)(B), this brief contains 13,652 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ] This brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14 point Times New Roman.

[ ] This brief has been prepared in a monospace typeface using _____ with _____.

Dated November 20, 2015.

*s/Michael D. McKay*
Michael D. McKay
Attorney for Appellee Towery

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of November, 2015, I electronically filed the Appellee Towery's Response Brief to Appellants' Brief with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the following CM/ECF users:

Theodore J. Angelis                       theo.angelis@klgates.com
Pallavi Mehta Wahi                      pallavi.wahi@klgates.com
Heidi Craig Garcia                       heidi.garcia@klgates.com
Peter Talevich                           peter.talevich@klgates.com
*Counsel for Defendant-Appellee*
*Thomas J. Rudd*

John E. Justice                              jjustice@lldkb.com
*Counsel for Defendants-Appellees*
*City of Olympia, et al.*

Jean P. Homan                         jhoman@ci.tacoma.wa.us
*Counsel for Defendants-Appellees*
*City of Tacoma, et al.*

Lawrence A. Hildes                      lhildes@earthlink.net
*Counsel for Plaintiffs-Appellants*
*Julianne Panagacos, et al.*

It is also understood that the Supplemental Excerpts of Record jointly used by all appellees will be filed and served by both Appellee City of Tacoma and Appellee Thomas Rudd on the same date as this November 20 filing.

DATED this 20th day of November, 2015.

**McKAY CHADWELL, PLLC**


*s/Michael D. McKay*
Michael D. McKay