NOS. 14-35598, 14-35816

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

JULIANNE PANAGACOS, et al.,

Appellants/Plaintiffs,

v.

JOHN J. TOWERY, et al.,

Appellees/Defendants.

_____

ANSWERING BRIEF OF APPELLEE THOMAS RUDD

_____

K&L GATES LLP
Theodore J. Angelis, WSBA No. 30300
Pallavi Mehta Wahi, WSBA No. 32799
Heidi Craig Garcia, WSBA No. 41399
Peter A. Talevich, WSBA No. 42644
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: 206-623-7580
Facsimile: 206-623-7022
Email: theo.angelis@klgates.com
       pallavi.wahi@klgates.com
       heidi.garcia@klgates.com
       peter.talevich@klgates.com

Attorneys for Appellee/Defendant
Thomas Rudd

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT ............................................................ 2

STATEMENT OF ISSUES ......................................................................... 3

   A.   Summary Judgment ....................................................................... 3

   B.   Unsealing ....................................................................................... 4

   C.   Costs .............................................................................................. 4

   D.   Motion to Compel ......................................................................... 4

   E.   Reassignment on Remand ............................................................. 5

STATEMENT OF THE CASE ..................................................................... 5

STATEMENT OF FACTS ........................................................................... 7

   A.   Tom Rudd: Civilian Employee of the United States Army Responsible for Protecting Troops and Equipment ............................................. 7

   B.   John Towery: Mr. Rudd's Subordinate and Detective Adamson's Confidential Informer ................................................................... 15

   C.   The Port-to-Fort Movements, OlyPMR, and Police Action Against Plaintiffs ...................................................................................... 19

       1.   May 2007 Port of Grays Harbor ....................................... 20

       2.   November 2007 Port of Olympia ....................................... 21

       3.   August 2008 Port of Tacoma ............................................ 23

   D.   The "Outing" of John Towery and the Army's Internal Investigation ........ 24

   E.   Procedural History ...................................................................... 25

       1.   Initiation of This Lawsuit and the Initial Qualified Immunity Appeal ............................................................... 25

       2.   Remand and Discovery ..................................................... 26

       3.   Summary Judgment ........................................................... 28

       4.   Taxation of Costs .............................................................. 34

    5.    Motion to Unseal ......................................................... 35

F.    Harassment of Tom Rudd .................................................. 37

SUMMARY OF ARGUMENT ....................................................... 38

LEGAL ARGUMENT ............................................................ 40

A.    The SJ Order Is Reviewed De Novo, But All Other District Court Decisions Properly Before This Court Are Reviewed For Abuse of Discretion. ............................................................ 40

B.    The SJ Order Dismissing This Case Should Be Affirmed. ....................... 41

    1.    The District Court Considered All Evidence Properly Before It. ........ 41

    2.    The District Court Properly Credited the Cited Evidence in the Light Most Favorable to Plaintiffs. ................................... 43

    3.    The District Court Correctly Concluded That Mr. Rudd Did Not Violate the First or Fourth Amendment. ............................... 45

        a.   Mr. Rudd Cannot Be Held Liable for Mr. Towery's Alleged Spying........................................................... 46

            i.   Plaintiffs failed to demonstrate supervisor liability. ................ 47

            ii.  Mr. Towery's actions were permissible under the Invited Informer doctrine ................................................... 49

            iii. There is no evidence in the record that Mr. Rudd intended to chill Plaintiffs' First Amendment activity or that a reasonable person would have been chilled as a result of his conduct. ........................................................ 533

                a.   No reasonable factfinder could find that Mr. Rudd intended to chill Plaintiffs' speech. ..................................... 53

                b.   No reasonable factfinder could conclude that a person of ordinary firmness would be chilled by Mr. Rudd's actions. ...................................................... 58

        b.   Sharing Information Does Not Violate the Constitution. .............. 59

        c.   Mr. Rudd Cannot Be Liable for Alleged False Arrests of Some Plaintiffs by Tacoma and Olympia Defendants. ................. 60

        d.   Alleged Posse Comitatus Act Violations Are Irrelevant. ............. 63

        e.   In the Alternative, the District Court Should be Affirmed

Because Mr. Rudd Is Entitled to Qualified Immunity. .................66

C.  Mr. Rudd Seeks To Seal Only Those Documents Marked "Rudd-Confidential." ...............................................................................68

D.  Mr. Rudd Has or Will Remove the "Rudd-Confidential" Designation From Documents In the Summary Judgment Record If His Proposed Redactions Are Applied. ...........................................................70

E.  This Court Should Deny Plaintiffs' Request to Unseal Documents Outside the Summary Judgment Record and Reject Plaintiffs' Objections to Mr. Rudd's Redactions. .........................................71

    1.  The District Court Did Not Abuse Its Discretion By Denying the Motion to Unseal as Untimely. ..............................................71

    2.  If This Court Considers the Merits of Plaintiffs' Request, It Should Be Denied Except as Provided In Sections C and D. .........................73

        a.  Plaintiffs' Request Should Be Considered Under the Common Law Right-of-Access Doctrine, Not the First Amendment. ...................................................................73

        b.  Plaintiffs' Request Should Be Denied As To Documents That Are Not Part of the Summary Judgment Record. .................74

        c.  Mr. Rudd's Redactions to Documents that Are Part of the Summary Judgment Record Should Be Upheld. .........................76

F.  The District Court Did Not Abuse Its Discretion in Granting Mr. Rudd's Bill of Costs. ...................................................................80

G.  Plaintiffs Waived Their Challenge to the District Court's Denial of Their Motion to Compel (SER 1780-81). ...................................84

H.  If Any Part of this Case Is Remanded, It Should Remain With Judge Leighton. .......................................................................................85

CONCLUSION .....................................................................................88

STATEMENT OF RELATED CASES .................................................89

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adami v. Cardo Windows, Inc.*,
    299 F.R.D. 68 (D.N.J. 2014) ............................................................78

*Alliance to End Repression v. City of Chicago*,
    237 F.3d 799 (7th Cir. 2001) ...........................................................50

*Ariz. Premium Fin. Co., Inc. v. Emp'rs Ins. of Wausau, of Wausau Am Mut. Co.*,
    586 Fed. App'x 713 (2d Cir. 2014) ................................................43

*Ashcroft v. al-Kidd*,
    131 S. Ct. 2074 (2011) ..............................................................67, 68

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................47

*Ass'n of Mexican-Am. Educators v. California*,
    231 F.3d 572 (9th Cir. 2000) ...........................................................81

*Autotel v. Nev. Bell Tel. Co.*,
    697 F.3d 846 (9th Cir. 2012) ...........................................................85

*Banks v. Office of Senate Sergeant-at-Arms*,
    233 F.R.D. 1 (D.D.C. 2005) ............................................................79

*Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*,
    289 F.3d 589 (9th Cir. 2002) .....................................................75, 76

*Bichidaritz v. Univ. of Wash.*,
    No. C10-1371RSL, 2012 WL 3079092 (W.D. Wash. July 27, 2012) ..............................................................................................84

*Bissonette v Haig*,
    776 F.2d 1384 (8th Cir. 1985) ...................................................65, 66

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ............................................................50

*Cal. Dep't of Toxic Substances Control v. Commercial Realty
  Projects*,
  309 F.3d 1113 (9th Cir. 2002) ...........................................73

*California v. Montrose Chem. Corp. of Cal.*,
  104 F.3d 1507 (9th Cir. 1997) ......................................87, 88

*Carmen v. S.F. Unified Sch. Dist.*,
  237 F.3d 1026 (9th Cir. 2001) ......................................41, 42

*Caudle v. Bristow Optical Co., Inc.*,
  224 F.3d 1014 (9th Cir. 2000) .................................41, 72, 73

*Chavez v. United States*,
  683 F.3d 1102 (9th Cir. 2012) .................................46, 48, 63

*Chen v. City of Medina*,
  No. C11-2119 TSZ, 2013 WL 4511411 (W.D. Wash. Aug. 23,
  2013) ...............................................................................56

*Cintron v. Union Pac. R.R. Co.*,
  813 F.2d 917 (9th Cir. 1987) .......................................87, 88

*Congregation of the Passion, Holy Cross Province v. Touche, Ross &
  Co.*,
  854 F.2d 219 (7th Cir. 1988) .............................................81

*Corr. Servs. Corp. v. Malesko*,
  534 U.S. 61 (2001)......................................................64, 65

*D.Z. v. Buell*,
  796 F.3d 749 (7th Cir. 2015) .............................................43

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).........................................................57

*Equal Emp't Opportunity Comm'n v. United Parcel Serv., Inc.*,
  424 F.3d 1060 (9th Cir. 2005) ...........................................41

*Forsberg v. Pac. Nw. Bell Tel. Co.*,
   840 F.2d 1409 (9th Cir. 1988) ...........................................................57

*Guarino v. Brookfield Twp. Trustees*,
   980 F.2d 399 ....................................................................................43

*Hallett v. Morgan*,
   296 F.3d 732 (9th Cir. 2002) .......................................................41, 86

*Handschu v. Special Servs. Div.*, 475 F. Supp. 2d 331 (S.D.N.Y.
   2007) ...............................................................................................50

*Harman v. Apfel*,
   211 F.3d 1172 (9th Cir. 2000) ...........................................................42

*Hernandez v. Yellow Transp., Inc.*,
   670 F.3d 644 (5th Cir. 2012) .............................................................43

*Holland v. Sam's Club*,
   487 F.3d 641 (8th Cir. 2007) .............................................................43

*Jeff D. v. Otter*,
   643 F.3d 278 (9th Cir. 2011) .............................................................42

*Kamakana v. City of Honolulu*,
   447 F.3d 1172 (9th Cir. 2006) ....................................................*passim*

*Karam v. City of Burbank*,
   352 F.3d 1188 (9th Cir. 2003) ...........................................................57

*Kilroy v. Ruckelshaus*,
   738 F.2d 1448 (9th Cir. 1984) ...........................................................41

*Liteky v. United States*,
   510 U.S. 540 (1994) ..........................................................................87

*Livingston v. Isuzu Motors, Ltd.*,
   910 F. Supp. 1473 (D. Mont. 1995) ...................................................73

*Lolli v. Cty. of Orange*,
   351 F.3d 410 (9th Cir. 2003) .............................................................85

*Lucero v. Sandia Corp.*,
  495 Fed. App'x 903 (10th Cir. 2012) ................................................78

*McGill v. Faulkner*,
  18 F.3d 456 (7th Cir. 1994) .....................................................82, 83

*McQuiston v. Marsh*,
  707 F.2d 1082 (9th Cir. 1983) .......................................................72

*Medrano v. City of L.A.*,
  973 F.2d 1499 (9th Cir. 1992) ..................................................88, 89

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
  192 F.3d 1283 (9th Cir. 1999) ..................................................46, 61

*Moss v. U.S. Secret Serv.*,
  572 F.3d 962 (9th Cir. 2009) ........................................................46

*Panagacos v. Towery*,
  501 Fed. App'x 620 (9th Cir. 2012) ................................................26

*Presbyterian Church (U.S.A.) v. United States*,
  870 F.2d 518 (9th Cir. 1989) ..................................................60, 69

*United States v. Red Feather*, 392 F. Supp. 916 (D.S.D. 1975) ......................65, 66

*In re Reporters Comm. for Freedom of the Press*,
  773 F.2d 1325 (D.C. Cir. 1985) .....................................................75

*Reporters Comm. for Freedom of the Press v. Am. Tel. & Tel. Co.*,
  593 F.2d 1030 (D.C. Cir. 1978) .....................................................51

*Robbins v. Tripp*,
  510 B.R. 61 (E.D. Va. 2014) ........................................................79

*Ruff v. Cty. of Kings*,
  700 F. Supp. 2d 1225 (E.D. Cal. 2010) .............................................84

*S. Cal. Gas Co. v. City of Santa Ana*,
  336 F.3d 885 (9th Cir. 2003) .......................................................42

*Salazar v. G. Lewis*,
No. 11-CV-01189-JST (PR), 2013 WL 5228034 (N.D. Cal. Sept.
16, 2013) ............................................................................................... 23

*Save Our Valley v. Sound Transit*,
335 F.3d 932 (9th Cir. 2003) ......................................... 81, 82, 83, 84

*Schneider v. TRW, Inc.*,
938 F.2d 986 (9th Cir. 1991) ............................................................. 41

*Seattle Times Co. v. Rhinehart*,
467 U.S. 20 (1984) .............................................................................. 74

*Sec. Farms v. Int'l Bhd. of Teamsters*,
124 F.3d 999 (9th Cir. 1997) ............................................................. 81

*Simmons v. Navajo Cty.*,
609 F.3d 1011 (9th Cir. 2010) ........................................................... 47

*Skokomish Indian Tribe v. United States*,
410 F.3d 506 (9th Cir. 2005) ............................................................. 73

*Smith v. Doe*,
538 U.S. 84 (2003) .............................................................................. 52

*Smith v. Hughes Aircraft Co.*,
22 F.3d 1432 (9th Cir. 1993) ............................................................. 41

*United Nat'l Ins. Co. v. R&D Latex Corp.*,
242 F.3d 1102 (9th Cir. 2001) ..................................................... 87, 89

*United States v. Aguilar*,
883 F.2d 662 (9th Cir. 1989)
.................................................................................... 50, 54, 60

*United States v. Hartley*,
678 F.2d 961 (11th Cir. 1982) ........................................................... 65

*United States v. Jaramillo*,
380 F. Supp. 1375 (D. Neb. 1974) ..................................................... 66

*United States v. Mayer*,
    503 F.3d 740 (9th Cir. 2007) ........................................................50, 53, 54, 68

*United States v. Yunis*,
    681 F. Supp. 891 (D.D.C. 1988) ..........................................................................66

*Valley Broad. Co. v. U.S. Dist. Ct. for Dist. of Nev.*,
    798 F.2d 1289 (9th Cir. 1986) ..............................................................................76

*Warner v. Twp. of S. Harrison*,
    885 F. Supp. 2d 725 (D.N.J. 2012) ......................................................................60

*Wood v. Moss*,
    134 S. Ct. 2056 (2014)..........................................................................................56

*Wyatt Tech. Corp. v. Smithson*,
    345 F. App'x 236 (9th Cir. 2009) .........................................................................43

## Statutes

18 U.S.C. § 1385...........................................................................................................64

28 U.S.C. § 1291.............................................................................................................2

28 U.S.C. § 1331.............................................................................................................2

## Other Authorities

32 C.F.R. § 516.41(a).....................................................................................................27

Fed. R. App. P. 3(c)(1)(B) .............................................................................................85

Fed. R. App. P. 4(a)(1)(B)(iv)..........................................................................................2

Fed. R. Evid. 602 ...........................................................................................................67

Ninth Circuit Model Jury Instruction.............................................................................23

Western District of Washington Local Civ. R. 10(e)(9).................................................43

## INTRODUCTION

Appellee Thomas R. Rudd, a civilian employee of the U.S. Army ("Army"), respectfully asks the Court to affirm the district court's order granting summary judgment. Mr. Rudd's duties include ensuring the safety and security of soldiers and equipment. During the relevant time (2007 and 2009), the Army moved heavy combat equipment and personnel through ports in Western Washington in operations known as "Fort-to-Port" or "Port-to-Fort" movements. Activists used sophisticated, unlawful, and frequently dangerous tactics seeking to block the movement of troops and equipment. Mr. Rudd gathered information regarding the activists' plans from a variety of sources to avoid confrontations between protesters and the military. In gathering that information, Mr. Rudd did not violate any reasonable expectation of privacy or chill any protected speech, and Plaintiffs offer no evidence that Mr. Rudd's actions were proximately caused by a desire to chill protected speech, as Ninth Circuit authority requires. Accordingly, Plaintiffs' claims fail as a matter of law.

Because the district court properly dismissed the case against Mr. Rudd, its order taxing costs in Mr. Rudd's favor was not an abuse of discretion and should be affirmed. In addition, Plaintiffs' request to unseal certain documents that they filed under seal should be denied as it relates to the "Rudd-Confidential" documents because the documents are either not in the summary judgment record

or the redactions are supported by good cause and/or compelling reasons; their challenge to the district court's motion to compel discovery should be denied because Plaintiffs' waived their appeal; and their request for reassignment should be denied because they have not established bias or a gain in the appearance of fairness that would be outweighed by the waste and duplication that would result from reassignment.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this case under 28 U.S.C. § 1331. The district court orally granted Mr. Rudd's motion for summary judgment on June 18, 2014 ("SJ Order"), and issued a written decision elaborating on the SJ Order on July 21, 2014. On August 28, 2014, the district court issued an order denying Plaintiffs' motion to retax costs and awarding costs to Mr. Rudd ("Cost Award"). These are final orders over which this Court has appellate jurisdiction under 28 U.S.C. § 1291.

Plaintiffs filed their Notice of Appeal of the SJ Order ("First Notice of Appeal") on July 16, 2014. Plaintiffs filed a separate Notice of Appeal of the Cost Award ("Second Notice of Appeal") on September 29, 2014. Both Notices were timely under Federal Rule of Appellate Procedure 4(a)(1)(B)(iv).

On December 30, 2014, the district court denied Plaintiffs' Motion to Unseal documents that Plaintiffs had voluntarily filed under seal during the summary

judgment proceedings ("Order Denying Motion to Unseal").  Plaintiffs did not appeal this Order but filed a "Renewed Motion to Unseal" in this Court on January 12, 2015.  On March 24, 2015, this Court denied the Renewed Motion without prejudice to raising the issue in their Opening Brief.

STATEMENT OF ISSUES

**A.    Summary Judgment**

1.    Did the district court consider all of the evidence properly before it on summary judgment and draw all reasonable inferences in Plaintiffs' favor?

2.    Did the district court correctly conclude that Mr. Rudd did not violate the First or Fourth Amendment in receiving information from Mr. Towery where Mr. Towery acted as an Invited Informer and there is no evidence that Mr. Rudd intended to chill Plaintiffs' First Amendment conduct or that a reasonable person would be so chilled?

3.    Did the district court correctly conclude that Mr. Rudd did not violate the Fourth Amendment in connection with alleged false arrests by the Olympia and Tacoma Defendants because Plaintiffs did not present any evidence that Mr. Rudd knew of or encouraged such arrests through his information sharing?

4.    In the alternative, should the SJ Order be affirmed under the doctrine of qualified immunity because it was not clearly established that Mr. Rudd could

be held liable for his subordinate's alleged "spying" or for sharing information with local law enforcement?

**B.     Unsealing**

5.     Did the district court abuse its discretion by denying Plaintiffs' Motion to Unseal as untimely where Plaintiffs filed the documents under seal and did not challenge any of the confidentiality designations until eight months after the documents were produced to them and after the court had entered judgment in this case?

6.     In the alternative, does good cause exist to maintain the confidential treatment of documents produced in discovery but not filed with the district court?

**7.**     Do compelling reasons exist to support the limited redactions that Mr. Rudd has made to the documents that were filed in connection with the summary judgment proceedings?

**C.     Costs**

8.     Did the district court abuse its discretion by taxing costs in the amount of $14,234.98 in favor of Mr. Rudd?

**D.     Motion to Compel**

9.     Should this Court reject Plaintiffs' request to reverse the district court's order denying a motion to compel, SER 1780-81, where they did not appeal that order and they do not attempt to show any actual and substantial prejudice?

**E.     Reassignment on Remand**

10.     If this Court reverses any part of the SJ Order and remands the case for further proceedings, should it order the case be reassigned to another judge where Plaintiffs have failed to develop the argument in their Opening Brief, there is no basis for concluding that Judge Leighton is biased against Plaintiffs, and reassignment would involve waste and duplication disproportionate to any gain in the appearance of fairness?

## STATEMENT OF THE CASE

Thomas R. Rudd is a civilian employee of the Army.  During the time at issue, he led the Force Protection Division ("FPD") at Fort Lewis in Western Washington (now known as Joint Base Lewis-McChord ("JBLM")).  In that role, he was responsible for ensuring the safety of troops and equipment at Fort Lewis and throughout the region.  To carry out his mandate, he collected information and disseminated it to local law enforcement (including the Olympia and Tacoma Defendants).  Mr. Rudd supervised a staff of approximately five people, including co-defendant John Towery.

Plaintiffs[1] are activists who protested the shipment of equipment from public ports (including the Ports of Olympia, Tacoma, and Grays Harbor) to Ft. Lewis.

---

[1] Mr. Rudd understands that the Court prefers litigants to use names rather than titles in their briefs.  Because of the large number of plaintiffs in this case,

The activists participating in these protests included both peaceful protesters holding signs and those utilizing "direct action" with the explicit goal of disrupting the shipments. Plaintiffs claim to be associated with an organization called "Olympia Port Militarization Resistance" ("OlyPMR"), which was formed in 2006 after protests at the Port of Olympia turned violent and numerous activists (including some Plaintiffs) were arrested.

Plaintiffs brought this action in 2010 after discovering that one of their members (John Towery) was a civilian employee of the Army. They sued numerous individuals (including Messrs. Rudd and Towery) and some local law enforcement entities. At one point, the United States was a defendant in the litigation, but the claims against it were dismissed, and Plaintiffs never appealed this.

This is an appeal from a decision of the U.S. District Court for the Western District of Washington granting summary judgment to all Defendants and dismissing the action. Plaintiffs also appeal the district court's taxation of costs against them and ask this Court to unseal documents that they elected to file under

---

however, Mr. Rudd refers to them collectively as "Plaintiffs" when his arguments apply to them equally. He refers to them by name when addressing individualized arguments or evidence.

seal in the district court and/or in this Court and to order reassignment to a

different judge on remand.

## STATEMENT OF FACTS

**A.** **Tom Rudd: Civilian Employee of the United States Army Responsible for Protecting Troops and Equipment**

During the time at issue in this case, Defendant Tom Rudd was the Force

Protection Division Chief and Installation Antiterrorism Officer ("Force Protection

Chief") at Fort Lewis. ER 2993-94. As Force Protection Chief, Mr. Rudd was

responsible for a wide variety of initiatives aimed at ensuring the safety and

security of the community at Ft. Lewis, and providing support to Department of

Defense ("DOD") entities throughout Western Washington. SER 1179-80.[2] The

initiatives he supervised included:

- trainings to combat sexual assault;
- responding to active shooter situations
- responding to workplace violence;
- antiterrorism training for soldiers' family members, Department of Defense civilian workforce, and contractors; and
- conducting threat assessments for a wide variety of facilities and events with a military nexus such as:
  - recruiting centers,
  - Madigan Army Medical Center,

---

[2] To the extent possible, Mr. Rudd relies on the facts Plaintiffs cite in their Opening Brief and their district court filings. Regarding issues that Plaintiffs did not address below, Mr. Rudd relies on the uncontested facts in his summary judgment briefing.

- o public events that impacted a substantial number of military personnel,
- o movement of troops and equipment to and from the installation,
- o and visits by High Risk Personnel (such as senior political and military leaders).

The claims against Mr. Rudd focus on his threat assessments regarding the movement of troops and equipment to and from Fort Lewis. The Army ships heavy combat equipment (including Stryker vehicles) through regional ports, such as the Ports of Olympia, Tacoma, and Grays Harbor. SER 1182. This equipment is dangerous, as the activists themselves recounted in their emails. For example, they noted that the JBLM Stryker vehicles are fitted with "slat armor," which makes them "top heavy" and "weigh more than their designed weight." *See* SER 1221. As a result, they are "dangerous" to those nearby, and their tires "can explode and kill persons." *Id.*[3]

Plaintiffs' claims generally focus on events beginning in 2007. *See* App. Br. at 9. Plaintiffs did not dispute, however, that in May 2006—during the movement of the 3/2 Stryker Brigade Convoy Team from Fort Lewis to the Port of Olympia—there were confrontational protests in which dozens of activists were arrested. SER 1183; *See* App. Br. at 6, 15. And Plaintiffs' own testimony and emails show that the "civil disobedience" that they (and other activists) engaged in,

---

[3] Drew Hendricks, who works for Plaintiffs' counsel, authored the emails quoted in this section.

*see* App. Br. at 13, was meant to block the movement of troops and equipment by placing activists in close proximity to heavy combat machinery. *See* SER 1064 ("direct action" practiced during protests included "individuals blocking streets"); SER 1067-68 ("Q. Just to be clear, some people involved in the PMR movement were intending to block the progress of the vehicles at that point? . . . A. There were people who did participate in blockades."); SER 1041-45, 1167-72 (describing 2006 Olympia protests where Dunn stepped in front of moving convoys); SER 973-74 (describing arrest for blocking freeway onramp with "Sleeping Dragon");[4] SER 1100-01, 1163, 1165 (describing and depicting protesters moving dumpster into street and holding large rock); SER 1224 (describing plans to block movement of Stryker vehicles); SER 1264, 1268, 1270-71 (activist emails stating that activists' goal was to block shipments and raise costs).

In each case, the activists hoped to leverage the Army's strong desire not to harm the activists (or their children) and to protect troops, equipment, and members of the public from the many types of harms that could arise from a collision. *See* SER 1152 ("An alarming part of this blockade was that children

---

[4] A "Sleeping Dragon" is a locking device wherein activists chain their wrists together inside reinforced PVC piping to prevent police from separating them from each other. SER 202, 1105.

were being used by the protestors as part of the blockade."); SER 1218-19

(reproducing pictures of activists using young children to block the path of Stryker

vehicles).

In their emails, the activists explicitly distinguished their plans and

activities—which they referred to as "direct action"—from traditional protest

activities, such as "holding signs by the road."  SER 1276.  They explained that

instead of picketing, they planned to engage in "actual civil disruption of military

spare parts movements."  *Id.*  They also contrasted confrontational blockades with

"family-friendly" protest activities held at different times, SER 1247, and

discussed recruiting sources inside law enforcement to provide leaks, *see, e.g.*,

SER 1239-41.

The activists were highly coordinated and worked cooperatively to facilitate

"high risk actions," SER 1234, using "Forward, Tactical, and Web" teams to

coordinate movements through different areas of Olympia, which they designated

as "green," "yellow," or "red" zones, used to stage different phases of their protest.

SER 1235-36, 1240-41.  They even discussed plans for confronting expected

police responses by creating "game[s]" where activists would try to stage

blockades at the intersecting borders of different law enforcement jurisdictions.

*See* SER 1244-45.  These tactics were intended to "raise the economic costs of

these military shipments, to the point that no port is willing to take them." SER 1264, 1270-71.

Mr. Rudd's job required him to protect both military and non-military personnel, including those against the war, by limiting confrontations where harm or violence could occur. *See* SER 1182-83. All of Mr. Rudd's work required a high level of situational awareness, not only regarding activists who targeted troops and equipment, but also of other events in the Western Washington/South Sound region that might impact military personnel.[5] SER 1180. As part of his job, Mr. Rudd routinely reviewed and subscribed to a variety of public information sources to identify potential threats to troops, equipment, and facilities. *Id.* For purposes of this information collection, "threat" included a wide variety of organizations (both those who opposed the military and those who did not), *see* ER 3103-04; SER 542, and individuals who had previously been arrested in connection with anti-Army activity, regardless of whether they were convicted, ER 3232-34. Mr. Rudd was assisted by a staff of approximately five, including Defendant John Towery. SER 1181.

---

[5] This explains why Colonel Beard was not concerned about Mr. Towery monitoring anti-police-brutality protests because collecting such information contributed to general situational awareness. ER 2825-26.

In addition to reviewing publicly available information, Mr. Rudd communicated and shared information with members of local and federal law enforcement on events in the region that could impact Ft. Lewis, Army or DOD operations.[6] SER 1180-81. For example, representatives from various state, local, and federal entities—including the Olympia Police Department ("OPD"), Tacoma Police Department ("TPD"), Thurston County Sheriff's Office, and Fort Lewis— attended regular intelligence-sharing meetings to improve information sharing and awareness. ER 3079-81. Various threats were discussed at these meetings, especially those involving individuals who posed a risk to officer safety. ER 3103-04. Intelligence on protest activities that required police presence was also discussed at these meetings, ER 3080-81, as were biker gangs, street gangs, and members of anti-government groups, ER 3103-04.[7]

As part of this coordinated effort, and to guard against potential threats to operations at Ft. Lewis, Mr. Rudd produced daily updates and Threat Assessments. The Threat Assessments not only identified possible threats, but also assessed risk levels and suggested potential responses. ER 3029-30. He shared these Threat

---

[6] Mr. Rudd testified that, since the September 11, 2001 terrorist attacks, there had been increased focus on information sharing among all levels of law enforcement to defend against a variety of threats. ER 3061-62.

[7] This evidence—put forth by Plaintiffs on appeal—directly contradicts their argument that Mr. Rudd did not investigate biker gangs and others.

Assessments with local, county, and state law enforcement to ensure "safe, complete military operations, moving personnel, equipment, and cargo with no adverse impacts on the community, the population, and/or the protesters." ER 3031. Many local law enforcement members received these communications, including Tor Bjornstad of OPD, ER 2833; Gary Smith and Mark Feddersen of TPD, ER 2948-49, 3134-35; Keith Fouts of the Grays Harbor Sheriff's Office, ER 2111; and John Green of the Aberdeen Police, *id.*

Mr. Rudd relied on information from many sources to produce these documents. SER 1180. He monitored public websites, blogs, social media platforms operated by activist groups, and other open news sources to collect information on activity that could impact Ft. Lewis. *Id.* Sometimes, those sources discussed plans for protests or peace vigils. ER 3071-73; *see also* ER 2111. Occasionally, Mr. Rudd also used information received from sources who attended protest planning meetings. ER 3011-12, 3049-50.

In the Threat Assessments and other communications, Mr. Rudd sometimes used the term "anarchist" to refer to a sub-set of activists who protested Port-to-Fort movements and who had described themselves as "anarchists." *See* ER 3060; *see also* ER 294. Mr. Rudd testified that he understood the term to describe certain protesters who "engaged in confrontational and/or illegal activity during military

operations," ER 3059-60, such as the "blockade of a Stryker convoy,"[8] ER 3060. But he had no knowledge of "anarchism" as a political philosophy. ER 3059.

In addition to collecting and disseminating information, Mr. Rudd actively participated in routing and re-routing Army convoys during the Port-to-Fort movements at issue in this case. ER 3017-18. Mr. Rudd attempted to route the convoys around demonstrations to avoid confrontations with activists. ER 3018; ER 3058. Nevertheless, confrontations and arrests by local law enforcement occasionally occurred. *See, e.g.*, ER 1164-65 (describing clashes between police and protesters in Olympia in November 2007). It was the duty of local law enforcement to physically protect troops or equipment from confrontation, and the Army sometimes presented Certificates of Appreciation to local, state, and federal agency members (including, for example, Officer Bjornstad) to thank them for their role in facilitating military operations. ER 3033-34.

But although Mr. Rudd regularly shared information with local law enforcement, he never directed police to take any specific actions against protesters. SER 1181. Instead, evidence from local law enforcement indicates that Mr. Rudd's recommendations minimally influenced, if at all, their on-the-ground

---

[8] This characterization was made by Plaintiffs' counsel, Larry Hildes.

operations.  ER 2950-51, 1390; SER 1123-24.[9]  Indeed, Lt. Bjornstad testified that "there was nothing in the [threat] assessment[s] that caused me to change . . . my approach to planning" for the November 2007 protests at the Port of Olympia.  ER 2873.

## B. John Towery: Mr. Rudd's Subordinate and Detective Adamson's Confidential Informer

Defendant John Towery began working for FPD in approximately January 2006 as a Computer Systems Administrator and Criminal Intelligence Specialist.  ER 1939, 3004.  His job included technology duties, intelligence collection, and liaising with local law enforcement.  ER 1939-41.  A brief description of Mr. Towery's intelligence collection and liaison activities follows, along with a description of his relationship with Detective Chris Adamson of the Pierce County Sheriff's Department.

*Intelligence Collection.*  In addition to monitoring online information available to the public, Mr. Towery began to gather information directly from activists in early 2007.  For example, during a February 5, 2007 protest, Mr.

---

[9] Plaintiffs emphasize Colonel Beard's self-promoting statements in emails to other Army personnel about the utility of Mr. Rudd's threat assessments to local law enforcement.  App. Br. at 14-15 (citing ER 1490).  But Col. Beard does not have personal knowledge of how local law enforcement used the information that Mr. Rudd disseminated and as a result, her statements are irrelevant and inadmissible for Plaintiffs' purpose.

Towery walked among activists to gauge their numbers and intentions.  SER 1181.

He continued to mingle with activists at various public events and was

recommended for a Certificate of Achievement for his contributions during the

Port of Olympia protests in November 2007, which included "up-to-the-minute

reports that clearly stated the intentions of anti-war protesters."  ER 2000, 2008,

3034-36.

  *Liaising with Local Law Enforcement.*  In addition to collecting

intelligence, Mr. Towery worked and shared information with local law

enforcement.  This included attending the meetings discussed in Section A above

and attending law enforcement conferences around the state.  For example, in 2007

he attended the "Northwest Regional Domestic Terrorism Conference."  ER 3247.

The conference attendees discussed all kinds of criminal activity, not just

terrorism.  ER 2970-72, ER 3107-22.  They also distributed "dossiers" on "habitual

arrestees during events that were occurring in [an attendee's] area of

responsibility."  ER 3108-11.  These included Plaintiffs Dunn and Berryhill.  *See*

ER 1151-52.

  *Association with Pierce County Sherriff's Office.*  Pierce County Sheriff's

Office Detective Chris Adamson approached Mr. Towery and asked him to do

undercover work for the Sheriff's Office in spring or summer 2007.  ER 1704.  Mr.

Towery agreed to serve as a confidential informant for Detective Adamson and signed an agreement memorializing this. ER 613, 1708-11. Adamson and Towery then informed Mr. Rudd of their arrangement. ER 600, 814, 1704.

Mr. Rudd expressed concern that Towery's undercover activities for Detective Adamson might bleed over into Towery's intelligence collection role for the Army. ER 1951. However, Detective Adamson and Mr. Towery assured Mr. Rudd that Towery would be working not as an Army employee, but as a voluntary informant during his off-duty hours and at his own expense to help Adamson investigate criminal activity. ER 1704, 1951. In addition, Mr. Rudd understood that Detective Adamson had established a process to ensure that Mr. Rudd did not receive any information from Mr. Towery that lacked a military nexus or other implication for the Force Protection Division.[10] ER 3028. Mr. Rudd, at Detective Adamson's request, did not discuss Mr. Towery's undercover activities with others so as not to jeopardize Mr. Towery's cover. ER 1951.

Mr. Towery attended meetings and protests to relay information about planned criminal activity to Detective Adamson. ER 604, 1704, 3198-99. Over time, Mr. Towery built friendships with members of the protest movement and

---

[10] Mr. Rudd did not verify whether such a process was actually in place, ER 3028, but he testified that he did not receive any information from Mr. Towery that did not relate to military operations and/or the interests of Ft. Lewis, ER 3003.

reported on those individuals to Detective Adamson. ER 3226-29. When Mr.

Towery learned information related to military affairs (*i.e.*, information with a

"military nexus"), he would communicate it to Mr. Rudd. ER 3003, 3011-12.

Given the diversity of topics discussed at some protester meetings, Mr.

Towery occasionally attended meetings both in his capacity as an informant for

Detective Adamson (to collect criminal intelligence) and as a FPD intelligence

analyst (to collect information with a "military nexus"). *See* ER 3246-48, 3262,

3278-79, 3288-89. If Mr. Towery and Mr. Rudd believed that matters with a

military nexus might be discussed at a meeting, Mr. Rudd would arrange for Mr.

Towery to obtain overtime or comp-time. SER 1182. Thus, it is occasionally

difficult to differentiate between Mr. Towery's role as a confidential informant for

the Pierce County Sheriff's Department and his role as an Army intelligence

specialist. ER 3277-80; *see also* ER 3198-3200. But if Mr. Towery attended a

meeting where matters with a military nexus were not discussed, he would not

share what he learned with Mr. Rudd even if the Army had paid Mr. Towery to

attend. *See* ER 3198-3200. Thus, Mr. Towery sometimes attended meetings, such

as the meeting at the Love Shack,[11] where he did not learn anything with a military

---

[11] That particular meeting primarily concerned activists' plans to "crash" the
Republican National Convention and immobilize transportation infrastructure near
the event. ER 2114-15. Mr. Towery transmitted the information that he learned to

nexus, but for which he was still compensated because Messrs. Rudd and Towery believed, based on the timing of the meeting, that information with a military nexus might be discussed.  ER 3003, 3199-3200.

## C.   The Port-to-Fort Movements, OlyPMR, and Police Action Against Plaintiffs

In May of 2006, military equipment for the 3/2 Stryker Brigade Convoy Team ("SBCT") was shipped through the Port of Olympia.  SER 1183.  During that shipment, there were physical confrontations, with dozens of activists arrested.  *Id.*; *see also* ER 276, 294, 315, 320.  Some activists arrested during those protests subsequently identified themselves as part of "Olympia Port Militarization Resistance" ("OlyPMR") in public postings.  SER 1183; *see also* ER 276, 294, 315, 350.  OlyPMR advocated disruptive "direct action," as opposed to picketing with signs.[12]  SER 1229-31.

After OlyPMR formed, the Army used local civilian ports on three occasions that are at issue here:  (1) the Port of Grays Harbor in May of 2007 for the movement of the 4/6 Aviation (aboard USNS *Cape Henry*), (2) the Port of

_____

Detective Adamson, who instructed his colleague Gary Smith to forward it to law enforcement in Colorado and Minnesota.  ER 2113, 3122-23, 3125.

[12] In addition to OlyPMR, activists during the Port-to-Fort movements included the Port Liberation Front and other "self-described 'anarchists'" and other anti-war and anti-military activists, some of which joined OlyPMR in "direct action." SER 1205, 1229-31; *see also* ER 294.

Olympia in November 2007 for the 3/2 SBCT movement (aboard USNS *Brittin*),

and (3) the Port of Tacoma in August 2008 for the 4/2 SBCT movement (aboard

USNS *Brittin*).  SER 1184.  On each occasion, activists tried to physically block

the transport vehicles.  *Id.*; *see also* ER 1164-65, 2869-2872.  In some cases,

Plaintiffs were stopped and/or arrested during those movements, as described

below.  *See, e.g.*, ER 371-76,

      1.    <u>May 2007 Port of Grays Harbor</u>

In the late Spring of 2007, OlyPMR organized events in Aberdeen to protest

Army operations at the Port of Grays Harbor.  *See* ER 277-78.  On May 3, 2007,

Mr. Rudd forwarded an email chain between Plaintiff Jeff Berryhill and other

activists regarding upcoming peace vigils to members of the Aberdeen Police.  ER

2111.  On May 4,[13] Berryhill was pulled over by a Grays Harbor Sheriff vehicle

while driving home from a Friday evening vigil.  ER 277, 2517.  He was given a

warning, but alleged that the stop was pretextual.  ER 278, 2517.

The day before, Mr. Rudd had emailed Keith Fouts of the Grays Harbor

Sheriff's Office asking to meet so Mr. Rudd could introduce Officer Fouts to Mr.

Towery.  ER 2111-12.  Four days later, Officer Fouts informed Mr. Rudd that

---

[13] Berryhill testified in deposition that he was pulled over on March 4, ER 2517, but in his Declaration, he stated that he was stopped on May 4, ER 277.  Mr. Rudd resolves this factual inconsistency in Plaintiffs' favor.

"three vehicles containing 15 anarchists" were leaving Aberdeen and that Fouts was pursuing them. ER 3044. Rudd passed this information on to Patrol Commander John Green of the Aberdeen Police. ER 2019, 3043-44. Mr. Towery was in one of the cars. ER 3259.[14]

One month later, on June 17, 2007, Mr. Rudd emailed Commander Green and told him that an activist was contesting a traffic citation and had called for supporters to attend his hearing. ER 2020. Commander Green forwarded this email to Aberdeen Police Chief Robert Torgerson, explaining that Commander Green had asked the court to put this activist first on its docket so that his case could be disposed of quickly before supporters could arrive. *Id.*

### 2. November 2007 Port of Olympia

The next military convoys at issue occurred in November 2007 in Olympia. ER 1161. Before and during those convoys, Mr. Towery attended OlyPMR planning meetings and shared information that he learned with Mr. Rudd regarding activists' intentions to block convoys. ER 3238-40. Mr. Rudd may have put that information into Threat Assessments. *Id.* Initially, the protests surrounding these convoys were expected to be peaceful. ER 1161, 3238-39. As the date of the

---

[14] Plaintiffs cite no evidence, either in their SJ Opposition or their appellate brief, that any of these cars was actually stopped. Plaintiffs cite only their counsel's questions at deposition asking whether Mr. Rudd was aware the cars had been stopped. Mr. Rudd's answer was that he was not aware. *See* ER 3045-46.

movements neared, however, Defendants learned (through a "variety of sources"[15])
that activists disagreed about whether to employ peaceful protests or violent tactics
to block military shipments through the Port of Olympia.[16]  ER 1162, 2839.

Activists were initially peaceful as the military equipment began arriving on
November 5.  ER 1163.  But they soon became confrontational, with activists
darting in front of heavy combat vehicles and using their or their children's bodies
as shields to create blockades and obstruct vehicle movement.  ER 1164.  Activists
continued obstructing the roadways until November 14, causing local businesses to
close and preventing access by fire and medical responders.  ER 1165-69.

Some activists were arrested for this conduct.  For example, at some point
during the protests,[17] female protesters sitting in the roadway blocking the

---

[15] *See, e.g.*, ER 1238 (Rudd threat assessment), 2839 (Clint Colvin of Coast
Guard).  Mr. Rudd's threat assessment does not specify the source of his
information.  ER 3240.

[16] That disagreement may have been based, at least in part, on gender divisions
within OlyPMR.  *See* ER 2094; *see also* discussion *infra* (regarding "women-only"
demonstration).  As Mr. Rudd explained in an email to other military personnel
regarding the divide, "these frictions help prevent group consolidation and impede
unified planning and execution."  ER 2094.

[17] The only "evidence" that Plaintiffs cited to the district court that the protest
occurred the evening of November 13 is a question of Mr. Rudd by Plaintiffs'
attorney.  ER 3038-39.  Attorney questions of that nature are not evidence.  *See
Salazar v. G. Lewis*, No. 11-CV-01189-JST (PR), 2013 WL 5228034, at *6 (N.D.
Cal. Sept. 16, 2013); 9th Cir. Model Jury Instr. 1.7 ("Questions and objections by
lawyers are not evidence.").

convoy's planned exit were arrested. ER 2869-71. It is undisputed that Mr. Rudd was not present during that time, but Plaintiffs assert that he was responsible for the arrests based on three pieces of evidence. First, on November 11, two days before the event, Mr. Rudd emailed Lt. Col. Reeves and Adrian Johnson of the Army recounting a meeting to plan a "women-only" protest demonstration. ER 2094. Second, on November 13, Mr. Rudd asked Mr. Towery to work overtime from 8:00 p.m. until midnight. ER 2011. Third, following these protests, Mr. Rudd and other Defendants monitored media coverage of the prosecutions of arrestees from the November 2007 protests, ER 2455, 2457, and Lieutenant Smith emailed Mr. Rudd a list of arrested activists, ER 1320-24, 3142-44.

### 3.　August 2008 Port of Tacoma

The next set of protests at issue occurred about nine months later in August 2008 in Tacoma. *See* ER 3048-3050. On July 30, 2008, Mr. Rudd emailed Bjornstad, Smith, and others regarding anticipated protests. ER 2057-59, 2907-08. In that email, Rudd noted that activists "used to the catch and release situation experienced in the Olympia NOV 07 protests may be mistaken in thinking they will be arrested, booked, arraigned and quickly back on the street." ER 2058. Mr. Rudd also informed the recipients that Plaintiff Berryhill had recently been arrested at the Port of Tacoma. ER 2058.

Commander Bjornstad forwarded these emails to Commander Nelson, *see* ER 1261-62, to update him on information that Bjornstad received from Mr. Rudd, ER 2908-09. Around the same time, Commander Bjornstad also received and forwarded to OPD command staff a Threat Assessment concerning protests at the Port of Tacoma. ER 2913. Plaintiffs claim that they suffered excessive force at these demonstrations, *see* ER 181-83, but do not identify any evidence linking Mr. Rudd to the allegedly unconstitutional uses of force.

**D.** **The "Outing" of John Towery and the Army's Internal Investigation**

Plaintiffs exposed John Towery as a "spy" in July 2009. *See* ER 1936-38. After initial news of this was published on the internet, the Army initiated a "15-6 Investigation" into the activities of Messrs. Rudd and Towery to determine whether their activities violated Defense Department Regulations or the Posse Comitatus Act. *Id.* Mr. Rudd testified that he responded to every question posed by investigators "to the best of [his] ability." ER 2999-3000.

After the 15-6 Investigation, a Public Communication Plan written as a guide for responses to press inquiries noted that "[t]he investigation concluded that the policy violation represented by Mr. Towery's on-duty observations of demonstrators was ***not a knowing, deliberate violation***, and that it was ***approved and encouraged by his supervisors, who were not fully aware of the gravity of his conduct***." ER 1957 (emphasis added). The 15-6 Report nevertheless

- 24 -

recommended that the Garrison Commander consider disciplining Mr. Rudd for "withh[olding] information from his superiors that was relevant to their proper consideration of the legality of . . . Towery's on-duty and off-duty activities[, and for] misrepresent[ing] whether a legal opinion had been provided concerning the legality of Mr. Towery's . . . activities" under applicable DOD regulations. ER 2473. It further recommended that Mr. Rudd be given a letter of reprimand for not telling anyone about Mr. Towery's undercover activities. ER 2496. But it did not find any violations of the Posse Comitatus Act ("PCA") or of the First or Fourth Amendments. ER 1956-57.

## E.    **Procedural History**

### 1.    Initiation of This Lawsuit and the Initial Qualified Immunity Appeal

Plaintiffs filed this lawsuit in January 2010. ER 19. They did not name the United States or the Army in the original complaint, but subsequently amended the complaint to add the Army. ER 21. Pursuant to the Westfall Act, the district court substituted the United States for the federal-employee defendants, ER 24, before granting the United States' motion to dismiss.

Mr. Rudd filed a motion to dismiss on December 2, 2010 for failure to state a claim. ER 26. The district court denied that motion in part, and Mr. Rudd appealed the district court's denial of his qualified immunity defense. ER 29-30. This Court affirmed the partial denial, holding that Plaintiffs' allegations were

plausibly supported based on facts that, as a rule of procedure, were required to be treated as true at the 12(b)(6) stage.  *See Panagacos v. Towery*, 501 Fed. App'x 620 (9th Cir. 2012).

    2.   <u>Remand and Discovery</u>

District court proceedings resumed following remand in March 2013.  ER 34.  The district court, agreeing with Defendants about the amount of time needed to prepare this case for trial, originally set the new trial date for June 2014 and the deadline for dispositive motions in March 2014.  *See id.*

Three months after the district court's order setting the trial date and pre-trial deadlines, and eight-and-a-half months before the discovery cutoff date, Plaintiffs still had not served any written discovery on any of the Defendants or sought documents from the Army (through the procedure known as a *Touhy* request), as required to obtain documents generated or received as part of Mr. Rudd's official duties.  *See* 32 C.F.R. § 516.41(a) & Appendix F (Glossary); *see also* SER 4.  To facilitate discovery and preserve the trial schedule, Messrs. Rudd and Towery submitted *Touhy* requests to the Army for documents that Plaintiffs might think were relevant to this litigation.  SER 4.

While the Army searched for responsive documents, the parties to the litigation negotiated a Stipulated Protective Order.  ER 39; SER 4.  As part of the Stipulated Protective Order, they agreed that the Army would produce the

documents responsive to the *Touhy* requests to Messrs. Rudd and Towery, who in turn would produce the documents to Plaintiffs and the other defendants after deciding which documents to designate as "Confidential."[18] SER 1845-60. The district court signed and entered the Stipulated Protective Order on November 26. ER 39.

On December 6, the Army produced documents responsive to the *Touhy* requests to Messrs. Rudd and Towery. SER 5. In total, the Army produced 2,232 documents consisting of 9,440 pages. *Id.* Mr. Rudd designated less than half of the documents as "Rudd-Confidential." *Id.* Mr. Rudd produced the Army documents, including those designated as "Rudd-Confidential," to the other parties on December 21, 2013. *Id.*

The documents marked "Rudd-Confidential" fall into the following categories:

- Documents containing Mr. Rudd's Personally Identifying Information ("PII");

- Other personal information such as Mr. Rudd's contact information and pay grade;

- Information regarding Mr. Rudd's medical history;

---

[18] This procedure was not unique to the Army's production of documents to Mr. Rudd. It applied to any third-party document production. *See* SER 1845-60.

- Threat Assessments that Mr. Rudd prepared in the course of his employment, which he was obligated to keep confidential and which frequently contained his personal information; and

- Mr. Rudd's employment records and documents containing opinions regarding his job performance, including the 15-6 Report.

Throughout the litigation, Mr. Rudd's attorneys told Plaintiffs' counsel that the "Rudd-Confidential" designation could be removed from many documents if certain redactions were made, and Plaintiffs agreed to make those redactions.  *Id.*  Plaintiffs never made them, however, so the designations were not removed.  *Id.*

On February 13, 2014, Plaintiffs filed a motion to compel Mr. Rudd to organize the Army's document production.  ER 41.  The district court denied that motion because Mr. Rudd had not produced those documents, and there is no basis for ordering a party to organize a third-party document production.  SER 1780-81.

3.    <u>Summary Judgment</u>

Shortly after the district court denied Plaintiffs' motion to compel, Defendants timely filed motions for summary judgment, ER 43-44.  Plaintiffs then moved for an extension of time to file their Summary Judgment Response in Opposition (hereafter "SJ Response").  ER 47.  The district court extended the deadline, but specified that Plaintiffs were to file a separate response to each

Motion, and that each response could not exceed the Motion it was addressing. SER 731-32.

The day that their response briefs were due, Plaintiffs filed another motion for an extension of time. ER 48. The district court granted that motion, and again reset the deadline for Plaintiffs' responses to May 27. ER 49. Plaintiffs ultimately filed a single, 128-page SJ Response on May 28. ER 147-274. Unlike Defendants—who did not file their motions or supporting documentation under seal[19]—Plaintiffs filed not only their SJ Response but almost all of their supporting documentation under seal. *See* ER 49-51. At no time before filing the SJ Response and supporting documentation did Plaintiffs contact Mr. Rudd and ask that he remove the "Rudd-Confidential" designation from any documents or ask whether Mr. Rudd would permit them to file some or all of their Response in the ordinary course, rather than under seal. SER 5.

In support of their SJ Response, Plaintiffs filed 4,903 pages of exhibits, including entire <u>deposition transcripts</u>, rather than excerpts of the relevant portions.

---

[19] Mr. Rudd did file three exhibits in support of his *Reply* under seal, but he did not file his principal motion or supporting exhibits under seal. To avoid doing so, Mr. Rudd conferred with the Army and arranged for removal of its protective order designations, per the procedure agreed to in the Stipulated Protective Order. *See* SER 1845-60.

They did not include their own deposition testimony, however, instead submitting declarations from each Plaintiff. *See* ER 275-391.

Although Plaintiffs filed a large percentage of the discovery record, they relied on little of it in their SJ Response. The Response cited 480 pages of evidence—less than 10% of the total pages they had filed. *Compare* ER 147-274 (Plaintiffs' SJ Response), *with* ER 49–52 (docket sheet showing numerous supporting filings). Moreover, none of the declarations Plaintiffs submitted were signed. ER 50-51.[20] The district court ordered Plaintiffs to correct these deficiencies within three days, the deadline for Defendants' replies was extended, and Oral Argument was once again postponed, this time to June 18. *Id.*

At the outset of the June 18 hearing, Judge Leighton told the parties that he "ha[d] reviewed some of the declarations, but not all of them" and was prepared to rule on the Olympia and Tacoma Defendants' motions without argument. ER 78. After dismissing the claims against those Defendants, he proceeded to hear oral argument on the remaining motions.

The primary issue at the subsequent argument was whether either Mr. Rudd and/or Mr. Towery could be held liable for allegedly "spying" on Plaintiffs. ER

---

[20] Plaintiffs also failed to provide the district court with bench copies required under the local rules and failed to provide Defendants' counsel with copies of the documents that they had filed under seal. ER 50-51.

83-84.  After hearing extensive argument from all parties—including two rounds of argument by the non-moving Plaintiffs—Judge Leighton ruled.  At the outset of his ruling, he expressed extreme sympathy for Plaintiffs and their counsel and his "concern[] about the military apparatus involving itself in civil life on the mainland."  ER 143.  He nevertheless granted summary judgment and dismissed the case because Plaintiffs had not presented "sufficient evidence that Mr. Towery and Mr. Rudd were motivated by animus to chill [Plaintiffs'] First Amendment rights."  *Id.*  Judge Leighton also held that there was no cognizable chill because Plaintiffs actually succeeded in conveying their message via protest and were able to "exercise[] their First Amendment rights in the extrem[e]."  *Id.*

Judge Leighton also ruled that under the well-established "invited informer" doctrine, "[i]nfiltration of private meetings of expressive groups do[es] not violate the First and Fourth Amendment."  ER 144.  Moreover, Messrs. Towery and Rudd were entitled to qualified immunity because no authority clearly established that the so-called "infiltration" violated constitutional rights or that providing information to civil law enforcement was illegal.  ER 144-45.  Finally, Judge Leighton held that Plaintiffs had failed to produce evidence that Mr. "Rudd caused an arrest or action he knew would be unsupported by probable cause."  ER 145.

Accordingly, Judge Leighton granted Mr. Rudd's motion for summary judgment.

*Id.*

Regarding the unsigned declarations and unruly exhibit filings, Judge

Leighton said:

> I have decided that I would strike the declarations that were not signed and all that, and Hendricks, the issues about that, I am going to forego those.
>
> The Court of Appeals, if they want to go review the 5,000 pages, they can go do that. You've got my best judgment.
>
> As I often say many times, I am not a rule follower by nature, but I am a follower of fundamental fairness and the rule of law. And ***I am satisfied that the plaintiffs have failed to present a case that can go any further than this point, and it's over***.

ER 145 (emphasis added). Although Judge Leighton admitted that he did not

review every declaration, he did not specify which ones he did not read, and in

context, he made clear that he reviewed the declarations on which the parties

explicitly relied. As he explained:

> You gave me a 5,000-page attachment that, you know, I look stupid, but I'm not. I'm not going to wade into that, 5,000 pages. ***I am guided by the instruction of the lawyers. When in doubt, trust the lawyers.*** I rely on all of you so much. I wasn't at every deposition. It's not too much to have an argument focused on the issues extant right now.

ER 122-23 (emphasis added).  Plaintiffs' counsel explicitly agreed with this statement.  ER 123.

Judge Leighton issued his written Order granting Defendants' Motions for Summary Judgment on July 21, 2014.  ER 57, 61-74.  As he explained, "Plaintiffs have failed to adduce sufficient evidence to establish a necessary connection between Defendants' conduct and any constitutional violations."  ER 61.  As to Mr. Rudd, he held:

> There is no evidence to show that Rudd['s] . . . actions chilled
> First Amendment rights, nor is there evidence to show that [he]
> intended to chill First Amendment rights.  [His and Towery's]
> stated objective was to avoid a blockade of troops and
> equipment and ensure the safety of all involved in these
> transfers, and there is no evidence establishing a contrary intent.

ER 73-74.  Judge Leighton also reiterated that "it is not enough, as a matter of law, that Rudd provided information to other law enforcement agencies.  Plaintiffs must show that Rudd caused an arrest he knew would be unsupported by probable cause," but they did not do so because they "ha[d] not come forward with evidence to lend *any* credence to their theories."  ER 74 (emphasis added).  Finally, the district court summed up by saying that Messrs. "Rudd and Towery's actions may offend the democratic ideals that underlie our collective moral consciousness, but they remain within the constraints of the law."  *Id.*

Plaintiffs filed a Notice of Appeal challenging this Order on July 16, 2014.

ER 56.

4.    Taxation of Costs

After Judge Leighton granted Mr. Rudd's motion for summary judgment and

dismissed the case, Mr. Rudd (like the other defendants) filed a motion for costs.

ER 55.  Specifically, Mr. Rudd sought $15,714.49 in costs, comprising:

1.  Fees for copies of depositions                  $14,867.23

2.  Witness fees                                              $40.00

3.  Exemplary and duplication costs             $787.26

4.  Statutory attorneys' fees                          $20.00

ER 3318-19.  In their response, Plaintiffs argued that each side should bear its own

costs or, alternatively, that certain costs were not taxable.  ER 3354-3367.  The

clerk disallowed costs for video-taped depositions and exemplary and duplication

costs and taxed the remaining amount of $14,234.98 against Plaintiffs.  ER 3318-

19.

Plaintiffs then filed a Motion to Retax Costs, asking the district court to

"exercise its discretion to deny costs in full" or, in the alternative, to stay any cost

award pending appeal.[21]  ER 3304.  The district court denied that motion on

---

[21] Mr. Rudd did not challenge the clerk's decision to reduce his costs.  *See* ER 57-58.

August 28, 2014.  ER 57.  Plaintiffs filed a Notice of Appeal of that Order on

September 29, 2014.  ER 58.  The Second Notice of Appeal was not an amendment

of the First Notice of Appeal, and although Plaintiffs asked that the Cost Appeal be

consolidated with the Summary Judgment appeal, *see* ER 3290-91, they did not

file a motion for consolidation, *see* 9th Cir. No. 14-35816 Dkt. # 9 at 2-5.

     5.    <u>Motion to Unseal</u>

     After the district court granted the motions for summary judgment, Plaintiffs

requested a meet-and-confer to discuss "deconfidentializing" all of the Army

documents.  SER 5-6.  Although the purported reason for the request was so that

Plaintiffs would not need to seal their appellate briefs and excerpts of record, they

asked the Army to remove the "Army Documents Subject to Protective Order"

designation from ***all*** of the Army documents, including those that were not in the

district court record.  *Id.*  During the telephonic meet-and-confer, Mr. Rudd's

counsel reminded Plaintiffs' counsel that some Army documents were also

designated "Rudd-Confidential" and would need to be filed under seal unless Mr.

Rudd removed this designation.  SER 6.

     On August 22, the Army produced redacted versions of the documents that

Plaintiffs had requested and that were in the district court record.  *Id.*

Approximately 80% of those pages had previously been marked "Rudd-

Confidential."  *Id.*  But before Mr. Rudd's attorneys could complete their review of

the Army's redactions to determine if they were sufficient to protect Mr. Rudd's privacy interests, Plaintiffs filed a motion to unseal with this Court and attached all of the redacted Army documents as Exhibit 7. *Id.* [22]

Mr. Rudd's counsel subsequently finished reviewing the Army's redactions to the "Rudd-Confidential" documents in Exhibit 7 and determined that the Army's redactions of Mr. Rudd's contact information made the "Rudd-Confidential" designation unnecessary for many of the documents. SER 7. But because the Army did not redact everything in which Mr. Rudd had a privacy interest, he filed a response in opposition to the Motion to Unseal. *Id.*

On November 6, this Court entered an Order denying Plaintiffs' Motion to Unseal without prejudice to renewal after first seeking relief from the district court. 9th Cir. No. 14-35598 Dkt. (hereafter "9th Cir. Dkt.") # 21. Plaintiffs filed a Motion to Unseal in the district court on November 12. ER 58. In his Response to the Motion to Unseal, Mr. Rudd agreed to remove the "Rudd-Confidential" designation from all of the requested documents that were in the district court record, provided that certain redactions were made. D.C. Dkt. # 419 at 8-12. In order to assist Plaintiffs and the district court, Mr. Rudd's counsel submitted redacted versions of all documents in the record that had previously been marked

---

[22] The parties ultimately filed a stipulated motion to strike Exhibit 7 to correct Plaintiffs' violation of the Stipulated Protective Order. SER 7.

"Rudd-Confidential," showing precisely which redactions Mr. Rudd was requesting. SER 8-10.

The district court denied the Motion to Unseal as untimely on December 30, 2014. SER 1-2. The Order denying the motion explains that

> Plaintiffs did not object to the classification of documents pursuant to the Protective Order at any time prior to the Order granting summary judgment and subsequent appeal. This matter is now before the Court of Appeals. The parties and the Appellate Court have access to the sealed documents to argue and to evaluate the merits of the case.

*Id.*

After the district court denied the motion to unseal, Plaintiffs filed a Renewed Motion to Unseal in this Court. 9th Cir. Dkt. # 22-1. This Court denied that motion without prejudice to renewing the arguments in the consolidated appellate brief. 9th Cir. Dkt. # 35.

## F.    <u>Harassment of Tom Rudd</u>

As this Court is aware, since March 2014, Mr. Rudd has been harassed by anonymous individuals as a result of this litigation. In March 2014, shortly before Mr. Rudd filed his motion for summary judgment, he received multiple anonymous emails calling him a spy. 9th Cir. Dkt. # 24-3, ¶¶ 4-5. One of those messages alluded that the sender was someone who Mr. Rudd had allegedly "spied on" and specifically stated that the sender had recruited one of Mr. Rudd's subordinates to

spy on Mr. Rudd.  *Id.* at 6.  Another email, sent the day after Judge Leighton orally granted Mr. Rudd's motion for summary judgment, accused Mr. Rudd of bribing the judge "to dismiss our case" and called him an "evil piece of shit."  *Id.* at 9.

This harassment continues to this day.  Since Mr. Rudd first brought this harassment to this Court's attention in January 2015, he has received more than 30 additional threatening and/or harassing messages that appear to relate to this litigation.  *See* Declaration of Thomas R. Rudd ¶ 4, Nov. 20, 2015.

## SUMMARY OF ARGUMENT

The SJ Order should be affirmed because Plaintiffs have failed to raise a genuine issue of material fact as to whether Mr. Rudd violated their First or Fourth Amendment rights.  The bulk of their Consolidated Opening Brief (hereafter "Brief") addresses other Defendants' conduct—including that of John Towery, the OPD, and the TPD—and Plaintiffs have not presented sufficient evidence that Mr. Rudd is liable for any such conduct.  Even if Mr. Rudd could be held liable, the relevant law was not sufficiently clear during the relevant time (2007-2009), and as a result, he is entitled to qualified immunity.

The Cost Award should be affirmed because the district did not abuse its discretion by taxing some of Mr. Rudd's costs against Plaintiffs.  Plaintiffs do not claim that the district court applied the wrong law and concede that the default rule is that costs should be awarded to the prevailing party.  Plaintiffs argue that the

district court could, and should, have denied costs at Plaintiffs' request, but cannot establish an abuse of discretion.

Plaintiffs waived any argument that the district court abused its discretion in denying their motion to compel Mr. Rudd to organize the Army's production. If the Court considers this issue, it should affirm. The district court has broad discretion to manage discovery, and there is no basis for finding an abuse of discretion.

This Court should also deny Plaintiffs' request to unseal documents that Plaintiffs themselves filed under seal with the district court and/or this Court. As the district court concluded in rejecting Plaintiffs' request, Plaintiffs had ample opportunity to challenge the confidentiality designations before the SJ Order was entered. This conclusion was not an abuse of discretion. Moreover, Mr. Rudd has already provided and/or agreed to provide redactions to all documents in the summary judgment record marked "Rudd-Confidential" and remove the designation. His minimal redactions to the summary judgment record are all supported by compelling reasons, and his minimal redactions to other documents are supported by good cause. To the extent any dispute remains, it is between Plaintiffs and a non-party, the Army.

Finally, if this Court were to reverse and remand any portion of this case, it should not order that the case be reassigned to a different judge. Plaintiffs offer no support for the notion that Judge Leighton cannot reasonably be expected to put aside his beliefs about this case. Moreover, Judge Leighton has gone out of his way to show sympathy to their cause. Thus, there is no basis for concluding that reassignment would increase the appearance of fairness (much less actual fairness), and it would not justify the expenditure of substantial judicial resources for another judge to come up to speed on a case spanning five years and over 400 docket entries.

## LEGAL ARGUMENT

**A.     The SJ Order Is Reviewed De Novo, But All Other District Court Decisions Properly Before This Court Are Reviewed For Abuse of Discretion.**

Plaintiffs' Brief raises numerous issues. For the *appellate* issues that are properly before this Court,[23] one of two standards of review applies: de novo or abuse of discretion. The de novo standard applies to this Court's review of the SJ Order. *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). This Court reviews the evidence properly before the district court in the light most favorable to Plaintiffs and determines whether it raises any genuine issues of

---

[23] Plaintiffs also raise certain non-appellate issues, such as whether portions of this Court's record should be sealed.

material fact and whether the district court correctly applied the relevant substantive law. *Schneider v. TRW, Inc.*, 938 F.2d 986, 989 (9th Cir. 1991); *see also Carmen*, 237 F.3d at 1030-32. Summary judgment on legal issues is always appropriate, *see Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1452-53 (9th Cir. 1984), as is summary judgment on a mixed question of law and fact if the underlying facts are not disputed, *Equal Emp't Opportunity Comm'n v. United Parcel Serv., Inc.*, 424 F.3d 1060, 1068 (9th Cir. 2005).

All of the other appellate issues discussed below should be reviewed for an abuse of discretion. *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) (motion to compel); *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1022 (9th Cir. 2000) (timeliness of motion); *Smith v. Hughes Aircraft Co.*, 22 F.3d 1432, 1438 (9th Cir. 1993) (cost award). Under that standard, the district court's order will not be reversed unless it applied the wrong law, *see Jeff D. v. Otter*, 643 F.3d 278, 283 (9th Cir. 2011), or this Court "is convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances," *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000).

**B.    The SJ Order Dismissing This Case Should Be Affirmed.**

      1.    <u>The District Court Considered All Evidence Properly Before It.</u>

Plaintiffs first argue that the district court erred because Judge Leighton said that he only "reviewed some of the declarations, but not all of them." App. Br. 36

(citing ER 78).  Plaintiffs ignore the context of this statement:  They had dumped

almost 5,000 pages of documents, including twelve factual declarations, on the

district court but relied on only some documents (including three declarations) in

their SJ Response.[24]

The district court was only required to review evidence that the parties

specifically cited in their summary judgment papers.  *S. Cal. Gas Co. v. City of

Santa Ana*, 336 F.3d 885, 896 (9th Cir. 2003) (affirming grant of summary

judgment where opposing party's arguments lacked "specific citation[s]" to the

"statement of disputed facts" and declaration on which it relied); *Carmen*, 237 F.3d

at 1030 ("A lawyer drafting an opposition to a summary judgment motion may

easily show a judge, in the opposition, the evidence that the lawyer wants the judge

to read.  It is absurdly difficult for a judge to perform a search, unassisted by

counsel, through the entire record, to look for such evidence."); *see also Wyatt

Tech. Corp. v. Smithson*, 345 F. App'x 236, 239 (9th Cir. 2009) (holding that

plaintiff waived claim by citing two sets of exhibits totaling 198 pages "to provide

factual support for its claims, without providing explanation or specific line or

---

[24] The three declarations on which Plaintiffs relied are those of Plaintiff Berryhill, Plaintiff Panagacos, and third-party witness Esworthy.  ER 275-292 (Berryhill Decl.), 319-29 (Esworthy), 359–66 (Panagacos).

page references").[25]  The district court was not required to review any of the

declarations other than the three identified above, just as it was not required to

review evidence included in Plaintiffs' document dump but not specifically cited in

the SJ Response.[26]

    2.    <u>The District Court Properly Credited the Cited Evidence in the Light
Most Favorable to Plaintiffs.</u>

Plaintiffs incorrectly argue that the district court "disbelie[ved]" their

statements of facts.  Specifically, they claim the district court wrongly credited the

---

[25] Other circuits have reached the same conclusion.  *See, e.g.*, *D.Z. v. Buell*, 796
F.3d 749, 756 (7th Cir. 2015) (affirming summary judgment in constitutional case
even though district court disregarded plaintiff's expert's statements where
plaintiff failed to cite to expert's report and deposition with "specificity"); *Ariz.
Premium Fin. Co., Inc. v. Emp'rs Ins. of Wausau, of Wausau Am Mut. Co.*, 586
Fed. App'x 713, 716 (2d Cir. 2014) (affirming judgment even though district court
did not review all pages of an 80-page exhibit where party failed to direct court to
relevant pages); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 650-51 (5th Cir.
2012) (affirming summary judgment where "some of the evidence these plaintiffs
were citing had not been pointed out at the time of the original decision"); *Holland
v. Sam's Club*, 487 F.3d 641, 644 & n.5 (8th Cir. 2007) (affirming summary
judgment in civil rights case where plaintiff only made "general, conclusory, and
cursory statements" that there was evidence to support her position but did not
"designate[] the specific facts" she was relying on); *Guarino v. Brookfield Twp.
Trustees*, 980 F.2d 399, 403 & n.2, 406 & n.6 (6th Cir. 1992) (affirming summary
judgment in civil rights case even though district court did not review all 660 pages
of material filed with opposition brief).

[26] Contrary to Plaintiffs' assertions, the district court never "ordered Plaintiffs to
provide binders of all controverted deposition testimony," so there was no error
when the court declined to review them at oral argument.  *See* App. Br. at 5.
Instead, Plaintiffs apparently misunderstood the court's order to supply "bench
copies of any document larger than 50 pages" under LCR 10(e)(9).  *See* ER 50-51.

Olympia Defendants' testimony that Plaintiff Grande was standing in the street when officers sprayed him over Grande's testimony that he was standing on the sidewalk. App. Br. at 37. They also argue that the district court "accepted [Defendants'] characterizations to conclude that Plaintiffs 'jump[ed] in front of the moving Stryker vehicles, us[ed] a "Sleeping Dragon" to block a freeway ramp, us[ed] young children to block military equipment' in protests"; and accepted Defendants' assertion that the TPD/RIG had placed a surveillance camera "two blocks from Crespo's house" instead of "kitty-corner" from his house as Crespo stated. App. Br. at 37.

Plaintiffs' arguments regarding Crespo and Grande are not relevant to their claims against Mr. Rudd. But even if they had, their arguments would fail because Plaintiffs did not cite the allegedly contradictory testimony in their SJ Response. *See* ER 147-274. Thus, the district court could not, and need not, credit that testimony.

Regarding the other allegedly disputed issues of fact, the evidence before the district court established that activists jumped in front of Stryker vehicles, used a "Sleeping Dragon" to block a freeway ramp, and used young children to block military equipment. *See, e.g.*, ER 1164; SER 971, 974, 1041-44, 1126. Neither Plaintiffs' Brief nor their SJ Response points to any contradictory evidence. ER

- 44 -

153, 176-78, 183, 205.  Accordingly, Plaintiffs failed to establish any genuine issue of material fact that could have precluded summary judgment.

>   3.    The District Court Correctly Concluded That Mr. Rudd Did Not Violate the First or Fourth Amendment.

In order to survive summary judgment, Plaintiffs were required to present sufficient evidence from which a reasonable jury could conclude that Mr. Rudd violated their First and/or Fourth Amendment rights.  As to their First Amendment claim, Plaintiffs needed to submit evidence showing that Mr. Rudd intended to chill their political speech, that this desire to deter their speech was a "substantial or motivating factor in [Mr. Rudd's] conduct," and that Mr. Rudd's actions would have chilled a person of ordinary firmness from exercising her First Amendment rights. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).  As for their Fourth Amendment claim, Plaintiffs had to present evidence to support a reasonable jury's conclusion that Mr. Rudd was personally involved in violating their right to be free from unreasonable search and seizure or knowingly caused another government actor to commit such searches or seizures. *See Chavez v. United States*, 683 F.3d 1102, 1110-11 (9th Cir. 2012); *cf. Moss v. U.S. Secret Serv.*, 572 F.3d 962, 971 (9th Cir. 2009) (reversing district court's denial of motion to dismiss where plaintiffs failed to allege government defendant was responsible for how local police carried out defendant's order to relocate protesters).

Plaintiffs claim that Mr. Rudd violated their First and Fourth Amendment rights by encouraging his subordinate Mr. Towery to "spy" on them.  The district court properly rejected these arguments because: (1) Mr. Towery was an Invited Informer; and (2) Plaintiffs had not presented any evidence from which a reasonable jury could conclude that Mr. Rudd intended to chill or actually chilled their First Amendment rights.  Plaintiffs also contend that Mr. Rudd violated their Fourth Amendment rights by disseminating information to the Tacoma and Olympia Defendants, even though Mr. Rudd knew (or should have known) that Plaintiffs would be arrested without probable cause as a result.  The district court properly rejected those arguments because Plaintiffs needed to show actual—not just constructive—knowledge, and they presented no evidence that Mr. "Rudd caused an arrest he *knew* would be unsupported by probable cause."  ER 73-74 (emphasis added).  On appeal, Plaintiffs challenge these rulings and also argue that the district court erred by not considering alleged Posse Comitatus Act violations. App. Br. at 44-50.  The district court's ruling was correct and the SJ Order should be affirmed.

> a.    *Mr. Rudd Cannot Be Held Liable for Mr. Towery's Alleged Spying.*

Plaintiffs argue that Mr. Rudd violated the First and Fourth Amendments when his subordinate John Towery "spied" on them, but that argument fails for

three reasons.  First, Plaintiffs have not satisfied the requirements for supervisor liability.  Second, Mr. Towery's conduct was permissible under the Invited Informer doctrine.  Third, there is no evidence that Mr. Rudd intended to chill Plaintiffs' First Amendment activity or that a person of ordinary firmness would have been chilled by Mr. Rudd's conduct.

>            i.    Plaintiffs failed to demonstrate supervisor liability.

A government official can only be held liable if his own actions violated the Constitution; it is not enough that a subordinate violated it.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Simmons v. Navajo Cty.*, 609 F.3d 1011, 1021 (9th Cir. 2010) (affirming summary judgment in favor of supervisors because plaintiffs adduced no evidence that supervisors "themselves acted . . . unconstitutionally, not merely that a subordinate did").  Thus, to be held liable for a subordinate's civil rights violation, a supervisor must have actual knowledge of unconstitutional conduct and its unlawfulness and must have sanctioned that conduct.  *See Chavez*, 683 F.3d at 1111 (holding that supervisors—even those with line authority over other defendants—who were not directly involved in complained-of conduct "would [not] have had reason to know that [their subordinates] had" violated the Constitution).

Although they do not cite to *Chavez*, Plaintiffs recognize their burden and argue that this Court should reverse the SJ Order because a reasonable jury could

conclude that Mr. Rudd directed Mr. Towery to engage in allegedly unconstitutional conduct.[27]  App. Br. at 41, 66-67; *see also* App. Br. at 69 ("Rudd instructed Towery to spy and work with local agencies . . . .").  There are three problems with their argument.  First, Mr. Towery's presence at Plaintiffs' meetings—of which Mr. Rudd was aware—was not unconstitutional because he was an Invited Informer.  *See* Section B.3.a.ii. *infra*.  Second, Plaintiffs' have not presented *any* evidence from which a jury could conclude that Mr. Rudd directed Mr. Towery to commit any unconstitutional act while attending meetings.[28]  Third, Plaintiffs' allegations that Mr. Rudd "collaborated" with third parties engaged in unconstitutional actions rests entirely on his dissemination of information to local law enforcement, which is not unconstitutional.  *See* Section B.3.b. *infra*.

---

[27] The conduct that they complain about consists exclusively of Towery's (1) "gather[ing of] highly personal data on Plaintiffs and PMR"; (2) "attend[ance at], participat[ion] in, and report[ing] on protected political organizing even when [not] related to [any] legitimate military objective"; (3) compiling a "list of vehicles/license plates from Port of Grays Harbor legal demonstrations"; (4) "creation and dissemination of Domestic Terrorism Index Forms on Berryhill and Dunn"; and (5) "collaborat[ion] directly with RIG and TPD."  App. Br. at 66-68.

[28] The absence of any evidence that Mr. Rudd supervised or instructed Mr. Towery on actions to take at the meetings he attended is notable.  In contrast, there is evidence that Detective Adamson supervised and directed Mr. Towery's actions in connection with the meetings Mr. Towery attended.  *See, e.g.*, ER 180 (citing ER 602 (Adamson deposition)).

By focusing in their Brief on Mr. Rudd's alleged direction of Mr. Towery's actions, Plaintiffs have waived any argument that Mr. Rudd can be held liable based solely on knowledge of Mr. Towery's activities. But even if they had not waived that argument, the evidence does not support it. Specifically, while there is evidence that Mr. Rudd had general knowledge of Mr. Towery's activities because, for example, he approved overtime pay for Mr. Towery on occasion, ER 3006-07, there is no evidence that he had knowledge of any unconstitutional act. Attending meetings is not unconstitutional under the Invited Informer doctrine.

ii.    <u>Mr. Towery's actions were permissible under the Invited Informer doctrine</u>

At the heart of this appeal is Plaintiffs' argument that the district court misinterpreted the Invited Informer doctrine. Under this doctrine, use of an undercover agent does not violate the Constitution if (1) there was a legitimate law enforcement purpose for the investigation, and (2) the undercover agent adheres to the scope of invitation. *United States v. Mayer*, 503 F.3d 740, 751-54 (9th Cir. 2007) (holding that undercover investigation did not violate First Amendment rights of members of organization that opposed sexual age-of-consent laws); *United States v. Aguilar*, 883 F.2d 662, 705 (9th Cir. 1989) (holding that use of confidential informants to investigate Sanctuary movement not unconstitutional), *superseded by statute on other grounds as recognized in Khan v. Holder*, 584 F.3d

773, 783 (9th Cir. 2009); *see also Alliance to End Repression v. City of Chicago*, 237 F.3d 799, 802 (7th Cir. 2001) (recognizing that First Amendment permits use of undercover agents to investigate groups with ideological agendas).[29]

    Plaintiffs wrongly claim that Mr. Towery's undercover activities do not comply with this doctrine because (1) "protecting the military from dissent and non-violent protest is not" a legitimate law enforcement objective; (2) Mr. Towery engaged in activities that did not serve any legitimate law enforcement purpose, (including "entrapment," the creation and sharing of "Domestic Terrorism Dossiers," and attending meetings unrelated to port-to-fort movements and protests in Western Washington); and (3) Mr. Towery exceeded the scope of invitation by joining the Oly22 listserv.  App. Br. at 40, 42-43, 66-67.

    Regarding this last point—exceeding the scope of invitation—Plaintiffs' arguments fail for two reasons.  First, and as discussed above, Plaintiffs have not adduced any evidence that could support the conclusion that Mr. Rudd knew of

---

[29] The other cases Plaintiffs cite are irrelevant either because they have been vacated, *Handschu v. Special Servs. Div.*, 475 F. Supp. 2d 331 (S.D.N.Y. 2007), *vacated*, No. 71 Civ. 2203(CSH), 2007 WL 1711775 (S.D.N.Y. June 13, 2007), or they do not involve the Invited Informer doctrine, *Branzburg v. Hayes*, 408 U.S. 665 (1972) (holding that reporters did not have a constitutional right not to testify before a grand jury about criminal conduct that they witnessed); *Reporters Comm. for Freedom of the Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030 (D.C. Cir. 1978) (considering whether allegedly bad faith subpoenas abridged First Amendment rights).

(and directed) any action by Mr. Towery that exceeded scope of invitation.  *See*
Section B.3.a.i. *supra*.  Second, there is no evidence that Mr. Towery actually
exceeded the scope of invitation.  Mr. Rudd respectfully refers the Court to Mr.
Towery's arguments for more detail regarding this issue.

Regarding legitimate law enforcement purposes—the district court correctly
concluded that ensuring the safety and security of soldiers and equipment was a
legitimate law enforcement purpose that outweighed any threat to Plaintiffs'
constitutional rights.  Mr. Rudd's job duties included protecting soldiers and
military equipment.  SER 1179-80.  As discussed above, the activists' own emails
show that they planned and engaged in sophisticated, coordinated, and often-
dangerous tactics that they called "direct action," and which they explicitly
distinguished from the traditional protest activity of picketing.  *See supra* pp. 9-10,
19.  Their tactics included placing young children in front of trucks carrying multi-
ton Stryker vehicles to stop the equipment transport.  *See supra* pp. 9-10, 22, 45.
The activists themselves recognized that their actions were highly dangerous, not
just to themselves but also to the troops and equipment.  *See supra* p. 8.  Protecting
against such risks—by trying to reroute or reschedule convoys—is undeniably a
legitimate law enforcement purpose.  *See, e.g.*, *Smith v. Doe*, 538 U.S. 84, 102-03
(2003) (upholding statute and describing public safety as a "legitimate nonpunitive

purpose"). Plaintiffs do not cite any evidence that Mr. Rudd was motivated by a desire to squelch dissent. Accordingly, any threat to Plaintiffs' constitutional rights was outweighed by the threat against which Mr. Rudd was trying to protect.

Plaintiffs try to distinguish this case from *Mayer* by claiming that the NAMBLA members at issue in *Mayer* were all criminals. App. Br. at 39-43 (citing *United States v. Mayer*, 503 F.3d 740 (9th Cir. 2007)). Plaintiffs misstate *Mayer*'s facts. Some members of NAMBLA were convicted criminals, but the organization itself was "a political, civil rights and educational organization" that did "not engage in any activities that violate the law" or "advocate that anyone else should do so." *Mayer*, 503 F.3d at 743. Even accepting Plaintiffs' assertion that OlyPMR was a peaceful organization that did not advocate law-breaking, it was undisputed that some of its members (including Plaintiffs) engaged in coordinated, dangerous "direct action," including blocking convoys with "Sleeping Dragons" and placing young children in front of massive vehicles. ER 1164-65; SER 1218-19. Thus, both OlyPMR and NAMBLA were expressive organizations with criminal elements, and just as in *Mayer*, the allegedly political nature of OlyPMR as an organization does not defeat Mr. Rudd's good faith interest in preventing harm to (or by) troops and equipment.

Finally, Plaintiffs argue that Mr. Towery's "entrapment" activities could not have served any legitimate law enforcement purpose, and the fact that Mr. Towery engaged in those activities vitiates any such purpose. Once again, however, Plaintiffs offer no evidence that Mr. Rudd knew of, much less directed, any of Towery's alleged "entrapment" activities. Accordingly, he cannot be liable. *See* Section B.3.a.i. *supra*. But even if there was evidence that Mr. Rudd knew of (but did not direct) those activities, the only actions by Towery that could conceivably or speculatively have involved Mr. Rudd—creating and disseminating Domestic Terrorism Dossiers and attending meetings that were not related to port-to-fort movements—are consistent with the legitimate law enforcement purpose of preventing harm to (or by) troops and equipment.

In short, the district court properly interpreted the Invited Informer doctrine and there is no legitimate basis for distinguishing this case from *Mayer* or *Aguilar*.

iii.   <u>There is no evidence in the record that Mr. Rudd intended to chill Plaintiffs' First Amendment activity or that a reasonable person would have been chilled as a result of his conduct.</u>

a.   *No reasonable factfinder could find that Mr. Rudd intended to chill Plaintiffs' speech.*

Plaintiffs attempt to cobble together support for their allegation that Mr. Rudd was motivated by a desire to chill their First Amendment Speech, but the

- 53 -

evidence they cite was insufficient to survive summary judgment.  Plaintiffs'

arguments rest entirely on the following:

- Col. Beard "praised" Mr. Rudd's work and recounted that it prevented

  Plaintiffs from achieving their mission of blocking movement of

  troops and equipment, App. Br. at 60;

- Mr. Rudd (and others) used the term "Anarchist" to describe some

  activists, App. Br. at 60, 62-63;

- Mr. Rudd did not engage in (or authorize Towery to engage in)

  "similar activities on biker gangs and neo-Nazi groups," App. Br. at

  62;

- Mr. Rudd relied on a *Daily Olympian* article that reported on PMR

  violence rather than confirming such violence independently, App. Br.

  at 59-60; and

- Mr. Rudd authorized pay for Mr. Towery to "spy on Plaintiffs  . . .

  even when the subject of meetings and activities had nothing to do

  with military shipments or related activities," and to attend the

  Northwest Regional Domestic Terrorism Conference, at which two

  Plaintiffs were identified as "Domestic Terrorism Threat[s]," App. Br.

  at 61.

Some of these claims are false, such as Plaintiffs' assertion that Mr. Rudd did not monitor "biker gangs and neo-Nazi groups," *see* SER 542 (demonstrating that Mr. Rudd did monitor such groups),[30] and their claim that Mr. Rudd's concern regarding PMR was based solely on an article in the *Daily Olympian*, *see* SER 1183 (declaring that Mr. Rudd had personal knowledge that OlyPMR was created following the violent protests at the Port of Olympia in 2006). The other claims cannot support an inference that Mr. Rudd intended to chill Plaintiffs' speech.

First, statements by Colonel Lois Beard cannot raise a genuine issue of material fact as to Mr. Rudd's intent. The Supreme Court recently rejected a similar argument when it "decline[d] to infer from alleged instances of misconduct on the part of particular agents an unwritten policy of the Secret Service to suppress disfavored expression, and then to attribute that supposed policy to all field-level operatives." *Wood v. Moss*, 134 S. Ct. 2056, 2070 (2014); *see also Chen v. City of Medina*, No. C11-2119 TSZ, 2013 WL 4511411, at *10 (W.D. Wash. Aug. 23, 2013) (granting new trial because, *inter alia*, plaintiff improperly

---

[30] But even if Mr. Rudd did not monitor these groups, his failure to do so would not be circumstantial evidence of Mr. Rudd's animus towards Plaintiffs' viewpoint because there is no evidence that those groups presented similar threats to troops or equipment. In other words, "biker gangs and neo-Nazis groups" are not similarly situated to Plaintiffs and OlyPMR. *Cf. Wood v. Moss*, 134 S. Ct. 2056, 2070 (2014) (holding that it is constitutionally permissible to impose restrictions on one group, but not another, if a valid security reason exists for doing so).

attempted to impute comments of others to an individual defendant in order to establish discriminatory motive for plaintiff's termination). Moreover, the statements by Col. Beard that Plaintiffs rely on are taken out of context and do not even show that *she* had any animus toward Plaintiffs' message. Although Plaintiffs make much of her comment that the protesters were unable to "accomplish the mission as expected," *see* App. Br. at 14, the "mission" that she was referring to their plans to commit "criminal act[s]" by blocking the movement of Stryker vehicles, not their plans to protest, *see* SER 528.

Second, using the term "anarchist" does not show that Mr. Rudd disagreed with or sought to suppress Plaintiffs' message. *Cf. Karam v. City of Burbank*, 352 F.3d 1188, 1194-95 (9th Cir. 2003) (holding that circulating reports about "gadflies" and "loonies" who criticized city council did not show that city had a policy of arresting such people). Many anti-war activists, including some Plaintiffs, used that term to describe themselves, ER 294, and Mr. Rudd and others used the term—accurately or not—to distinguish between peaceful protesters and those that engaged in more disruptive direct action, ER 3044, 3059-60. Moreover, as Plaintiffs own putative expert acknowledged—albeit in a report that is not part of the summary judgment record[31]—individuals like Mr. Rudd *do not intend* to

---

[31] Professor Pyle's opinions were not offered in support of Plaintiffs' SJ Response

violate constitutional rights through their actions, even if they use terms such as "anarchist" that also refer to political ideologies.  *See* ER 991.

Third, the fact that Mr. Towery was compensated for attending one meeting where Plaintiffs discussed matters unrelated to Fort Lewis, App. Br. at 26-27, 61 (citing ER 602, 3198-99), and a conference on "domestic terrorism," ER 3247, does not support a reasonable conclusion that Mr. Rudd harbored hostility towards the content of Plaintiffs' speech.  With respect to the meeting, it is undisputed that Mr. Towery attended because he thought that an upcoming military shipment might be discussed.  ER 1809, 3199-200.  As for the conference, all types of criminal activity were discussed there, not just "terrorism."  ER 2970-72, 3107-22. Indeed, the people in the "Domestic Terrorism Dossiers" distributed at that conference were not specifically identified as terrorists, but rather "habitual arrestees during events that were occurring in [an attendee's] area of responsibility."  ER 3108-11.  The fact that Mr. Rudd authorized pay for Mr. Towery to attend a conference at which matters within the scope of Mr. Towery's

---

and therefore are not part of the record.  *See Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1417-18 (9th Cir. 1988) (expert's affidavit was properly disregarded on summary judgment where affidavit was filed in support of another motion and not cited in party's summary judgment opposition papers).  Professor Pyle's opinions were attached to Plaintiffs' reply in support of their Motion for an Extension of Time to submit expert reports.  ER 39.  Had Professor Pyle's opinions been offered, Mr. Rudd would have challenged their admissibility under *Daubert v. Merrell  Dow Pharm., Inc.*, 509 U.S. 579 (1993).

employment would be discussed cannot support a conclusion that Mr. Rudd disagreed with Plaintiffs' speech.

        *b.*     *No reasonable factfinder could conclude that a person of ordinary firmness would be chilled by Mr. Rudd's actions.*

Plaintiffs' failure to present evidence of Mr. Rudd's intent is fatal to their First Amendment claim. But even if this Court were to conclude that the meager "evidence" Plaintiffs present raised a genuine issue of material fact as to Mr. Rudd's intent, the SJ Order should still be affirmed because there is no evidence that Mr. Rudd's conduct would "chill or silence a person of ordinary firmness from future First Amendment activities." App. Br. at 71 (quoting *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)).

In support of their claim that a person of ordinary firmness would be chilled by Mr. Rudd's conduct, Plaintiffs rely on the following alleged results of that conduct: (1) PMR "disintegrated"; (2) five of the seven Plaintiffs moved away from Western Washington; and (3) all seven activists "significantly altered or abandoned First Amendment activity." App. Br. at 71. These are not the same alleged chilling effects that Plaintiffs relied on before the district court. *See* ER 193-94, 224-29, 233-36. Moreover, to support their new arguments, Plaintiffs rely on evidence that was not cited to the district court. App. Br. at 28-30. By failing

to raise these alleged chilling effects and the evidence supposedly supporting them below, Plaintiffs forfeited their right to raise them on appeal.

Even if Plaintiffs had not forfeited this argument, it would still fail for two reasons.  First, contrary to the assertions in Plaintiffs' Brief, the evidence shows that Plaintiffs continued to exercise their First Amendment rights after John Towery's identity was revealed.  *See, e.g.*, ER 2661 (Plaintiff Garfield testifying that she attended a protest in the same year she was deposed).  Second, and more importantly, even if Plaintiffs had substantially curtailed their First Amendment activity, this does not compel the conclusion that a reasonable person would have been chilled as a result of Mr. Rudd's conduct.  This Court has previously found no First Amendment chill where a plaintiff discovers that a covert agent participated in its prior speech activities.  *Aguilar*, 883 F.2d at 697 (rejecting argument that "spying" on First Amendment protected activity chills a person's ability to exercise his First Amendment rights); *cf. Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989) (concluding that government officials were entitled to qualified immunity).

> b.    *Sharing Information Does Not Violate the Constitution.*

The only conduct of Mr. Rudd (as opposed to Mr. Towery) that Plaintiffs challenge is his sharing of information (whether obtained from Mr. Towery or other sources) with local law enforcement.  This challenge must be rejected

because as the district court properly recognized, sharing information with law enforcement entities does not violate the Constitution. *Warner v. Twp. of S. Harrison*, 885 F. Supp. 2d 725, 741 (D.N.J. 2012) ("The sharing of law enforcement investigation information with other government officials is not prohibited by the constitution, nor should it be.").

   c.    *Mr. Rudd Cannot Be Liable for Alleged False Arrests of Some Plaintiffs by Tacoma and Olympia Defendants.*

In order to hold Mr. Rudd liable for allegedly false arrests, Plaintiffs must show that he either directly participated in such arrests or actually knew they would result. *See, e.g.*, *Mendocino*, 192 F.3d at 1295-96 (allegations that police defendants provided false statements for a probable cause declaration to support an arrest they knew lacked probable cause were sufficient to survive summary judgment). Plaintiffs cannot meet this burden. They concede that Mr. Rudd was not directly involved in their arrests, but argue that he is liable because he "exhorted, encouraged, and collaborated with law enforcement," which Plaintiffs claim "caus[ed their] arrests/detentions." App. Br. at 67-68.

Yet Plaintiffs provide no evidence that Mr. Rudd instructed local law enforcement to falsely arrest them. They rely on an email he sent to Aberdeen Police Department Commander Green regarding "15 anarchists in 3 cars leaving Aberdeen," but this email—which merely relayed information from Keith Fouts of

the Grays Harbor Sherriff's Office, ER 3043-44—contained no instruction of any kind. ER 2019. Plaintiffs also cite no evidence, except their counsel's deposition questions (which are not competent evidence), that these cars were even stopped. *See* ER 3045-46. Nor do the list of license plates that Plaintiffs argue "resulted in multiple detentions," App Br. at 67-68; ER 2028-2056, or the "domestic terrorism" dossiers, ER 1150-52, 3107-12, instruct officers to take any particular action.

Plaintiffs likewise state that Mr. Rudd "advis[ed] police to 'conduct apprehensions as necessary.'" App. Br. at 67. Approximately seven Threat Assessments in Exhibit 350 include the quoted language, but those Threat Assessment simply note that apprehensions might be needed to "prevent attempts to block port gates" that troops and equipment needed to pass through. *See, e.g.*, ER 2312. There is no suggestion that police should make any arrest not supported by probable cause.

Similarly, Plaintiffs' allegation that Mr. Rudd instructed police to "catch-and-do-not-release," App. Br. 67, is fabricated. The actual quote appears in an email where Mr. Rudd remarked that Tacoma booking practices differed from Olympia's in that "activists used to the catch and release situation experienced in Olympia . . . may be mistaken in thinking they will be arrested, booked, arraigned,

and quickly back on the street." ER 2058. This was not an instruction to engage in any conduct whatsoever.

Finally, to the extent Plaintiffs argue that Mr. Rudd is liable because he *should* (but did not actually) know that sharing information with law enforcement would lead to unlawful arrests, App. Br. at 69, they apply an incorrect standard. What Mr. Rudd *should have* known is irrelevant. He is only liable if he "personally reviewed and, thus, knowingly ordered, directed, sanctioned or permitted" the allegedly false arrests. *Chavez*, 683 F.3d at 1110. Plaintiffs present no evidence from which a jury could draw such a conclusion. Even if there were evidence that Mr. Rudd provided advice, this does not equate to actual knowledge of unconstitutional action.[32] *See Chavez*, 683 F.3d at 1110-11. Plaintiffs also cite no evidence instructing *unlawful* arrests, and it certainly would not violate their rights for Mr. Rudd to suggest *lawful* arrests. *See Chavez*, 683 F.3d at 1111 (supervisor's knowledge of "frequent stops" versus *unlawful* stops did not defeat qualified immunity).

Plaintiffs' arguments rest on surmise and speculation, which is insufficient to defeat summary judgment.[33]

---

[32] Indeed, the evidence here suggests that police officers generally did not rely on the information they received from Mr. Rudd. See ER 2873; SER 1108-09, 1117-18, 1123-24.

[33] In addition, Mr. Rudd is also not liable because Plaintiffs have failed to present

### d. Alleged Posse Comitatus Act Violations Are Irrelevant.

Finally, Plaintiffs argue that the district court should have considered Mr.

Rudd's alleged violations the Posse Comitatus Act ("PCA")[34] when deciding that

they had not presented evidence that Mr. Rudd violated their constitutional rights.

They do not dispute that they do not have a private right of action under the PCA.

SER 1875. They nonetheless argue that because Mr. Rudd allegedly violated the

statute by sharing information with local law enforcement, they were not required

to show that Mr. Rudd knew that the allegedly unconstitutional arrests would occur

in order to satisfy their burden under the Fourth Amendment.

No legal authority supports Plaintiffs' position, which essentially urges this

Court to adopt negligence per se as a constitutional standard. Plaintiffs cite

*Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001), but that case is

inapposite. *Malesko* did not involve the PCA. Instead, it addressed whether

*Bivens* confers a private right of action against private entities that acted under the

---

sufficient evidence for their claims against the Olympia and Tacoma Defendants.
Mr. Rudd does not address those deficiencies here and instead incorporates by
reference the Olympia and Tacoma Defendants' arguments regarding their alleged
violations of Plaintiffs' Fourth Amendment rights.

[34] The Posse Comitatus Act is a criminal statue that provides, "Whoever, except in
cases and under circumstances expressly authorized by the Constitution or Act of
Congress, willfully uses any part of the Army or the Air Force as a posse comitatus
or otherwise to execute the laws shall be fined under this title or imprisoned not
more than two years, or both." 18 U.S.C. § 1385.

color of federal law. *Id.* at 66. The Supreme Court held that *Bivens* does not reach private entities because if such entities could be sued for damages under *Bivens*, plaintiffs would decline to pursue the individual who was "directly responsible" for the injury. *Id.* at 71. *Malesko* has no bearing on whether an alleged violation of the PCA changes a plaintiff's burden in a *Bivens* action.

Nor do the other five cases Plaintiffs rely on support their position. Only two of those involve the Fourth Amendment, and neither helps Plaintiffs. In *United States v. Hartley*, 678 F.2d 961 (11th Cir. 1982), criminal defendants sought to suppress evidence allegedly obtained in violation of the Fourth Amendment and PCA. That case did not hold that a PCA violation establishes a Fourth Amendment violation, as Plaintiffs suggest. Instead, the *Hartley* court found no PCA violation, and it referred to the alleged violations as "red herrings." *Id.* at 977-78. Here, too, the alleged violations of the PCA are red herrings.

*Bissonette v Haig*, 776 F.2d 1384 (8th Cir. 1985), supports summary judgment. There, military personnel allegedly created "an armed perimeter around [a] village" that "*directly restrained* plaintiffs' freedom of movement." *Id.* at 1391 (emphasis added). The Eighth Circuit held that allegations of direct, unlawful restraint by military personnel were sufficient to state a claim under *Bivens* for a Fourth Amendment violation, but mere aerial surveillance by the military did not

- 64 -

violate the PCA or Fourth Amendment. *Id.* Here, Plaintiffs concede that Mr. Rudd, unlike the armed perimeter in *Bissonette*, did not have any direct involvement in arrests. At most, he indirectly supported law enforcement actions, more akin to aerial surveillance, which *Bissonette* confirms is neither a PCA nor Fourth Amendment violation.

Plaintiffs' three other cases are inapposite, too. Two of them addressed whether the military's alleged violation of the PCA in connection with events leading to defendants' arrests required dismissal of defendants' indictments. *United States v. Yunis*, 681 F. Supp. 891, 891-92, 895 (D.D.C. 1988) (holding that Navy did not violate the PCA); *United States v. Jaramillo*, 380 F. Supp. 1375, 1378-79 (D. Neb. 1974) (holding that Army did not violate the PCA). The third case, *United States v. Red Feather*, 392 F. Supp. 916 (D.S.D. 1975), addressed whether a PCA violation could be relevant in establishing an element of another crime the defendants allegedly committed, but did not address whether a PCA violation is relevant to a Fourth Amendment analysis. *Id.* at 921. Like *Bisonette*, these cases support Mr. Rudd's arguments. They hold that the Army does not violate the PCA by providing law enforcement with "advice or recommendations . . . on tactics or logistics," *id.* at 925, as long as the military does not control the operation, *Yunis*, 681 F. Supp. at 895. Here, there is no evidence that Mr. Rudd did

anything but provide "advice or recommendations" to police. Plaintiffs present no

evidence that Mr. Rudd controlled operations by civilian law enforcement.

Moreover, the only evidence they cite of Mr. Rudd's allegedly "pervasive" role in

civilian law enforcement is a statement from Col. Beard, who did not have any

direct knowledge of Mr. Rudd's activities. App. Br. at 48 (citing ER 1489-91).

Col. Beard's testimony is inadmissible because it lacks foundation. *See* Fed. R.

Evid. 602. Even if it were admissible, it does not raise a genuine issue of material

fact because—as discussed above—Mr. Rudd provided only indirect assistance to

local law enforcement, and the officers testified that the information they received

did not significantly impact their actions. *Compare* ER 1489-91, *with* ER 2873;

SER 1108-09, 1117-18, 1123-24. In sum, there is no evidence that Mr. Rudd

controlled local law enforcement and no evidence that he violated the PCA.

> e.  *In the Alternative, the District Court Should be Affirmed Because Mr. Rudd Is Entitled to Qualified Immunity.*

Finally, even if this Court were to conclude that the district court

misinterpreted some other aspect of the law, it should still affirm the SJ Order

because Mr. Rudd is entitled to qualified immunity. Under that doctrine, summary

judgment must be granted to a government official unless the official violated a

law that was "'clearly established' at the time of the challenged conduct." *Ashcroft*

*v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citation omitted). In determining

whether a law was clearly established, the Court must (1) be careful not to define the law "at a high level of generality" and (2) ask whether "at the time of the challenged conduct, '[t]he ***contours*** of the right were sufficiently clear' that every 'reasonable official would have understood that what he [wa]s doing violates that right.'" *Id.* at 2083-84 (emphasis added) (citation omitted).

Mr. Rudd is entitled to qualified immunity because there was no basis for a reasonable official to believe that it violated the First or Fourth Amendment to (1) obtain information from a subordinate, even if that subordinate obtained it under false pretenses, or (2) disseminate that information to local law enforcement agencies. Indeed, Plaintiffs' repeated characterization of their claims as "novel"[35] compels a finding that the relevant law is not clearly established. But even if it did not, Mr. Rudd would still be entitled to qualified immunity for three reasons.

First, no court has ever held that reliance on a confidential informant violates the Constitution,[36] and this Court has explicitly rejected the argument that such a practice is unconstitutional, even if it "present[s] a risk of interfering with an organization's First Amendment rights." *United States v. Mayer*, 503 F.3d 740,

---

[35] *See, e.g.*, App. Br. at 103, 106; 9th Cir. Dkt. # 43-1 at 2; 9th Cir. Dkt. # 43-2 at 1 ("This is a[] . . . case involving multiple issues of first impression . . . .").

[36] In the absence of any authority, a law is rarely "clearly established." *Al-Kidd*, 131 S. Ct. at 2083 (holding that qualified immunity was warranted where "not a single judicial opinion had held that pretext could render an objectively reasonable arrest pursuant to a material-witness warrant unconstitutional").

750 (9th Cir. 2007).  Second, there is authority for the proposition that information

sharing of the sort Mr. Rudd engaged in is constitutional.  *See* Section B.3.b.

*supra*.  Third, there is no authority to support Plaintiffs' theory that a PCA

violation—even if one existed—is relevant to, much less constitutes, a violation of

the First or Fourth Amendment.  *See* Section B.3.d. *supra*.  To the contrary, this

Court has held that violation of statutes or regulations that are not clearly "based

on constitutional concerns" are irrelevant to alleged violations of the First or

Fourth Amendments.  *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d

518, 528 (9th Cir. 1989) (holding that INS agents who had allegedly violated

agency regulations were entitled to qualified immunity for purposes of First and

Fourth Amendment claims).  Therefore, Mr. Rudd could not have been on notice

that his conduct was unconstitutional, and he is entitled to qualified immunity.

## C.  Mr. Rudd Seeks To Seal Only Those Documents Marked "Rudd-Confidential."

Plaintiffs filed both their Brief and the entirety of their Excerpts of Record

under seal.  They now ask this Court to unseal some of those documents.  It is

unclear whether the request encompasses their Brief.  *Compare* App. Br. at 3-4

(stating the issue presented as "[w]hether the court should order the designated

Army documents and the associated pleadings unsealed and allow Plaintiffs'

Substantive Brief[37] to be unsealed so that the public may read it and follow the issue presented"), *with id.* at 81-92 (not discussing their Brief in the section on unsealing).  To the extent Plaintiffs are asking this Court to unseal their Brief, Mr. Rudd does not take a position on that request because he does not believe the Brief reveals any of *his* confidential information.  Nor does Mr. Rudd take a position on Plaintiffs' request vis-à-vis discovery documents not designated "Rudd-Confidential."[38]  The dispute regarding documents designated "Army Document Subject to Protective Order" and the Army's redactions to the documents *it* produced is between Plaintiffs and the Army.  Mr. Rudd does not have an interest in the dispute.

---

[37] "Substantive Brief" apparently refers to one of two briefs that Plaintiffs filed on July 7, 2015.  *See* 9th Cir. Dkt. # 43-4.  This Court subsequently ordered Plaintiffs to combine those two briefs into a "single consolidated opening brief."  9th Cir. Dkt. # 53.  Mr. Rudd believes that "Substantive Brief" now refers to "Consolidated Opening Brief."

[38] The documents designated "Army Document Subject to Protective Order" but not "Rudd-Confidential" appear to include the following documents from the "List of Documents Appellants Seek to Unseal" located at ER 3384-93: ER 1039, 1314-18, 1409-13, 1416-19, 1427-31, 1489-96, 1500-11, 1525-30, 1554-55, 1573, 1697-1701, 1887-89, 1907-12, 1918-19, 1927-35, 1956-68, 1978-2010, 2012-18, 2020, 2064-67, 2105-08, 2111-12, 2121-26, 2208-22, 2453-56, 2466.  It is difficult for Mr. Rudd to know for certain that there are no additional documents, however, because it appears that the "Rudd-Confidential" designation may have been inadvertently removed from some documents in Volume VI and VIII, and in other cases (such as ER 1573) the document description in the List does not match the document.

**D.    Mr. Rudd Has or Will Remove the "Rudd-Confidential" Designation From Documents In the Summary Judgment Record[39] If His Proposed Redactions Are Applied.**

Mr. Rudd has a privacy interest in the information in certain documents, but in an effort to resolve Plaintiffs' concerns, he removed the "Rudd-Confidential" designation from every document Plaintiffs previously identified, so long as he could redact: (1) personal information (including contact, social security, and salary information), (2) medical history information, and (3) portions of the Army's 15-6 Report and internal Army emails containing non-factual employee evaluation and disciplinary material.  *See* SER 19-337, 2248-2356.

As has been the case throughout this litigation, Mr. Rudd does not oppose unsealing documents so long as they are in the summary judgment record and Mr. Rudd can make the redactions identified above.[40]  However, Mr. Rudd's redactions likely will not allow the documents to become public, as the Army has redacted and designated some of them "Army Document Subject to Protective Order."  Mr. Rudd cannot address the Army's designations because he cannot, and does not, speak for the Army.

---

[39] As used herein, "summary judgment record" means that the documents were relied upon by one or more of the parties in their summary judgment papers. *See* Section B.1. *supra*.

[40] Mr. Rudd is willing to remove his designation subject to the required redactions despite the fact that Plaintiffs' request was untimely—as previously held by Judge Leighton and discussed in the next section.

**E.    This Court Should Deny Plaintiffs' Request to Unseal Documents Outside the Summary Judgment Record and Reject Plaintiffs' Objections to Mr. Rudd's Redactions.**

Plaintiffs seek to unseal a number of documents outside the summary judgment record.[41]  Plaintiffs also have objected to some of Mr. Rudd's redactions, but as explained below, documents not in the summary judgment record should not be unsealed, and the redactions should remain.

1.    The District Court Did Not Abuse Its Discretion By Denying the Motion to Unseal as Untimely.

The district court considered Plaintiffs' request to unseal certain documents and denied it as untimely.  SER 1-2.  This denial must be upheld unless the district court abused its discretion.  *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1022 (9th Cir. 2000) (denial of motion as untimely); *see also Kamakana v. City of Honolulu*, 447 F.3d 1172, 1178 & n.3 (9th Cir. 2006) (decision whether to unseal judicial record).  Where, as here, there is no specific time restriction for filing a motion, the request will nevertheless be considered untimely unless it was filed "within a reasonable period . . . and it does not unfairly surprise or prejudice the

---

[41] Specifically, the following documents labeled "Rudd-Confidential" appear on the "List of Documents Appellants Seek to Unseal" but are not in the summary judgment record: ER 1042-43, 1235-37, 1241, 1423, 1432-34, 1438-45, 1463-65, 1467-87, 1497-99, 1512-24, 1534-53, 1556-64, 1897-1901, 1936-38, 1942-44, 1953-54, 1969-75, 2068-74, 2100-04, 2109-10, 2474-2512.  However, some documents listed by Plaintiffs (such as ER 1556-64) do not match the descriptions in the List, and the confidentiality designations appear to have been cropped off of some documents in Volumes VI and VIII.

affected party." *McQuiston v. Marsh*, 707 F.2d 1082, 1084 (9th Cir. 1983), *superseded by statute on other grounds as recognized in Melkonya v. Sullivan*, 501 U.S. 89, 95-96 (1991). This Court routinely upholds district court denials of motions as untimely under this standard. *See, e.g.*, *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 519 (9th Cir. 2005); *Cal. Dep't of Toxic Substances Control v. Commercial Realty Projects*, 309 F.3d 1113, 1120 (9th Cir. 2002); *Caudle*, 224 F.3d at 1022.

The district court did not abuse its discretion in denying Plaintiffs' motion as untimely because Plaintiffs' delay was unreasonable and unfairly surprised Mr. Rudd. After receiving the documents, Plaintiffs waited eight months, until after their case was dismissed, to file their motion to unseal. App. Br. at 31-34. They failed to challenge the designations during the district court proceedings despite a Stipulated Protective Order *requiring* them to "confer with the designating party to determine whether the designating party [would] remove the confidential designation, whether the document [could] be redacted, or whether a motion to seal or stipulation and proposed order is warranted." SER 1848.

The district court's decision that this eight-month delay was unreasonable and prejudicial to Appellees is consistent with precedent in this Circuit. For example, in *Livingston v. Isuzu Motors, Ltd.*, 910 F. Supp. 1473 (D. Mont. 1995),

the district court denied a motion to release exhibits presented at trial from a

protective order where the party seeking release did not challenge the designations

until after trial and had treated them as confidential during the trial proceedings.

*Id.* at 1480.  There, as here, the court concluded that plaintiffs' motion was

untimely.  *Id.*  This was not an abuse of discretion and the request to unseal should

be denied.

      2.    <u>If This Court Considers the Merits of Plaintiffs' Request, It Should Be</u>
               <u>Denied Except as Provided In Sections C and D.</u>

        *a.*    *Plaintiffs' Request Should Be Considered Under the Common*
              *Law Right-of-Access Doctrine, Not the First Amendment.*

      As an initial matter, it appears that Plaintiffs are arguing that the First

Amendment requires that certain documents be unsealed.  Plaintiffs lack standing

to make this argument because they can already access unredacted, unsealed

version of all documents, and the First Amendment does not give them a right to

disseminate that information.  *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37

(1984) (holding that protective order that restricted dissemination of information

obtained in discovery did not offend the First Amendment).  But even if they had

standing, the First Amendment does not apply to their request to unseal.

      *First,* the First Amendment does not apply to documents not filed as part of

the district court proceedings because those documents are not "*judicial records*

*and documents.*"  *See* App. Br. at 83-84 (citing *In re Wash. Post Co.*, 807 F.2d 383,

390 (4th Cir. 1986)) (emphasis added). This is true even if the documents were subsequently filed with the Court of Appeals as Excerpts of Record. Including documents in the Excerpts of Record does not make them part of the district court record. *See, e.g.*, *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 593-95 (9th Cir. 2002).

*Second*, the First Amendment does not require unrestricted access to documents filed in civil cases. As the D.C. Circuit has recognized, the public has not historically had unrestricted access to such records and the right of access to such records does not play an essential role in the proper function of the judicial process and the government as a whole. *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1330-40 (D.C. Cir. 1985) (holding that sealing did not violate the First Amendment). Thus, it is well established that courts may seal portions of the record upon a showing of "good cause" or "compelling reasons." The "compelling government interest" test of the First Amendment is inapplicable.

  b.  *Plaintiffs' Request Should Be Denied As To Documents That Are Not Part of the Summary Judgment Record.*

In the Ninth Circuit, if confidential documents were *not* relied upon by one or more of the parties in their summary judgment papers, the district court should seal them if "good cause" justifies their confidential treatment. *Kamakana*, 447 F.3d at 1180 (citing Fed. R. Civ. P. 26(c)). In determining whether "good cause"

exists, courts balance the individual's interest in confidentiality against the public's interest in accessing the information so it can better understand the judicial process and/or significant public events. *Valley Broad. Co. v. U.S. Dist. Ct. for Dist. of Nev.*, 798 F.2d 1289, 1292-94 (9th Cir. 1986). The private interest will usually outweigh the public interest if the "'court files might . . . become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, [or] circulate libelous statements." *Kamakana*, 447 F.3d at 1179 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)).

Here, good cause exists to protect the discovery documents that are not part of the summary judgment record because such documents cannot be considered by this Court[42] and therefore cannot help the public better understand this appeal or the summary judgment proceedings. Moreover, these documents do not relate to "significant public events" as that phrase is used in *Valley Broadcasting*. In contrast to the Watergate scandal at issue in *Warner Communications*, which led to the resignation of the President of the United States in the face of near-certain impeachment, this case involves claims against two civilian employees of the

---

[42] *See, e.g.*, *Barcamerica Int'l USA Trust*, 289 F.3d at 595 (granting motion to strike documents not part of the record on appeal).

Army in western Washington. These are not the kinds of documents in which the public has an inherent right to possess under *Valley Broadcasting*.[43]

While the public does not have a cognizable interest in accessing these documents, Mr. Rudd has cognizable interests in maintaining their confidentiality. These documents all contain confidential information, as described below. Moreover, Mr. Rudd has and continues to receive voluminous threats related to this case. *See supra* p. 38. The risk that these documents will be used for an improper purpose is exceptionally high and outweighs any interest that the public might have in accessing them.

     *c.*     *Mr. Rudd's Redactions to Documents that Are Part of the Summary Judgment Record Should Be Upheld.*

The documents *actually cited* in the parties' summary judgment papers are part of the record on appeal and can be sealed (or redacted) only for "compelling reasons." *Kamakana*, 447 F.3d at 1177-79 (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).

Mr. Rudd redacted the following information: (1) his personal information, including his contact information and social security number; (2) information

---

[43] Even if these discovery documents related to a significant public event—which they do not—there is no reason to believe that they would help the public understand that event any better than would documents in the summary judgment record.

regarding his medical history; and (3) non-factual, evaluative, and disciplinary statements regarding his employment performance. Of these, Plaintiffs concede that Mr. Rudd's contact information, social security number, and medical records can properly be redacted. App. Br. at 86. It is unclear whether they object to his redaction of his salary information or his medical history information. But Plaintiffs object to the redaction of certain Army records and also portions of the 15-6 Report.[44] *Id.* at 87.

Compelling reasons support Mr. Rudd's challenged redactions. ***First***, courts routinely permit redaction of salary information when it is not directly relevant to the litigation. *See, e.g.*, *Lucero v. Sandia Corp.*, 495 Fed. App'x 903, 913-14 (10th Cir. 2012) (sealing portion of joint appendix that disclosed, *inter alia*, salary information); *Adami v. Cardo Windows, Inc.*, 299 F.R.D. 68, 86 (D.N.J. 2014) (recognizing legitimate privacy interest in not having salaries disclosed to public). Mr. Rudd's salary is irrelevant to the issues in this case, as Plaintiffs apparently acknowledge since they have not explained its relevance despite multiple rounds of briefing. ***Second,*** Mr. Rudd's medical history (specifically, a question-and-answer on one page of the 15-6 Investigation Report, which can be found unredacted at ER

---

[44] They also object to the withholding of "Threat Assessments" but Mr. Rudd has removed the "Rudd-Confidential" designation from all such documents that are in the summary judgment record and that Plaintiffs previously requested be unsealed, provided that his contact information is redacted.

2502 and redacted at SER 2316) is properly redacted because that information did not play any role in the district court decision, *see* ER 61-74, and the risk is high that the information (and speculation based on Mr. Rudd's medical history) will be used for an improper purpose such as "gratify[ing] private spite, promot[ing] public scandal, [or] circulat[ing] libelous statements," *Kamakana*, 447 F.3d at 1179.  **Third,** compelling reasons exist to redact portions of emails and the 15-6 Report that go **beyond the facts** and express **opinions** about Mr. Rudd's job performance and what his employer should do in response.  Much like salary information, most people consider performance evaluations and employee discipline to be private matters.  By their nature, they are a source of embarrassment and their release might result in harassment.  *See, e.g.*, *Banks v. Office of Senate Sergeant-at-Arms*, 233 F.R.D. 1, 10-11 (D.D.C. 2005) (requiring redaction of disciplinary material); *Robbins v. Tripp*, 510 B.R. 61, 69 (E.D. Va. 2014) (upholding sealing of report regarding attorney conduct where its release could harm subject's reputation and "would serve no useful purpose other than to embarrass").  Additionally, those opinions (as opposed to the underlying facts) cannot assist the public in understanding these proceedings or the events that led to them.  Accordingly, the public's alleged interest is outweighed by Mr. Rudd's interest, and the redactions should stand.

Plaintiffs take issue with minor redactions to the 15-6 Report.  The only

redactions Mr. Rudd made parts of that Report within the summary judgment

record[45] are (1) information about medical history, ER 2502; SER 2316, and (2)

five lines of text where the investigating officer recommends that discipline be

considered for Messrs. Rudd and Towery for withholding information from

superiors (versus Army investigators) that was potentially relevant to determining

the legality of Towery's activities under DOD regulations and the PCA.  ER 2472-

73; SER 2283-84.  As stated above, Plaintiffs do not object to the first of these.  As

for the second, this minimal redaction does not raise the concerns Plaintiffs

articulate.  The redacted information does not "demonstrate that Rudd and Towery

omitted key facts and evidence from their sworn statements" to investigators.  App.

Br. at 87.  Moreover, Mr. Rudd does not seek to withhold "the Army's internal

plan to address the civilian media and frame their conclusions"—indeed, the

Army's "Public Communication Plan" summarizing the results of the 15-6

Investigation has been released with only minor redactions, all of which were

applied by a non-party, the Army.  SER 318-24.  Accordingly, Plaintiffs' reasons

---

[45] The Opening Brief challenges protective order designations applied to the 15-6
Report generally, but the majority of that report was not part of the summary
judgment record.

for requesting the unredacted 15-6 Report should be rejected and the redactions should stand.

**F.    The District Court Did Not Abuse Its Discretion in Granting Mr. Rudd's Bill of Costs.**

The Federal Rules of Civil Procedure and the Ninth Circuit recognize a presumption that costs should be awarded to the prevailing party in litigation. *Save Our Valley v. Sound Transit*, 335 F.3d 932, 944 (9th Cir. 2003) (quoting Fed. R. Civ. P. 54(d)(1)). That presumption applies in civil rights cases. *Id.* at 944-46 (affirming cost award in civil rights case). The district court may, if appropriate, deviate from that presumption and deny costs, *see, e.g.*, *Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 591-93 (9th Cir. 2000) (affirming denial of costs); *Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co.*, 854 F.2d 219, 222 (7th Cir. 1988) (explaining that presumption in favor of awarding costs is hard to overcome),[46] but the award will not be disturbed unless the district court abused its discretion, *Sec. Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1016 (9th Cir. 1997) (affirming award).

---

[46] Plaintiffs rely on this Seventh Circuit case, but it does not support their position. That court reversed the cost award because the motion to tax costs was untimely under the local rules, 854 F.2d at 222-23, not because of the "losing party's inability to pay," *id.* at 222, as Plaintiffs imply. Indeed, in the absence of the local rule, the Seventh Circuit's logic favors affirmance here.

The Ninth Circuit's decision in *Save Our Valley* illustrates why the district court did not abuse its discretion, making affirmance of the Cost Award proper. There, as here, the court granted summary judgment against the plaintiff and awarded costs to the prevailing defendants in a civil rights case. 335 F.3d at 934-35. There, as here, plaintiff argued that it should not be required to pay because it had "limited resources"; had "raised issues of great public importance, both to the local community and to civil rights plaintiffs everywhere"; and the "legal questions it has raised are close and complex." *Id.* at 946. The Ninth Circuit disagreed, explaining that although "th[o]se factors would have justified the district court's decision to deny costs to the prevailing party, had the district court exercised its discretion in that manner," it was not an abuse of discretion not to do so.[47] *Id.*

Another good example of why there was no abuse of discretion to award costs in this case is *McGill v. Faulkner*, 18 F.3d 456 (7th Cir. 1994). There, the court held that an allegedly indigent prisoner whose civil rights claim failed could be ordered to pay the prevailing defendants' costs. *Id.* at 460. In reaching that conclusion, the court declined to accept the plaintiff's "unsupported, self-serving statements that he was unable to pay the costs," noting the existence of wealthy prisoners. *Id.* at 459. The court also explained that even if the plaintiff had

---

[47] Thus, Plaintiffs' argument that there is substantial authority for denying costs is irrelevant, as are Plaintiffs' cases in which various district courts denied costs.

established he was unable to pay the award, such a showing did "not automatically shield[ him] from the imposition of costs." *Id.* at 458 (citing *Weaver v. Toombs*, 948 F.2d 1004 (6th Cir. 1991)); *see also id.* at 459-60 (explaining why indigent and non-indigent litigants must be treated the same by making both liable for costs) (quoting *Flint v. Haynes*, 651 F.2d 970, 973-74 (4th Cir. 1981)). Finally, the court rejected the suggestion that assessing costs would have a "'chilling effect' on prisoners' civil rights litigation." *Id.* at 460 (citing *Weaver*, 948 F.2d at 1008).

Just as it was not an abuse of discretion to tax costs against the allegedly indigent prisoner in *McGill* or the nonprofit organization in *Save Our Valley*, it was not an abuse of discretion to tax costs against Plaintiffs. Plaintiffs offer three reasons why the Cost Award should be reversed: the "significant public interest" presented by this case, the disparity of economic means between Plaintiffs and Rudd, and the amount of costs awarded. All these arguments fail under controlling authority. **First**, as shown above, this Court rejected the "significant public importance" argument in *Save Our Valley* and should do the same here. **Second**, there is no evidence of disparate economic means. In fact, Plaintiffs do not cite any evidence regarding Mr. Rudd's economic means[48] and the only evidence that

---

[48] Plaintiffs suggest that Mr. Rudd's financial situation is irrelevant because it is "probable" that his litigation expenses have been paid by the U.S. government. But even if the government is paying for his defense, only Mr. Rudd's personal

they offer regarding their own economic situations is their deposition testimony in which they state their current positions and/or employers without providing particulars regarding their income and/or assets. *See* ER 2513 (Berryhill); ER 2556 (Crespo); ER 2625, 2639 (Dunn); ER 2646-47 (Garfield); ER 2662 (Grande); ER 2718 (Panagacos); ER 2734 (Robbins). **Third**, the amount of costs awarded is not as high as Plaintiffs imply. Specifically, the amount of costs awarded to Mr. Rudd is only $2,033.57 per Plaintiff, *see* SER 343, and the total amount awarded to all Defendants is only $5,442.77 per Plaintiff, SER 341, 343, 345, 347—approximately the size of the award in *Save Our Valley*, 335 F.3d at 944 ($5,310.55), and significantly less than the costs awarded in other civil rights cases in the Western District of Washington, *see, e.g.*, *Bichidaritz v. Univ. of Wash.*, No. C10-1371RSL, 2012 WL 3079092, at *1 (W.D. Wash. July 27, 2012) ($13,613.96).

---

financial situation is relevant. *See, e.g.*, *Ruff v. Cty. of Kings*, 700 F. Supp. 2d 1225, 1245 (E.D. Cal. 2010) (citing *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 639 (11th Cir. 1991); *Safway Rental & Sales Co. v. Albina Engine & Mach. Works, Inc.*, 343 F.2d 129, 135 (10th Cir. 1965)). As such, Rudd is not—and never has been—required to divulge any arrangement he might have with the U.S. government to pay his litigation expenses.

### G. Plaintiffs Waived Their Challenge to the District Court's Denial of Their Motion to Compel (SER 1780-81).

At the end of their brief, s*ee* App. Br. at 94, embedded in their challenge to the cost awards, Plaintiffs include a one-sentence request—with only cursory argument and without any citation to legal authority—that this Court should reverse the district court's order denying their motion to compel Mr. Rudd to respond to discovery. SER 1780-81. Plaintiffs' request has been waived twice over. First, they did not include that order in either of their Notices of Appeal, which means it is not properly before this Court. *See* Fed. R. App. P. 3(c)(1)(B) ("The notice of appeal must . . . designate the judgment, order, or part thereof being appealed . . . .").[49] Second, Plaintiffs fail to offer any substantive argument or legal authority for their position. *See, e.g.*, *Autotel v. Nev. Bell Tel. Co.*, 697 F.3d 846, 857 n.9 (9th Cir. 2012) ("[T]he conclusory statement in [Autotel's] opening brief, unaccompanied by argument or citation to the record, is insufficient to preserve the issue for appeal, and we do not address it.").

---

[49] This case is distinguishable from cases such as *Lolli v. Cty. of Orange*, 351 F.3d 410, 414 (9th Cir. 2003), in which this Court held that mistakenly appealing only a denial of reconsideration does not necessarily waive an appeal of the underlying order the district court declined to reconsider. While the intent to appeal a summary judgment order can be fairly inferred from appeal of an order denying a motion for reconsideration, the intent to appeal a discovery order cannot be fairly inferred from a notice of appeal of an order granting summary judgment.

But even if Plaintiffs' request was properly before this Court, it should be denied. A district court's denial of a motion to compel is reviewed for abuse of discretion. *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002). The district court properly determined that Mr. Rudd could not be compelled to organize the Army's document production and that Mr. Rudd need not respond to the excessive number of interrogatories Plaintiffs propounded. Although Plaintiffs summarily claim that these orders "prejudic[ed their] ability to argue this case," App. Br. at 94, *they have not even attempted to show any actual and substantial prejudice*, *see Hallett*, 296 F.3d at 751 (affirming denial of motion to compel where plaintiffs suffered no prejudice from denial). The district court did not abuse its discretion, and if this Court addresses the issue, it should affirm the district court's order.

## H.    If Any Part of this Case Is Remanded, It Should Remain With Judge Leighton.

Sprinkled throughout their Brief is Plaintiffs' legally unsupported assertion that this case should be reassigned to another judge on remand because Judge Leighton has "demonstrated unwillingness to review all evidence and make a proper and fully informed decision." App. Br. at 2, 94. Judge Leighton has done no such thing. Even if he had, Plaintiffs have not met their burden and their request for a new judge should be denied.

Plaintiffs' burden on this issue is a heavy one. They must show either (1) that the district court judge has exhibited personal bias against them[50] or (2) that "unusual circumstances" warrant reassignment. *See, e.g.*, *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1118 (9th Cir. 2001) (declining to reassign case). For purposes of this analysis, "unusual circumstances" means (1) "the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected"; (2) "reassignment is advisable to preserve the appearance of justice"; or (3) "reassignment would [not] entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.* at 1118-19 (citation omitted). "[A] finding of either [of the first two factors] would support" reassignment on remand. *California v. Montrose Chem. Corp. of Cal.*, 104 F.3d 1507, 1521 (9th Cir. 1997) (declining to reassign case). In the absence of either of those factors, the decision must be based on a weighing of judicial resources against the

---

[50] Bias against a party's attorney—even if shown—is irrelevant. *Cintron v. Union Pac. R.R. Co.*, 813 F.2d 917, 921 (9th Cir. 1987) (declining to reassign case). Nor do expressions of impatience, annoyance, or anger establish bias. *See Liteky v. United States*, 510 U.S. 540, 555-56 (1994) (holding that disqualification was not required and rejecting argument that "the questions [the judge] put to certain witnesses, his alleged 'anti-defendant tone,' his cutting off of testimony said to be relevant to defendants' state of mind, and his post-trial refusal to allow petitioners to appeal *in forma pauperis*" was evidence of bias).

appearance of fairness. *See Medrano v. City of L.A.*, 973 F.2d 1499, 1508 (9th Cir. 1992) (denying reassignment where reassignment "would entail a significant amount of waste and duplication").

Plaintiffs cannot satisfy any of these requirements. They have not argued bias, and thus their request must be justified by "unusual circumstances." *Cintron v. Union Pac. R.R. Co.*, 813 F.2d 917, 921 (9th Cir. 1987) (declining reassignment). But there is absolutely no basis for concluding that Judge Leighton will have substantial difficulty in disregarding his previously expressed views or findings. Indeed, Judge Leighton has gone out of his way to accommodate Plaintiffs by, for example, granting them numerous extensions[51] and expressing his sympathy for Plaintiffs and his "concern about the military apparatus involving itself in civil life on the mainland." ER 143. Nor can it be said—particularly in light of the statement quoted in the preceding sentence—that remand to a different judge would "preserve the appearance of justice." *See Montrose Chem.*, 104 F.3d at 1521 (explaining that Ninth Circuit has "reassigned cases based upon the 'appearance of justice' in few situations") (citations omitted).

Because Plaintiffs are unable to establish either of the first two requirements for "unusual circumstances" their request for reassignment must be denied unless

---

[51] *See, e.g.*, ER 27 (granting extension), 38 (same), 47 (same), 49 (same).

"reassignment would [not] entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *United Nat'l Ins. Co.*, 242 F.3d at 1118-19.  As demonstrated in the previous paragraph, reassignment would result in (at most) a miniscule gain in the appearance of fairness.  At the same time, it would cause significant waste and duplication of judicial efforts.  This case has been pending for approximately five years and has been actively litigated by the parties.  The district court docket consists of more than 400 entries.  The substantial effort that a new judge would have to expend to come up-to-speed in this case cannot be outweighed by any minimal gain in preserving the appearance of fairness.  *See Medrano*, 973 F.2d at 1508 (third factor heavily favored remand to same judge because he was "already familiar with the issues and theories . . . in this case").  Accordingly, if this Court were to remand any part of this case for further proceedings, it should remand it to Judge Leighton.

## CONCLUSION

Mr. Rudd respectfully requests that this Court affirm the district court's SJ Order dismissing this case because there is no evidence to support a reasonable jury in concluding that Mr. Rudd is liable for the violation of Plaintiffs' First or Fourth Amendment rights.  Mr. Rudd also asks that this Court affirm the Cost Award because it was not an abuse of discretion to abide by the general presumption and grant costs to the prevailing party in this case.  Finally, Mr. Rudd

asks that this Court deny Plaintiffs' other requests, all of which are waived or unjustified.

## STATEMENT OF RELATED CASES

Appellee Mr. Rudd is unaware of any related cases which may be pending before this Court.

DATED this 20th day of November, 2015.

Respectfully submitted,

K&L GATES LLP

By:   s/ Theodore J. Angelis
  Theodore J. Angelis, WSBA No. 30300
  Pallavi Mehta Wahi, WSBA No. 32799
  Heidi Craig Garcia, WSBA No. 41399
  Peter A. Talevich, WSBA No. 42644
925 Fourth Avenue, Suite 2900
Seattle, WA  98104
Telephone: 206-623-7580
Facsimile:  206-623-7022
Email:  theo.angelis@klgates.com
  pallavi.wahi@klgates.com
  heidi.garcia@klgates.com
  peter.talevich@klgates.com

Attorneys for Appellee/Defendant
Thomas Rudd

# CERTIFICATE OF COMPLIANCE
## PURSUANT TO CIRCUIT RULE 32-1

**CASE NUMBER 14-35598, 14-35816**


Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-4(1), I certify that the answering brief is proportionately spaced, has a typeface of 14 points or more and contains 20,487 words.


11/20/15 _____               _____ s/  Theodore J. Angelis _____
Date                                             Signature of Filing Party

CERTIFICATE OF SERVICE

U.S. Court of Appeals Docket No.    14-35598, 14-35816

I hereby certify that I arranged for the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 20, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


Signature:    s/ Theodore J. Angelis